**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
WICHITA DIVISION**

MARQUAN TEETZ, as Next Friend and
Personal Representative of the
ESTATE OF CEDRIC LOFTON,
deceased,

        Plaintiff,

    v.

SEDGWICK COUNTY, KANSAS;
JASON STEPIEN; BRENTON NEWBY;
KAREN CONKLIN; BILLY BUCKNER;
BENNY MENDOZA; CITY OF WICHITA,
KANSAS; and JOHN DOE WICHITA
POLICE DEPARTMENT OFFICERS 1-10,

        Defendants.

<u>**DEMAND FOR JURY TRIAL**</u>

---

## COMPLAINT

---

      Plaintiff Marquan Teetz, as Next Friend and Personal Representative of the Estate of Cedric Lofton, deceased, by and through his attorneys, Action Injury Law Group, LLC, Hart McLaughlin & Eldridge, LLC, and Ben Stelter-Embry, complains as follows against Defendants Sedgwick County, Kansas; Sedgwick County Juvenile Intake and Assessment Center officers Jason Stepien; Brenton Newby; Karen Conklin; Billy Buckner; and Benny Mendoza; City of Wichita, Kansas; and John Doe Wichita Police Department ("WPD") Officers 1-10:

**OVERVIEW OF THE ACTION**

1.        The Black child photographed below, 17-year-old Cedric Lofton, is dead because of the actions, inaction, conscious disregard, willful and wanton, and depraved behavior of officers in Sedgwick County and the Wichita Police Department. This is a civil rights action to recover for Cedric's tragic, unnecessary, and untimely death.



2.      In the early morning hours of September 24, 2021, Cedric returned to his foster home after leaving without notice a day earlier. Cedric's grandmother had recently passed away and upon Cedric's return, his foster father was concerned about Cedric's mental health.

3.      Seeking guidance with concern, Cedric's foster father called the Kansas Department of Children and Families ("DCF"). DCF told him to call the police and to not let Cedric in the home. The purpose of this instruction was to obtain a mental health evaluation and treatment for Cedric. This is why the Wichita police were called. Cedric had committed no crime; he was a child returning innocently home.

4.      WPD officers arrived and encountered Cedric outside his foster home. Cedric was tired and afraid. He showed no signs of violence and presented no harm or danger. It was immediately clear that he was experiencing a mental health crisis, telling WPD officers that he was worried people were trying to "kill" him and that all he wanted to do was to go inside his home and go to sleep. Cedric asked the officers, "Y'all are here to protect me, right?"

5.      This foster child needed help. But rather than provide it, WPD officers physically confronted him, unnecessarily escalated a benign scenario, arrested him, and entombed him in a WRAP restraint system — effectively a full-body straitjacket. The use of the WRAP predictably and inexcusably exacerbated Cedric's fear and paranoia.

6.      Worse, WPD did not then take Cedric to a hospital for mental health evaluation and treatment. Instead, they brought him to Sedgwick County's Juvenile Intake and Assessment Center ("JIAC")—a kind of juvenile detention—and locked him in a holding room still in the WRAP restraint. In other words, even though the entire point of WPD's involvement was to get Cedric help and even though he had committed no crime, WPD refused to obtain help and treated Cedric like a violent criminal. This despite the fact that one officer admitted: "For me, I think we should have taken [Cedric] to [the hospital at] St. Joe [for treatment]."

7.      Worse still, when confronted with JIAC's intake questioning about whether Cedric required medical treatment, WPD *intentionally* falsified their response and swore that he needed no such treatment, knowing that was exactly what was needed and required. Indeed, a JIAC intake officer witnessed a WPD officer change his response to the intake form when he learned it would trigger WPD's obligation to transport Cedric for treatment. As such, the officer prioritized his own convenience at the expense of this child's welfare. And JIAC officials knowingly permitted it.

8.      Within a few hours, Cedric was dead. Following a brief altercation, Cedric died after several JIAC officers forced him to the floor in the prone position and pinned him on his stomach ***for 39 uninterrupted minutes*** until he stopped breathing. The smiling child photographed above was condemned to die hooked to life-supporting tubes in a hospital bed, shown here:



9. Cedric posed no threat to anyone — not least of which the five able-bodied, adult officers who cycled-in and out of the room during Cedric's slow death. These JIAC officers perpetrated a prolonged and abhorrent case of excessive force on a 135-pound, shoeless, shackled, and unarmed juvenile in the obvious throes of a mental health crisis.

10. Months later, the Sedgwick County medical examiner determined that Cedric was killed as a result of this incident and concluded that Cedric's death was a "homicide."

11. Tragically, Cedric's death was presaged by a 2016 Kansas Department of Corrections inspection of JIAC. In a report memorializing that inspection, KDOC noted systemic deficiencies at JIAC, including its inability to handle children with mental health issues, its need for training on de-escalation techniques and management of risk, and its need for assistance in dealing with a Wichita Police Department who too often dropped juveniles at JIAC's door as a form of punishment while refusing any obligation to transport such juveniles for mental health treatment. JIAC did nothing to address those deficiencies. Neither did the Wichita Police Department. For these reasons, Sedgwick County's and the City of Wichita's policies and procedures, as well as their failure to train their personnel, are responsible for Cedric's death as well.

12. There is nothing to suggest those agencies will change now. Cedric had not been dead long when Sedgwick County leadership made false statements and publicly painted this foster child as someone to be feared. At a September 30, 2021, press conference, three days after Cedric was pronounced dead, Sedgwick County Sheriff Jeff Easter emphasized the possibility of serious drug use by Cedric. "There is information that we have that Mr. Lofton may have ingested some illegal narcotics," he said. That was false, as Cedric's toxicology report later showed.

13. Still further, on December 29, 2021, as soon as the medical examiner concluded Cedric's cause of death was homicide at the hands of JIAC personnel, District Attorney Bennett

gratuitously assured the public that the medical examiner's conclusion of homicide did "not reflect a legal determination" and therefore did not mean that JIAC officers were criminally liable.

14. As expected, just a few weeks later, on January 19, 2022, District Attorney Bennett announced that he would not charge any of the JIAC officers criminally in connection with Cedric's death. District Attorney Bennett — in a fantasy-riddled alternative narrative — relied upon Kansas' "Stand-Your-Ground" law as preventing him from pursuing charges. Such a justification was, at best, a misreading of the law and, at worst, a dereliction of duty – an excuse for not doing his job and charging the criminally culpable. Kansas law in no way immunizes or absolves the JIAC officers of criminal liability, let alone the lesser civil liability standard at issue here, where JIAC officers used prolonged deadly force on a shoeless, shackled, and unarmed 135-pound teenager until he could no longer breathe and died.

15. The local government's intransigence in the face of this tragedy is perhaps best encapsulated in the words of Sedgwick County Manager Tom Stolz, who long before District Attorney Bennett announced his charging decision, told his corrections division leaders that he "hope[d] our employees on admin[istrative] leave [while Cedric's death was still being investigated] knows their leave is a formality and that we will vigorously defend them in this matter."

16. Now, Cedric's brother and best friend, Marquan Teetz, brings this action to illuminate the truth and obtain some measure of justice for Cedric's death.

## JURISDICTION AND VENUE

17. The Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 in that claims in this action arise under the United States Constitution.

18. The Court has personal jurisdiction over Defendants because they reside in the State of Kansas, in or near Wichita, and because their conduct described herein occurred exclusively in Wichita, Kansas.

19.     Venue is proper in this Court because Cedric Lofton's injuries and damage occurred in Wichita, in the District of Kansas, Defendants reside and conduct business in Wichita, in the District of Kansas, and virtually all of the occurrences described herein occurred in Wichita, in the District of Kansas.

**THE PARTIES**

20.     Plaintiff Marquan Teetz is a resident of the State of Kansas. Mr. Teetz was the brother and best friend of Cedric Lofton. On February 28, 2022, Mr. Teetz was appointed personal representative of the Estate of Cedric Lofton in the Sedgwick County, Kansas, District Court, Case No. 2022-PR-000255-DE, in order to pursue this action.

21.     Sedgwick County is a county in the State of Kansas in which the City of Wichita sits. Sedgwick County is responsible for operation of the Department of Corrections, including the Juvenile Services Division which operates the Juvenile Intake and Assessment Center ("JIAC") where Cedric Lofton was killed.

22.     Jason Stepien is an employee of Sedgwick County. On September 24, 2021, he was working at JIAC when he unlawfully and excessively restrained Cedric Lofton resulting in Cedric's death and/or failed to intervene in such restraint resulting in Cedric's death.

23.     Brenton Newby is an employee of Sedgwick County. On September 24, 2021, he was working at JIAC when he unlawfully and excessively restrained Cedric Lofton resulting in Cedric's death and/or failed to intervene in such restraint resulting in Cedric's death.

24.     Karen Conklin is an employee of Sedgwick County. On September 24, 2021, she was working at JIAC when she unlawfully and excessively restrained Cedric Lofton and/or failed to intervene in such restraint resulting in Cedric's death.

25.     Billy Buckner is an employee of Sedgwick County. On September 24, 2021, he was working at JIAC when he unlawfully and excessively restrained Cedric Lofton and/or failed to intervene in such restraint resulting in Cedric's death.

26.     Benny Mendoza is an employee of Sedgwick County. On September 24, 2021, he was working at JIAC when he unlawfully and excessively restrained Cedric Lofton and/or failed to intervene in such restraint resulting in Cedric's death.

27.     The City of Wichita is a municipal corporation in Sedgwick County, Kansas. At all relevant times, it was responsible for the acts of the Wichita Police Department and its officers.

28.     John Doe Wichita Police Officers 1-10 are police officers with the Wichita Police Department who responded to a call for service relating to Cedric Lofton on the evening of September 24, 2021, and who ultimately arrested Cedric Lofton and transported him to JIAC later that evening. Plaintiff is unable to name these WPD officers at this time because the City of Wichita has repeatedly refused to identify them, including in response to Plaintiff's pre-suit requests under the Kansas Open Records Act, K.S. § 45-201 *et seq*. Upon obtaining their identities in this litigation, Plaintiff will amend the Complaint to name them as Defendants. Defendants City of Wichita and Sedgwick County are aware of the officers intended to be named here, as are the officers themselves.

## FACTS APPLICABLE TO ALL COUNTS

### *WPD officers confront and arrest 17-year-old Cedric Lofton outside his home*

29.     In the early morning hours of September 24, 2021, Cedric Lofton was a 17-year-old foster child in Wichita, Kansas. He was just returning home after having left without announcement for a period of roughly 24 hours.

30.     Upon his return, Cedric's foster father was concerned. Cedric's grandmother, with whom Cedric had been close, had just died and Cedric was showing signs of sadness, confusion, and paranoia.

31.     Cedric's foster father called the Kansas Department of Children and Families ("DCF") and asked what to do. DCF told him not to let Cedric inside his home and to call the police. The purpose was to obtain a mental health evaluation and treatment for Cedric. Cedric's foster father did as he was told and called WPD.

32.     WPD officers arrived and found Cedric standing outside his home. It was immediately clear that Cedric was tired, fearful, and just wanted to go inside and sleep. He was non-combative. Police instructed Cedric that he needed to come with them anyway.

33.     Cedric told the officers he just wanted to go inside his home. Cedric spoke to them about seeing people (who were not there) and about how he feared people were trying to kill him. All signs were that Cedric was a child in distress, experiencing a mental health crisis. This was obvious to anyone, let alone police officers who should have been trained to recognize and address such issues.

34.     For a period, two WPD officers spoke with Cedric and tried to have him come with them willingly. Throughout this time, Cedric did not present a threat to anyone, including the officers. At no time, however, did the officers seek the counsel or assistance of mental health professionals to address Cedric's obvious mental health episode or engage the assistance of Cedric's foster father.

35.     On information and belief, no officer with Crisis Intervention Team (CIT) training was present at, or called to, Cedric's home. *See* WPD Policy No. 519.

36.     Eventually officers grew impatient and moved to take Cedric by force, depicted below.



37. As Cedric shrieked in fear and cried for help, officers quickly controlled and handcuffed him in his front yard.

### *WPD officers confine Cedric in the "WRAP" restraint system*

38. After he was handcuffed, officers decided to confine Cedric in a full-body WRAP restraint prior to transporting him elsewhere.

39. On information and belief, the supervising officer on-scene made the decision to mummify this frightened, 17-year-old foster child in the WRAP outside his home.

40. The WRAP is a full-body restraint mechanism, not unlike a straitjacket for the whole body. Still images of Cedric in the WRAP are reproduced in paragraphs further below.

41. Policy 915 of the Wichita Police Department Policy Manual governs officers' use of the WRAP. That policy provides part that:

     a. The purpose of the WRAP is to "control[] and immobiliz[e] a violent or potentially violent/combative subject who has been detained or taken into custody."

     b. The WRAP "should be utilized only when less restrictive alternatives would be ineffective in controlling the disorderly behavior" purportedly justifying its use in the first place and "for only the amount of time absolutely necessary."

42. The policy specifically identifies concerns with respect to using the WRAP in instances of mental health crises. *See* Policy No. 915.III.C.2 ("For mental health patients, a mental health consultation shall be secured as soon as possible to assess the need for mental health treatment. A subject should not remain in the WRAP Restraint System at a medical facility for more than 30-minutes.").

43. Due to the extreme nature of the WRAP, one federal judge likened its use to torture when forced improperly on juveniles. *C.P.X. through S.P.X. v. Garcia*, 450 F.Supp.3d 854, 914-95 (S.D. Iowa 2020).

44.     Despite the extremity of the WRAP and its easily anticipated effect on a 17-year-old in mental health crisis, several WPD officers forced Cedric into the WRAP on the front lawn of his home.

45.     Cedric continued to look confused and afraid as they did. He continued to shriek aloud in fear. The use of the WRAP only worsened the mental health crisis he was experiencing.

46.     Depicted here is an image of Cedric as the officers confined him in the WRAP.



47.     Use of the WRAP was unnecessary and unjustified in Cedric's case. WPD officers violated WRAP policy when they forced it on Cedric.

*Rather than transport Cedric to a hospital, WPD officers take Cedric to juvenile detention and lie about Cedric's need for a mental health evaluation during intake*

48.     While still in the WRAP, Cedric was carried by several WPD officers into a police car for transport to JIAC.

49.     It remained obvious that Cedric should have been transported immediately to a hospital for mental health evaluation and treatment.

50.     Nonetheless, and in total disregard for Cedric's health and welfare, WPD officers chose to take Cedric to the Juvenile Intake and Assessment Center in Wichita, Kansas.

51.     Upon arrival WPD officers carried Cedric into JIAC like a duffel bag, as the WRAP necessitates. Cedric was placed in a locked holding room, still in the WRAP, while several officers milled about outside the room.



52.     JIAC is part of the Juvenile Services Division of the Sedgwick County Department of Corrections. It describes its mission as "[t]o connect referred youth and their families with appropriate services in order to limit their involvement with the juvenile justice system." Notably, JIAC says nothing about its capacity to assist children in a mental health crisis.

53.     As a part of intake at JIAC, both JIAC employees and WPD officers (again) had an opportunity to obtain mental health care for Cedric. However, WPD officer(s) falsified answers during

intake to avoid transferring Cedric to a hospital. Indeed, as recently testified at a Sedgwick County public hearing by the JIAC official who oversaw juvenile admissions that evening, a WPD officer initially reported to JIAC that Cedric Lofton was exhibiting signs requiring immediate medical (mental health) attention. However, when the officer learned that such a response would require that WPD transport Cedric to the hospital, the officer changed his answer. In other words, WPD officers prioritized their convenience over this child's health and welfare, and ignored their sworn duty.

54.     JIAC officers knew WPD's response was false. Nonetheless, JIAC officers—as well as fellow WPD officers—did nothing in response to this unconscionable about-face and misrepresentation on the issue of Cedric's needing medical attention. Accordingly, Cedric remained at the detention center rather than receive the medical evaluation and treatment he needed.

55.     WPD's intentional misrepresentation was a knowing violation of law. When a law enforcement officer delivers a juvenile to an intake and assessment worker, that officer has a duty to furnish the intake and assessment worker "with all of the information in the officer's possession pertaining to the juvenile, the juvenile's parent or other persons interested in or likely to be interested in the juvenile and all other facts and circumstances which caused the juvenile to be arrested or taken into custody." K.S.A. (2019 Supp.) 38-2330(c)(3).

*After Cedric is allowed to walk around JIAC freely,*
*an altercation with JIAC officers ensues after one officer pushes Cedric*

56.     After a period, Cedric was let out of the WRAP restraint in the holding cell.

57.     After a further period, Cedric was let out of his holding cell by JIAC officer Jason Stepien and allowed to walk around the intake room freely.

58.     During this time, Cedric tried to approach the intake booths at JIAC and officer Jason Stepien signaled for Cedric to move away.

59.     After Cedric continued to try to approach the intake booths again, Mr. Stepien escalated the situation by pushing Cedric toward a far wall as depicted below. Mr. Stepien did so

unnecessarily, aggressively, and without justification. Before this point, there was no physical altercation between Cedric and staff. Mr. Stepien was the first to use physical force.

60.     Immediately, both officer Stepien and another JIAC officer, Brenton Newby, grabbed Cedric and held him. They did so not in self-defense or standing their ground.

61.     Unsurprisingly, matters escalated, with Cedric defending himself and in turn officer Stepien and officer Newby repeatedly striking and attempting to tackle Cedric to the ground. This appears to have been intentional to avoid clear video evidence of their excessive force.

62.     Ultimately, Cedric was dragged by Mr. Stepien and Mr. Newby into another holding cell wherein Sedgwick County claims there are no cameras.

### *JIAC officers pin Cedric to the ground, in the prone position on his stomach, for 39 uninterrupted minutes until after he stops breathing*

63.     Officers Stepien and Newby were large, strong, and physically capable adult men. Using their strength and superior physical stature, they pushed the 135-pound, shoeless, unarmed, and t-shirt-clad juvenile to the back of the intake room into another holding room. The time was 4:27 a.m.

64.     Within a minute or two, by 4:29 a.m., they had Cedric pinned on a bench and had his legs shackled.

65.     Within a few minutes after that, by 4:33 a.m., they had taken Cedric to the ground of the holding room and pinned him there onto his stomach in the prone position.

66.     Officers Stepien and Newby continued to pin Cedric in the prone position on the ground of the holding cell. Other JIAC officers, including Karen Conklin, Billy Buckner, and Benny Mendoza, came to the holding room as well. At various points, no fewer than five officers cycled in and out of the room, taking turns (in tandem) pinning Cedric to the ground or, at a minimum, refusing to do anything while their fellow officers pinned him to the ground. The officers forced him in the prone position, on his stomach, throughout this time. An image from the officers' long and disturbing

attack is included below. All of these aggressive physical maneuvers were unnecessary and directly led to Cedric's death.



67.     The officers subsequently handcuffed Cedric while continuing to pin him in the prone position. Positioning Cedric in this way inappropriately put his life at risk.

68.     Yet, the officers continued to pin Cedric in the prone position until 5:12 a.m., for a total of 39 uninterrupted minutes without reprieve. At this point, Cedric had stopped breathing for some time. On information and belief, JIAC officers knew or should have known that Cedric had stopped breathing or had been struggling to breathe for several minutes. In statements, JIAC officers have stated that he began "snoring" for a time at or before 5:08 a.m. — falsely suggesting, it seems, that they believed they had somehow lulled him to sleep. The suggestion is fantastical and callous. They knew, or should have known had they exercised any care, that Cedric was dying, not falling asleep.

69.     Officers did not roll Cedric onto his back until 5:13 a.m. and finally began attempting emergency resuscitation efforts. Too much time had passed, and it was too late.

70.     At no point during their 39-minute pinning of Cedric did they attempt to sit him upright or otherwise put him in a position of safety. This is despite the fact that they had five officers in the room, leg shackles applied by 4:29 a.m., and handcuffs subsequently applied. This is despite the fact that he posed no threat to this group of adult officers at any time.

71. At no time prior to his death were any of the JIAC officers in reasonable fear of death or serious bodily injury from Cedric. At the time they were purportedly "standing their ground," they were simply imposing their will on Cedric.

72. Officers' emergency resuscitation efforts were too little, too late. Emergency services finally arrived at 5:19 a.m. and after their own failed attempts at resuscitation, transported Cedric to Wesley Medical Center, where he lay on life support until he was pronounced dead on September 26, 2021.

### The Sedgwick County medical examiner rules Cedric's cause of death as homicide after extended restraint in the prone position

73. Sedgwick County's Chief Medical Examiner performed an autopsy on Cedric's body and a toxicology report using Cedric's blood.

74. The Medical Examiner determined that Cedric died due to "complications of cardiopulmonary arrest sustained after physical struggle while restrained in the prone position." The medical examiner determined the cause of death as "homicide." The medical examiner found that drugs played no role in Cedric's death.

### JIAC officers knew that they were using lethal force in pinning this 135-pound Black juvenile to the ground in the prone position

75. JIAC officers knew that pinning Cedric to the ground in the prone position could kill him, or it should have been known to JIAC officers with proper training. In either case, JIAC officers knew or should have known they were killing him as he struggled to breathe.

76. The Tenth Circuit has long recognized that it is "clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." *Weigel v. Broad*, 544 F.3d 1143, 1155 (10th Cir. 2008).

77.     Even without such training, the excessiveness of the officers' force would have been obvious to any reasonable officer given the surrounding circumstances.

78.     The Sedgwick County Department of Corrections Policy and Procedures Manual sets forth JIAC's written use of force policy (Policy No. 8.810).

79.     The policy states in pertinent part that:

a.  "JIAC staff shall use force only when all other less restrictive methods of behavior control have been attempted and failed, to protect the youth from injury, to prevent injury to others or to prevent escape."

b.  "The type and amount of force or restraint used shall only be to the extent reasonable and necessary to control a situation."

c.  "The use of force or restraints may be used only as a temporary control measure:

i.   To protect staff or others – justifiable self-defense.

ii.  To protect the youth from self-injury.

iii. To prevent escape from the facility.

iv.  To recover security devices.

v.   As a precaution against escape including preventing youth from pressing door access control systems.

vi.  To move youth who fail to comply with lawful orders.

vii. To prevent escalation of a dangerous situation after less restrictive methods have been attempted and failed.

d.  "Force and/or restraints SHALL NEVER be used under any circumstances for the purposes of punishment or discipline."

80.     Further, the Policy Manual dictates that all staff have a duty to intervene when "present and observing another staff using force that is clearly beyond what is approved or needed in the situation . . . to prevent any harm to a client. Staff shall [v]erbally intervene; and/or [p]hysically intervene; and, immediately report all observations through the chain of command." They did none of the foregoing, despite the fact that it was clearly and unambiguously necessary to protect Cedric.

81.     The Policy Manual also dictates that "[a]ny time a youth is injured in an accident involving use of force, he/she shall receive immediate medical attention."

82.     JIAC officers Jason Stepien, Brenton Newby, Karen Conklin, Billy Buckner, and Benny Mendoza violated JIAC's written use of force policies with respect to Cedric Lofton, resulting in his death. Their violations included but were not limited to: using such force when lesser forms of force would have accomplished their goal; using such force after Cedric Lofton no longer presented any kind of threat; using such force when no reasonable officer would have been in fear of their or others' safety; failing to intervene when they witnessed fellow officers using such excessive force; and failing to immediately render aid when Cedric was having trouble breathing.

83.     In the alternative, and to the extent JIAC's written policies authorize these Defendants' use of force on Cedric Lofton, JIAC's use of force policy is unconstitutional and resulted in Cedric Lofton's death.

***JIAC's and WPD's failures with respect to handling and de-escalating juveniles
with mental health issues were identified and documented long before Cedric Lofton's death***

84.     Sedgwick County had long known that JIAC was incapable of handling the children admitted into its care due, at a minimum, based on an inspection performed by the Kansas Department of Corrections in 2016.

85.     Specifically, on March 9, 2016, the Kansas Department of Corrections inspected JIAC and prepared a formal report. The report included several observations and recommendations that, unaddressed, presaged the death of Cedric Lofton:

      a.     <u>JIAC was ill-equipped to handle children with mental health issues</u>: The report noted that JIAC was receiving too many juveniles with mental health issues and acknowledged that JIAC was not the proper place for such children both because JIAC lacked the capacity to handle them and because JIAC's community mental health partners, including COMCARE and St. Francis, were not responsive. As a result, the report specifically stated that JIAC needed "[s]upport in providing timelier response for [mental health] cases."

b. <u>JIAC needed training on de-escalation techniques</u>: JIAC acknowledged that it needed training to address common issues of juveniles in its custody, including mental health issues, and specifically identified training on "staff management of risk," "de-escalation techniques," and "responding to trauma" as major needs.

c. <u>WPD exacerbated JIAC's problems</u>: The report explicitly admonished WPD for leaving mental health cases at JIAC as a form of punishment and refusing to provide transportation of youths to hospitals for medical evaluation. Specifically, WPD was noted to have "a tendency to sign paperwork and leave the juvenile quickly" and when "there is a need for transportation [to a medical facility, WPD [regularly] advise[d] it is the Sedgwick County Sheriff's responsibility" to handle such transport. The report also noted the tendency of WPD to improperly "us[e] detention [at JIAC] to punish youth."

86.     In the five and a half years after publication of this report, before Cedric Lofton first came into the custody of JIAC, JIAC failed to address or remedy any of these deficiencies, including by failing to train its personnel in appropriate identification of risk, risk management, de-escalation, and use of force. Further, JIAC failed to address the WPD's longstanding problem of using JIAC to punish juveniles with mental health issues rather than obtain, or aid in obtaining, mental health treatment. Further, JIAC itself failed to address it inability to recognize and obtain medical care in the event of mental health crises. These failures made Cedric's death not only foreseeable but predictable.

87.     The consequences of these known and longstanding failures also caused Cedric Lofton's tragic and untimely death.

## CLAIMS

### <u>Count 1</u>
### 42 U.S.C. § 1983 – Excessive Force
### (Against Jason Stepien)

88.     Plaintiff incorporates the allegations in paragraphs 1 through 87 as if fully restated here.

89.     The conduct of Mr. Stepien constituted excessive force in violation of the U.S. Constitution.

90.     At all material times, Mr. Stepien was acting under the color of state law as an agent and employee of Sedgwick County.

91.     At all material times, Mr. Stepien was wearing his official Sedgwick County uniform and was acting in the course and scope of his duties as a Sedgwick County employee at the time he restrained and killed Cedric Lofton.

92.     At all material times, Mr. Stepien had no reason to believe that he was in imminent danger or fear of imminent bodily harm from Cedric Lofton or for any other reason.

93.     Every reasonable officer would have known that using deadly force on Cedric Lofton constitutes excessive force in violation of the U.S. Constitution.

94.     Further, every reasonable officer would have known that failing to render emergency aid to someone who poses no threat of harm and on whom the officer used lethal force violates the U.S. Constitution.

95.     Mr. Stepien's conduct was objectively unreasonable.

96.     As a result of Mr. Stepien's excessive and unjustified use of force, Cedric Lofton experienced severe pain and suffering and emotional distress and died.

97.     As a direct and proximate result of these wrongful acts and omissions, Cedric Lofton's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of kinship, aid, counsel, guidance, advice, assistance, and protection and support.

98.     The acts and omissions of Mr. Stepien were intentional, wanton, malicious, reckless, oppressive, and/or showed callous indifference to the federally protected rights of Cedric Lofton.

WHEREFORE, Plaintiff Marquan Teetz, as Next Friend and Personal Representative of the Estate of Cedric Lofton, deceased, demands judgment against Defendant Jason Stepien for compensatory and punitive damages, costs, disbursements, attorney's fees, interest and for any other relief that the Court deems fair and just.

## Count 2
## 42 U.S.C. § 1983 – Excessive Force
## (Against Brenton Newby)

99.     Plaintiff incorporates the allegations in paragraphs 1 through 87 as if fully restated here.

100.    The conduct of Mr. Newby constituted excessive force in violation of the U.S. Constitution.

101.    At all material times, Mr. Newby was acting under the color of state law as an agent and employee of Sedgwick County.

102.    At all material times, Mr. Newby was wearing his official Sedgwick County uniform and was acting in the course and scope of his duties as a Sedgwick County employee at the time he restrained and killed Cedric Lofton.

103.    At all material times, Mr. Newby had no reason to believe that he was in imminent danger or fear of imminent bodily harm from Cedric Lofton or for any other reason.

104.    Every reasonable officer would have known that using deadly force on Cedric Lofton constitutes excessive force in violation of the U.S. Constitution.

105.    Further, every reasonable officer would have known that failing to render emergency aid to someone who poses no threat of harm and on whom the officer used lethal force violates the U.S. Constitution.

106.    Mr. Newby's conduct was objectively unreasonable.

107.    As a result of Mr. Newby's excessive and unjustified use of force, Cedric Lofton experienced severe pain and suffering and emotional distress and died.

108.    As a direct and proximate result of these wrongful acts and omissions, Cedric Lofton's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of kinship, aid, counsel, guidance, advice, assistance, and protection and support.

109. The acts and omissions of Mr. Newby were intentional, wanton, malicious, reckless, oppressive, and/or showed callous indifference to the federally protected rights of Cedric Lofton.

WHEREFORE, Plaintiff Marquan Teetz, as Next Friend and Personal Representative of the Estate of Cedric Lofton, deceased, demands judgment against Defendant Brenton Newby for compensatory and punitive damages, costs, disbursements, attorney's fees, interest and for any other relief that the Court deems fair and just.

### Count 3
### 42 U.S.C. § 1983 – Excessive Force
### (Against Karen Conklin)

110. Plaintiff incorporates the allegations in paragraphs 1 through 87 as if fully restated here.

111. The conduct of Ms. Conklin constituted excessive force in violation of the U.S. Constitution.

112. At all material times, Ms. Conklin was acting under the color of state law as an agent and employee of Sedgwick County.

113. At all material times, Ms. Conklin was wearing her official Sedgwick County uniform and was acting in the course and scope of her duties as a Sedgwick County employee at the time she restrained and killed Cedric Lofton.

114. At all material times, Ms. Conklin had no reason to believe that she was in imminent danger or fear of imminent bodily harm from Cedric Lofton or for any other reason.

115. Every reasonable officer would have known that using deadly force on Cedric Lofton constitutes excessive force in violation of the U.S. Constitution.

116. Further, every reasonable officer would have known that failing to render emergency aid to someone who poses no threat of harm and on whom the officer used lethal force violates the U.S. Constitution.

117.     Ms. Conklin's conduct was objectively unreasonable.

118.     As a result of Ms. Conklin's excessive and unjustified use of force, Cedric Lofton experienced severe pain and suffering and emotional distress and died.

119.     As a direct and proximate result of these wrongful acts and omissions, Cedric Lofton's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of kinship, aid, counsel, guidance, advice, assistance, and protection and support.

120.     The acts and omissions of Ms. Conklin were intentional, wanton, malicious, reckless, oppressive, and/or showed callous indifference to the federally protected rights of Cedric Lofton.

WHEREFORE, Plaintiff Marquan Teetz, as Next Friend and Personal Representative of the Estate of Cedric Lofton, deceased, demands judgment against Defendant Karen Conklin for compensatory and punitive damages, costs, disbursements, attorney's fees, interest and for any other relief that the Court deems fair and just.

### Count 4
### 42 U.S.C. § 1983 – Excessive Force
### (Against Billy Buckner)

121.     Plaintiff incorporates the allegations in paragraphs 1 through 87 as if fully restated here.

122.     The conduct of Mr. Buckner constituted excessive force in violation of the U.S. Constitution.

123.     At all material times, Mr. Buckner was acting under the color of state law as an agent and employee of Sedgwick County.

124.     At all material times, Mr. Buckner was wearing his official Sedgwick County uniform and was acting in the course and scope of his duties as a Sedgwick County employee at the time he restrained and killed Cedric Lofton.

125. At all material times, Mr. Buckner had no reason to believe that he was in imminent danger or fear of imminent bodily harm from Cedric Lofton or for any other reason.

126. Every reasonable officer would have known that using deadly force on Cedric Lofton constitutes excessive force in violation of the U.S. Constitution.

127. Further, every reasonable officer would have known that failing to render emergency aid to someone who poses no threat of harm and on whom the officer used lethal force violates the U.S. Constitution.

128. Mr. Buckner's conduct was objectively unreasonable.

129. As a result of Mr. Buckner's excessive and unjustified use of force, Cedric Lofton experienced severe pain and suffering and emotional distress and died.

130. As a direct and proximate result of these wrongful acts and omissions, Cedric Lofton's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of kinship, aid, counsel, guidance, advice, assistance, and protection and support.

131. The acts and omissions of Mr. Buckner were intentional, wanton, malicious, reckless, oppressive, and/or showed callous indifference to the federally protected rights of Cedric Lofton.

WHEREFORE, Plaintiff Marquan Teetz, as Next Friend and Personal Representative of the Estate of Cedric Lofton, deceased, demands judgment against Defendant Billy Buckner for compensatory and punitive damages, costs, disbursements, attorney's fees, interest and for any other relief that the Court deems fair and just.

## Count 5
### 42 U.S.C. § 1983 – Excessive Force
### (Against Benny Mendoza)

132. Plaintiff incorporates the allegations in paragraphs 1 through 87 as if fully restated here.

133. The conduct of Mr. Mendoza constituted excessive force in violation of the U.S. Constitution.

134. At all material times, Mr. Mendoza was acting under the color of state law as an agent and employee of Sedgwick County.

135. At all material times, Mr. Mendoza was wearing his official Sedgwick County uniform and was acting in the course and scope of his duties as a Sedgwick County employee at the time he restrained and killed Cedric Lofton.

136. At all material times, Mr. Mendoza had no reason to believe that he was in imminent danger or fear of imminent bodily harm from Cedric Lofton or for any other reason.

137. Every reasonable officer would have known that using deadly force on Cedric Lofton constitutes excessive force in violation of the U.S. Constitution.

138. Further, every reasonable officer would have known that failing to render emergency aid to someone who poses no threat of harm and on whom the officer used lethal force violates the U.S. Constitution.

139. Mr. Mendoza's conduct was objectively unreasonable.

140. As a result of Mr. Mendoza's excessive and unjustified use of force, Cedric Lofton experienced severe pain and suffering and emotional distress and died.

141. As a direct and proximate result of these wrongful acts and omissions, Cedric Lofton's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of kinship, aid, counsel, guidance, advice, assistance, and protection and support.

142. The acts and omissions of Mr. Mendoza were intentional, wanton, malicious, reckless, oppressive, and/or showed callous indifference to the federally protected rights of Cedric Lofton.

WHEREFORE, Plaintiff Marquan Teetz, as Next Friend and Personal Representative of the Estate of Cedric Lofton, deceased, demands judgment against Defendant Benny Mendoza for

compensatory and punitive damages, costs, disbursements, attorney's fees, interest and for any other relief that the Court deems fair and just.

**Count 6**
**42 U.S.C. § 1983 – Failure to Intervene**
**(Against Jason Stepien)**

143.    Plaintiff incorporates the allegations in paragraphs 1 through 87 as if fully restated here.

144.    The conduct of Mr. Stepien violated the U.S. Constitution. Every reasonable officer would have known that failing to intervene with respect to his fellow officer's use of deadly force violates the U.S. Constitution

145.    Mr. Stepien recognized that the force threatened and being used by his fellow officers in restraining Cedric Lofton in the prone position for a prolonged period of time was excessive and unreasonable under the circumstances.

146.    Mr. Stepien observed and was in a position to intervene to stop his fellow officers' use of excessive and unreasonable deadly force against Cedric Lofton.

147.    Further, every reasonable officer would have known that failing to intervene to render timely emergency aid to someone who poses no threat of harm and on whom a fellow officer had used lethal force violates the U.S. Constitution.

148.    For these reasons, Mr. Stepien's conduct was objectively unreasonable here.

149.    As a result, Cedric Lofton suffered severe pain and suffering and emotional distress and died.

150.    As a direct and proximate result of these wrongful acts and omissions, Mr. Lofton's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of kinship, aid, counsel, guidance, advice, assistance, and protection and support.

151.     The acts and omissions of Mr. Stepien were intentional, wanton, malicious, reckless, oppressive, and/or showed callous indifference to the federally protected rights of Cedric Lofton.

WHEREFORE, Plaintiff Marquan Teetz, as Next Friend and Personal Representative of the Estate of Cedric Lofton, deceased, demands judgment against Defendant Jason Stepien for compensatory and punitive damages, costs, disbursements, attorney's fees, interest and for any other relief that the Court deems fair and just.

### Count 7
### 42 U.S.C. § 1983 – Failure to Intervene
### (Against Brenton Newby)

152.     Plaintiff incorporates the allegations in paragraphs 1 through 87 as if fully restated here.

153.     The conduct of Mr. Newby violated the U.S. Constitution. Every reasonable officer would have known that failing to intervene with respect to his fellow officer's use of deadly force violates the U.S. Constitution

154.     Mr. Newby recognized that the force threatened and being used by his fellow officers in restraining Cedric Lofton in the prone position for a prolonged period of time was excessive and unreasonable under the circumstances.

155.     Mr. Newby observed and was in a position to intervene to stop his fellow officers' use of excessive and unreasonable deadly force against Cedric Lofton.

156.     Further, every reasonable officer would have known that failing to intervene to render timely emergency aid to someone who poses no threat of harm and on whom a fellow officer had used lethal force violates the U.S. Constitution.

157.     For these reasons, Mr. Newby's conduct was objectively unreasonable here.

158.     As a result, Cedric Lofton suffered severe pain and suffering and emotional distress and died.

159.    As a direct and proximate result of these wrongful acts and omissions, Mr. Lofton's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of kinship, aid, counsel, guidance, advice, assistance, and protection and support.

160.    The acts and omissions of Mr. Newby were intentional, wanton, malicious, reckless, oppressive, and/or showed callous indifference to the federally protected rights of Cedric Lofton.

WHEREFORE, Plaintiff Marquan Teetz, as Next Friend and Personal Representative of the Estate of Cedric Lofton, deceased, demands judgment against Defendant Brenton Newby for compensatory and punitive damages, costs, disbursements, attorney's fees, interest and for any other relief that the Court deems fair and just.

### Count 8
### 42 U.S.C. § 1983 – Failure to Intervene
### (Against Karen Conklin)

161.    Plaintiff incorporates the allegations in paragraphs 1 through 87 as if fully restated here.

162.    The conduct of Ms. Conklin violated the U.S. Constitution. Every reasonable officer would have known that failing to intervene with respect to her fellow officer's use of deadly force violates the U.S. Constitution

163.    Ms. Conklin recognized that the force threatened and being used by her fellow officers in restraining Cedric Lofton in the prone position for a prolonged period of time was excessive and unreasonable under the circumstances.

164.    Ms. Conklin observed and was in a position to intervene to stop her fellow officers' use of excessive and unreasonable deadly force against Cedric Lofton.

165.    Further, every reasonable officer would have known that failing to intervene to render timely emergency aid to someone who poses no threat of harm and on whom a fellow officer had used lethal force violates the U.S. Constitution.

166. For these reasons, Ms. Conklin's conduct was objectively unreasonable here.

167. As a result, Cedric Lofton suffered severe pain and suffering and emotional distress and died.

168. As a direct and proximate result of these wrongful acts and omissions, Mr. Lofton's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of kinship, aid, counsel, guidance, advice, assistance, and protection and support.

169. The acts and omissions of Ms. Conklin were intentional, wanton, malicious, reckless, oppressive, and/or showed callous indifference to the federally protected rights of Cedric Lofton.

WHEREFORE, Plaintiff Marquan Teetz, as Next Friend and Personal Representative of the Estate of Cedric Lofton, deceased, demands judgment against Defendant Karen Conklin for compensatory and punitive damages, costs, disbursements, attorney's fees, interest and for any other relief that the Court deems fair and just.

### Count 9
### 42 U.S.C. § 1983 – Failure to Intervene
### (Against Billy Buckner)

170. Plaintiff incorporates the allegations in paragraphs 1 through 87 as if fully restated here.

171. The conduct of Mr. Buckner violated the U.S. Constitution. Every reasonable officer would have known that failing to intervene with respect to his fellow officer's use of deadly force violates the U.S. Constitution

172. Mr. Buckner recognized that the force threatened and being used by his fellow officers in restraining Cedric Lofton in the prone position for a prolonged period of time was excessive and unreasonable under the circumstances.

173. Mr. Buckner observed and was in a position to intervene to stop his fellow officers' use of excessive and unreasonable deadly force against Cedric Lofton.

174.     Further, every reasonable officer would have known that failing to intervene to render timely emergency aid to someone who poses no threat of harm and on whom a fellow officer had used lethal force violates the U.S. Constitution.

175.     For these reasons, Mr. Buckner's conduct was objectively unreasonable here.

176.     As a result, Cedric Lofton suffered severe pain and suffering and emotional distress and died.

177.     As a direct and proximate result of these wrongful acts and omissions, Mr. Lofton's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of kinship, aid, counsel, guidance, advice, assistance, and protection and support.

178.     The acts and omissions of Mr. Buckner were intentional, wanton, malicious, reckless, oppressive, and/or showed callous indifference to the federally protected rights of Cedric Lofton.

WHEREFORE, Plaintiff Marquan Teetz, as Next Friend and Personal Representative of the Estate of Cedric Lofton, deceased, demands judgment against Defendant Billy Buckner for compensatory and punitive damages, costs, disbursements, attorney's fees, interest and for any other relief that the Court deems fair and just.

## Count 10
### 42 U.S.C. § 1983 – Failure to Intervene
### (Against Benny Mendoza)

179.     Plaintiff incorporates the allegations in paragraphs 1 through 87 as if fully restated here.

180.     The conduct of Mr. Mendoza violated the U.S. Constitution. Every reasonable officer would have known that failing to intervene with respect to his fellow officer's use of deadly force violates the U.S. Constitution

181.     Mr. Mendoza recognized that the force threatened and being used by his fellow officers in restraining Cedric Lofton in the prone position for a prolonged period of time was excessive and unreasonable under the circumstances.

182.     Mr. Mendoza observed and was in a position to intervene to stop his fellow officers' use of excessive and unreasonable deadly force against Cedric Lofton.

183.     Further, every reasonable officer would have known that failing to intervene to render timely emergency aid to someone who poses no threat of harm and on whom a fellow officer had used lethal force violates the U.S. Constitution.

184.     For these reasons, Mr. Mendoza's conduct was objectively unreasonable here.

185.     As a result, Cedric Lofton suffered severe pain and suffering and emotional distress and died.

186.     As a direct and proximate result of these wrongful acts and omissions, Mr. Lofton's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of kinship, aid, counsel, guidance, advice, assistance, and protection and support.

187.     The acts and omissions of Mr. Mendoza were intentional, wanton, malicious, reckless, oppressive, and/or showed callous indifference to the federally protected rights of Cedric Lofton.

WHEREFORE, Plaintiff Marquan Teetz, as Next Friend and Personal Representative of the Estate of Cedric Lofton, deceased, demands judgment against Defendant Benny Mendoza for compensatory and punitive damages, costs, disbursements, attorney's fees, interest and for any other relief that the Court deems fair and just.

### Count 11
### 42 U.S.C. § 1983 – Excessive Force (*Monell*)
### (Against Sedgwick County, Kansas)

188.     Plaintiff incorporates the allegations in paragraphs 1 through 187 as if fully restated here.

189. Sedgwick County, through its JIAC, in violation of Plaintiff's constitutional rights, implemented, enforced, encouraged, and sanctioned a policy, practice, and/or custom of excessive force on juveniles to the extent its written use of force policy authorized JIAC officers' use of force on Cedric Lofton.

190. Sedgwick County acted under the color of state law to deprive Cedric Lofton of his rights under the U.S. Constitution as described above. Accordingly, Sedgwick County has violated 42 U.S.C. § 1983.

191. Cedric Lofton was injured and died as a direct and proximate result of the above policies, practices, and/or customs.

WHEREFORE, Plaintiff Marquan Teetz, as Next Friend and Personal Representative of the Estate of Cedric Lofton, deceased, demands judgment against Sedgwick County, Kansas, for compensatory damages, costs, disbursements, attorney's fees, interest and for any other relief that the Court deems fair and just.

## **Count 12**
### **42 U.S.C. § 1983 – Deliberate Indifference in Failing to Train (*Monell*)**
### **(Against Sedgwick County, Kansas)**

192. Plaintiff incorporates the allegations in paragraphs 1 through 191 as if fully restated here.

193. Sedgwick County inadequately trained its JIAC employees and agents such that they were utterly incapable of performing their jobs on September 24, 2021, including by failing to obtain mental health treatment for Cedric Lofton and, in turn, failing to de-escalate the situation and pinning Cedric in the prone position for 39 uninterrupted minutes until he died.

194. Sedgwick County further inadequately trained its employees and agents such that not one of them intervened while 39 minutes passed and a 17-year-old, 135-pound, shoeless, unarmed juvenile was killed in front of them.

195.     Sedgwick County has a policy, pattern, and practice of inadequately training its employees to perform the job, including by inadequately training them on proper use of force, de-escalation techniques, and identification and management of mental health admittees.

196.     JIAC has a history of widespread prior abuse and/or a pattern of prior similar incidents which put it on notice of the need to adequately train on the foregoing.

197.     Sedgwick County's failure to adequately train in these respects constituted a deliberate indifference to the constitutional rights of citizens like Cedric Lofton. This is particularly so in the face of the Kansas Department of Corrections Report in 2016 putting Sedgwick County on notices of its repeated failures.

198.     As a result of Sedgwick County's failure to adequately train in these respects, Cedric Lofton suffered severe pain and suffering and emotional distress, and died.

199.     As a direct and proximate result, Cedric Lofton's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of kinship, aid, counsel, guidance, advice, assistance, and protection and support.

200.     Sedgwick County acted under the color of state law to deprive Cedric Lofton of his rights under the U.S. Constitution. Therefore, it has violated 42 U.S.C. § 1983.

WHEREFORE, Plaintiff Marquan Teetz, as Next Friend and Personal Representative of the Estate of Cedric Lofton, deceased, demands judgment against Sedgwick County, Kansas, for compensatory damages, costs, disbursements, attorney's fees, interest and for any other relief that the Court deems fair and just.

<u>**Count 13**</u>
**42 U.S.C. § 1983 – Deliberate Indifference to Serious Medical Need**
**(Against John Doe Wichita Police Officers 1-10)**

201.     Plaintiff incorporates the allegations in paragraphs 1 through 87 as if fully restated here.

202.     John Doe Wichita Police Officers 1-10 knew that if they did not obtain a mental health evaluation and treatment for Cedric Lofton, he would be seriously harmed.

203.     Despite this knowledge, Defendants intentionally refused to seek such treatment for Cedric Lofton and, instead, punished him by taking him to JIAC and falsifying information provided to JIAC upon intake which they knew would preclude Cedric from being sent to a hospital for mental health evaluation and treatment.

204.     By these actions, John Doe Wichita Police Officers 1-10 knew of and disregarded an excessive risk of serious injury to Cedric Lofton, were deliberately indifferent to Cedric Lofton's health and safety, and violated Cedric Lofton's rights under the U.S. Constitution.

205.     As a result, Cedric Lofton suffered personal injury, severe pain and suffering, emotional distress, and ultimately died.

206.     The acts and omissions of Defendants were intentional, wanton, malicious, and oppressive.

207.     Defendants acted under the color of state law to deprive Cedric Lofton of his rights under the U.S. Constitution.

WHEREFORE, Plaintiff Marquan Teetz, as Next Friend and Personal Representative of the Estate of Cedric Lofton, deceased, demands judgment against John Doe Wichita Police Officers 1-10, for compensatory damages, punitive damages, costs, disbursements, attorney's fees, interest and for any other relief that the Court deems fair and just.

## Count 14
### 42 U.S.C. § 1983 – Deliberate Indifference in Failing to Train (*Monell*)
### (Against City of Wichita, Kansas)

208.     Plaintiff incorporates the allegations in paragraphs 1-87 and 201-207 as if fully restated here.

209. The City of Wichita inadequately trained its police officers such that they were utterly incapable of performing their jobs on September 24, 2021, including by failing to obtain mental health treatment for Cedric Lofton and, in turn, falsifying information relating to his mental state and behavior such that he was admitted to JIAC and not taken for mental health evaluation and treatment.

210. The City of Wichita has a policy, pattern, and practice of inadequately training its officers to perform the job, including by inadequately training them on dealing with juveniles and those in the throes of a mental health crisis.

211. The Wichita Police Department has a history of widespread prior abuse and/or a pattern of prior similar incidents which put it on notice of the need to adequately train on the foregoing.

212. The City of Wichita's failure to adequately train in these respects constituted a deliberate indifference to the constitutional rights of citizens like Cedric Lofton. This is particularly so in the face of the Kansas Department of Corrections Report in 2016 putting WPD on notices of its repeated failures.

213. As a result of the City of Wichita's failure to adequately train in these respects, Cedric Lofton suffered severe pain and suffering and emotional distress, and died.

214. As a direct and proximate result, Cedric Lofton's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of kinship, aid, counsel, guidance, advice, assistance, and protection and support.

215. The City of Wichita acted under the color of state law to deprive Cedric Lofton of his rights under the U.S. Constitution. Therefore, it has violated 42 U.S.C. § 1983.

WHEREFORE, Plaintiff Marquan Teetz, as Next Friend and Personal Representative of the Estate of Cedric Lofton, deceased, demands judgment against the City of Wichita, Kansas, for

compensatory damages, costs, disbursements, attorney's fees, interest and for any other relief that the Court deems fair and just.

### Count 15
### 42 U.S.C. § 1983 – Deliberate Indifference to Serious Medical Need
### (Against Jason Stepien, Brenton Newby, Karen Conklin, Billy Buckner, and Benny Mendoza)

216.    Plaintiff incorporates the allegations in paragraphs 1 through 215 as if fully restated here.

217.    After they had restrained him for a period of time, Defendants recognized that Cedric Lofton was having difficulty breathing and/or maintaining consciousness, or had stopped breathing, and knew that if they did not provide and/or obtain immediate medical attention, he would be seriously harmed.

218.    Despite this knowledge, Defendants failed to provide or seek such treatment for Cedric Lofton.

219.    By these actions, Defendants knew of and disregarded an excessive risk of serious injury to Cedric Lofton, were deliberately indifferent to Cedric Lofton's health and safety, and violated Cedric Lofton's rights under the U.S. Constitution.

220.    As a result, Cedric Lofton suffered personal injury, severe pain and suffering, emotional distress, and ultimately died.

221.    The acts and omissions of Defendants were intentional, wanton, malicious, and oppressive.

222.    Defendants acted under the color of state law to deprive Cedric Lofton of his rights under the U.S. Constitution.

WHEREFORE, Plaintiff Marquan Teetz, as Next Friend and Personal Representative of the Estate of Cedric Lofton, deceased, demands judgment against Jason Stepien, Brenton Newby, Karen

Conklin, Billy Buckner, and Benny Mendoza, for compensatory damages, punitive damages, costs, disbursements, attorney's fees, interest and for any other relief that the Court deems fair and just.

**Count 16**
**42 U.S.C. § 1983 – Supervisory Liability**
**(Against Jason Stepien, Brenton Newby, Karen Conklin,**
**Billy Buckner, and Benny Mendoza)**

223.    Plaintiff incorporates the allegations in paragraphs 1 through 222 as if fully restated here.

224.    Defendants each had supervisory responsibilities over one or more of the JIAC officers who participated in Cedric Lofton's death.

225.    These Defendant participated in violating Plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his or her subordinates' violations.

226.    Cedric Lofton's constitutional rights were violated as a direct and proximate result and Plaintiff suffered damages.

WHEREFORE, Plaintiff Marquan Teetz, as Next Friend and Personal Representative of the Estate of Cedric Lofton, deceased, demands judgment against Jason Stepien, Brenton Newby, Karen Conklin, Billy Buckner, and Benny Mendoza, for compensatory damages, punitive damages, costs, disbursements, attorney's fees, interest and for any other relief that the Court deems fair and just.

**Count 17**
**42 U.S.C. § 1983 – Supervisory Liability**
**(Against John Doe Wichita Police Officers 1-10)**

227.    Plaintiff incorporates the allegations in paragraphs 1 through 226 as if fully restated here.

228.    Defendants each had supervisory responsibilities over one or more of the WPD officers who participated in Cedric Lofton's death.

229. These Defendant participated in violating Plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his or her subordinates' violations.

230. Cedric Lofton's constitutional rights were violated as a direct and proximate result and Plaintiff suffered damages.

WHEREFORE, Plaintiff Marquan Teetz, as Next Friend and Personal Representative of the Estate of Cedric Lofton, deceased, demands judgment against John Doe Wichita Police Officers 1-10, for compensatory damages, punitive damages, costs, disbursements, attorney's fees, interest and for any other relief that the Court deems fair and just.

## PRAYER FOR RELIEF

Plaintiff Marquan Teetz, as Next Friend and Personal Representative of the Estate of Cedric Lofton, deceased, respectfully requests the following relief from the Court:

a.   Compensatory damages against all Defendants in an amount to be determined by a jury;

b.   Punitive damages against all Defendants (except for Sedgwick County and the City of Wichita) in an amount to be determined by a jury;

c.   Pre-judgment and post-judgment interest as allowable by law and as ordered by the Court;

d.   Attorney fees' as allowable by law and as ordered by the Court;

e.   Reasonable costs; and

f.   Such other relief that the Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury of all of his claims.

Date:   June 13, 2022                    MARQUAN TEETZ


                                         /s/      *Andrew M. Stroth*
                                         _____

Andrew M. Stroth

Andrew M. Stroth*
ACTION INJURY LAW GROUP
191 N. Wacker Drive, Suite 2300
Chicago, IL  60606
(844) 878-4529
astroth@actioninjurylawgroup.com

/s/     *Steven Hart*
Steven Hart

Steven Hart*
John Marrese*
Max Bungert*
Maurice Rice II*
HART MCLAUGHLIN & ELDRIDGE, LLC
22 W. Washington Street, #1600
Chicago, IL 60602
P. (312) 955-0545
shart@hmelegal.com
jmarrese@hmelegal.com
mbungert@hmelegal.com
mrice@hmelegal.com

/s/     *Ben Stelter-Embry*
Ben Stelter-Embry

Ben Stelter-Embry
4001 W. 114th Street, Suite 110
Leawood, KS 66211
ben@protzmanlaw.com

*Seeking Pro Hac Vice Admission*