### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

MARQUAN TEETZ, as Next Friend and
Personal Representative of the ESTATE
OF CEDRIC LOFTON, deceased,

      Plaintiff,

v.

SEDGWICK COUNTY, KANSAS, et al.,

      Defendant.

Case No. 6:22-cv-01134

### MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANT SEDGWICK COUNTY, KANSAS TO DISMISS

In this Memorandum in Support, Defendant Sedgwick County, Kansas ("County"), by undersigned counsel, will demonstrate why this Court should dismiss both of the pleaded claims, which are Counts 11 and 12 of the Complaint, against it.

### I.      Nature of the Case

This civil suit is brought pursuant to 42 U.S.C. § 1983.  Cedric Lofton was a 17-year-old young man who was being held at Juvenile Intake and Assessment Center ("JIAC") in Wichita, Kansas when he suffered injuries that ultimately led to his untimely passing.  Plaintiff, Marquan Teetz, as next friend and personal representative of Lofton's Estate, seeks damages against the County, the City of Wichita, and various employees of both who were involved in Lofton's detention.

### II.     Summary of Alleged Facts[1]

According to the Complaint, on September 24, 2021, Cedric Lofton's foster father called the Wichita Police Department ("WPD") when Lofton showed up at his house after leaving

---

[1] This section sets forth facts as alleged in the Complaint.  The County does not admit any of them as true by including them in this Motion.

without notice the prior day.  (Doc. 1, at ¶ 2).  The Kansas Department of Children and Families instructed him to call the police rather than let Lofton in the house so that he could obtain a mental health evaluation and receive treatment.  (*Id.* at ¶ 3).  The foster father had been concerned about Lofton's mental health since his grandmother had recently passed away.  (*Id.* at ¶ 2).  Lofton "committed no crime" but, rather, was "returning innocently home."  (*Id.* at ¶ 3).

When WPD arrived, Lofton showed no signs of violence and presented no harm or danger.  (*Id.* at ¶ 4).  Instead, he was making comments that clearly revealed he was experiencing a mental health crisis.  (*Id.*)  The WPD grew impatient, ultimately arresting Lofton and "entomb[ing] him in a WRAP restraint system—effectively a full-body straitjacket."  (*Id.* at ¶¶ 5, 36-39).  The WPD did not take Lofton to the hospital for medical treatment but, rather, brought him to the JIAC, which is a program administered by Sedgwick County that connects youth and their families with appropriate services in order to limit their involvement with the juvenile justice system.  (*Id.* at ¶¶ 6, 48-50, 52).  The WPD lied to JIAC by representing that Lofton was not exhibiting signs of needing immediate medical attention because otherwise the WPD would have been required to transport him to the hospital.  (*Id.* at ¶¶ 53-55).

While at JIAC, Lofton was allowed to walk around freely, and as he was doing so, Defendant Jason Stepien, who was a JIAC employee, "unnecessarily, aggressively and without justification" pushed Lofton toward a wall even though Lofton was posing no threat.  (*Id.* at ¶¶ 56-59, 70).  Then, Stepien and Defendant Brenton Newby, who was another JIAC employee, grabbed and held Lofton before striking him repeatedly.  (*Id.* at ¶¶ 60-62).  They ultimately shackled Lofton's legs and pinned him onto his stomach in the prone position.  (*Id.* at ¶¶ 63-65).  Other JIAC employees—Karen Conklin, Defendants Billy Buckner, and Benny Mendoza—were present and assisted. (*Id.* at ¶ 66).  Plaintiff alleges that Lofton "posed no threat to this group of

adult officers at any time." (*Id.* at ¶ 70). Nevertheless, Lofton was held in a prone position for 39 minutes until it was discovered he was not breathing. (*Id.*) After the JIAC employees performed emergency resuscitation efforts, Lofton was transferred to the hospital, where he ultimately died on September 26, 2021. (*Id.* at ¶¶ 69, 72). The medical examiner determined the cause of death was "homicide." (*Id.* at ¶¶ 73-74).

Plaintiff claims Sedgwick County knew "that JIAC was incapable of handling the children admitted into its care." (*Id.* at ¶ 84). In support of this claim, he points to an inspection performed by the Kansas Department of Corrections in 2016, which revealed (1) JIAC was ill equipped to handle children with mental health issues; (2) JIAC needed training on de-escalation techniques; and (3) WPD exacerbated JIAC's problems.[2] (*Id.* at ¶¶ 84-86). JIAC purportedly did not address these deficiencies. (*Id.*)

The Complaint contains two claims against the County pursuant to 42 U.S.C. § 1983. In Count 11, which is an excessive force claim, Plaintiff asserts that the County had an unconstitutional use of force policy to the extent JIAC's written policies authorize the lethal force used on Lofton. (*Id.* at ¶¶ 188-191). However, Plaintiff does not actually allege the use of force policy did in fact authorize the force applied to Lofton. To the contrary, Plaintiff claims the JIAC employees violated JIAC's written use of force policies with respect to its conduct toward Lofton. (*Id.* at ¶¶ 78-82).

In Count 12, Plaintiff claims the County was deliberately indifferent in failing to train its employees. (*Id.* at ¶¶ 192-200). This purported failure is evidenced by the JIAC employees' (1) failure to obtain mental health treatment for Lofton, (2) decision to pin him in prone position

---

[2] As explained in Section V.C.i, *infra*, the purported results of the 2016 inspection do not establish liability against the County.

until he died, and (3) failure to intervene and stop the lethal force.  (*Id.*)  Though Plaintiff asserts

that the County has a history and pattern of prior incidents, he provides no supporting detail.

### III.   Issues Presented

    **A.**    **Can Sedgwick County, Kansas be sued when Kansas law clearly requires that a lawsuit against a county be brought against the county's board of county commissioners?**

    **B.**    **Does the excessive force claim against the County (Count 11) fail when not supported with facts establishing either a written policy that authorized the lethal force used on Lofton or other prior incidents of County employees violating a detainee's constitutional rights?**

    **C.**    **Does the failure to train claim against the County (Count 12) fail absent facts establishing a pattern of constitutional violations or that constitutional violations were a known consequence of the training provided?**

### IV.   Legal Standard: Fed. R. Civ. P. 12(b)(6)

"The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the

four corners of the complaint after taking those allegations as true."  *Mobley v. McCormick*, 40

F.3d 337, 340 (10th Cir. 1994).  The sufficiency of a complaint is a question of law, and when

considering a Rule 12(b)(6) motion to dismiss, a court must accept as true all well-pleaded

factual allegations in the complaint, view those allegations in the light most favorable to the non-

moving party, and draw all reasonable inferences in the plaintiff's favor.  *Smith v. United States*,

561 F.3d 1090, 1097 (10th Cir. 2009).

In order to state a claim, a complaint must contain factual assertions describing the

grounds entitling this plaintiff to relief from the named defendant.  *See* Fed. R. Civ. P. 8(a); *Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The U.S. Court of Appeals for the Tenth

Circuit identified two "working principles" that underlie the *Twombly* standard.  *Kansas Penn*

*Gaming, LLC v. Collins*, 656 F.3d 1210 (10th Cir. 2011).  *See also Ashcroft v. Iqbal*, 556 U.S.

662, 678-79 (2009).  First, the Court ignores legal conclusions, labels, and a formulaic recitation

of the elements.  *See Kansas Penn*, 656 F.3d at 1214.  Second, a plaintiff must allege facts that make his or her claim plausible: "a plaintiff must offer sufficient factual allegations to 'raise a right to relief above the speculative level.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555).  The factual allegations must be enough to "nudge" the claim across the line from merely conceivable to actually plausible.  *See, e.g.*, *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).  In other words, the "mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for *these* claims."  *Id.*  (emphasis original).

Scrupulous adherence to the pleadings standard of *Twombly* delivers on the promise of a just, speedy, and inexpensive determination of claims set forth in the Federal Rule of Civil Procedure 1.  It ensures that defendants are placed on notice of their alleged misconduct and can prepare an appropriate defense.  *See Kansas Penn*, 656 F.3d at 1215.  It also permits the termination of meritless claims before "ginning up the costly machinery associated with our civil discovery regime on the basis of a largely groundless claim."  *Id.*

## V.    Argument

### A.    Sedgwick County, Kansas is not an entity that may be sued under Kansas law.

As set forth in K.S.A. § 19-105, "[i]n all suits or proceedings by or against a county, the name in which the county shall sue or be sued shall be 'The board of county commissioners of the county of _____ . . . .'").  *See also Brown v. Sedgwick Cty. Sheriff's Office*, 513 F. App'x 706, 707–08 (10th Cir. 2013), citing *Hopkins v. State*, 702 P.2d 311, 316 (1985) (noting that the board of county commissioners is the appropriate defendant for claims against the county's subunits).

Here, in order to state a claim against a county, Plaintiff must sue and serve the Board of County Commissioners of Sedgwick County ("BOCC").  *See* K.S.A. § 19-105.  Plaintiff failed to do so.  Consequently, the claims against Defendant Sedgwick County, Kansas, which are contained in Counts 11-12 of the Complaint, must be dismissed.  As discussed below, permitting a simple substitution of the BOCC by way of an amendment will not cure the legal deficiency regarding the Plaintiff's allegations in Counts 11 and 12.

**B.      Count 11 (Excessive Force) must be dismissed because the County's written use of force policy did not authorize the use of lethal force on Lofton**

A municipal entity may not be held liable under 42 U.S.C. § 1983 by way of *respondeat superior*.  *See Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). In order to impose municipal liability under § 1983, Plaintiff must identify an official custom or policy that "was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury."  *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013).  The Tenth Circuit has distilled a municipal liability claim into three basic elements: official policy, causation, and state of mind.  *Id.*  "A challenged practice may be deemed an official policy or custom for § 1983 municipal-liability purposes if it is formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision."  *Id.* at 770.

After establishing a municipal policy or custom, a plaintiff must demonstrate "a direct causal link between the policy or custom and the injury alleged."  *Id.* at 770.

Finally, if a municipal policy is not facially unconstitutional, then a plaintiff may satisfy the state of mind element by showing that the municipal action was taken with deliberate indifference as to its known or obvious consequences.  *Id.*  The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure

to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. *Id.* Notice can be established by proving the existence of a pattern of unconstitutional behavior, but courts "have expressly held that one prior incident, even if it was a constitutional violation sufficiently similar to put officials on notice of a problem, does not describe a pattern of violations." *Waller v. City and Cnty. of Denver*, 932 F.3d 1277, 1287 (10th Cir. 2019). Absent a pattern of unconstitutional behavior, deliberate indifference may be found "only in a narrow range of circumstances where a violation of federal rights is highly predictable or a plainly obvious consequence of a municipality's action or inaction." *Id.* at 1284.

Here, in the first Count against the County, which is Count 11, Plaintiff asserts the County is liable under § 1983 for the employees' use of excessive force to the extent its written use of force policy authorized the County JIAC employees' use of force on Lofton. (Doc. 1, at ¶¶ 188-191). Thus, the claim is contingent on JIAC having a written policy that authorized the alleged excessive force.

This claim fails as a matter of law because not only is it based on nothing more than conclusory statements that should be disregarded pursuant to *Kansas Penn Gaming*, 656 F.3d at 1214, but Plaintiff does not actually allege that JIAC's written policy authorized the alleged excessive force or is otherwise unconstitutional. To the contrary, Plaintiff claims the JIAC employees violated the policy with respect to its conduct towards Lofton. (Doc. 1, at ¶¶ 78-82). The use of force policy, which is set forth, verbatim, in paragraphs 79-82 of the Complaint, does not say or in any way suggest that lethal force is permitted when a detainee is not posing a deadly threat or, as is alleged in Lofton's case, is posing no threat at all. (*Id.* at ¶¶ 79-82).

There are simply no pleaded facts that establish the County had a written policy that "was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *See Schneider*, 717 F.3d at 769.  Plaintiff failed to cite to any prior specific incidents of County JIAC employees deploying excessive force that could conceivably establish an un-written policy that permits the lethal force used on Lofton.  *See Connick v. Thompson*, 563 U.S. 51, 62 (2011) (multiple prior victims are required to put a municipality on notice that its supervision or discipline of officers is deficient).  As a result, Count 11 must be dismissed.

C.   **Count 12 (Failure to Train) must be dismissed because the Complaint lacks facts establishing either a pattern of constitutional violations or that Lofton's injuries were an obvious consequence of deficient training.**

In Count 12, Plaintiff alleges the County was deliberately indifferent in failing to train its employees.  As made clear by the U.S. Supreme Court in *Connick v. Thompson*, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  563 U.S. at 61.  Because this theory is "far more nebulous" than other claims based on policy, "a plaintiff must show that an alleged failure to train amounted to deliberate indifference to the rights of person with whom the untrained employee came into contact."  *Id.*

To demonstrate deliberate indifference, a pattern of similar constitutional violations by untrained employees is ordinarily necessary.  *Waller*, 932 F.3d at 1285.  Evidence of a pre-existing pattern of violations is only unnecessary in a narrow range of circumstances in which the unconstitutional consequences of a failure to train are highly predictable and patently obvious.  *Id.*  Here, the Complaint does not establish a pattern of constitutional violations, nor does it establish Lofton's injuries were an obvious result of the training the County's employees received.

### i. The Complaint lacks a pattern of constitutional violations.

Plaintiff fails to plead facts suggesting the existence of a pattern of similar constitutional violations by untrained employees of the County.  The Complaint lacks reference to any specific prior incidents in which an untrained County employee committed a constitutional violation, let alone a constitutional violation remotely similar to the one allegedly suffered by Lofton, such that the County had notice that its training likely would lead to the type of injuries suffered by Lofton.  *See id.* at 1285.

Plaintiff claims the County inadequately trained its JIAC employees because the employees failed to obtain mental health treatment for Lofton and pinned him in the prone position until he died.  (Doc. 1, at ¶ 193).  However, the fact that a constitutional violation may have occurred does not establish that the violation was the result of insufficient training.  *See Waller*, 932 F.3d at 1285; *Canady v. Unified Government of Wyandotte County/Kansas City, KS*, 68 Fed. Appx. 165, 166 (10th Cir. 2003) (affirming dismissal of a municipal liability claim on basis that the plaintiff had done nothing more than make a conclusory allegation that the officers did not have proper training or supervision because, if they did, they would not have acted in gross negligence).  Other conclusory allegations like the one in paragraph 196 of the Complaint, which states that "JIAC has a history of widespread prior abuse and/or a pattern of prior similar incidents which put it on notice of the need to adequately train on the foregoing" must also be disregarded.  *See Kansas Penn Gaming*, 656 F.3d at 1214; *Pino v. Weidl*, No. 20-2044-JAR-GEB, 2020 WL 3960424, at *6 (D. Kan. July 13, 2020) (plaintiff must plead facts that municipality had notice that its training was substantially certain to result in a constitutional violation to avoid dismissal of § 1983 claim; conclusory statements that noticed existed are insufficient).

Plaintiff's reference to the purported inspection of JIAC conducted by the Kansas Department of Corrections in 2016 does not establish a pattern of constitutional violations committed by untrained County employees.  According to Plaintiff, the 2016 inspection revealed the following: (1) JIAC needed more support from its mental health partners in providing timelier response for mental health cases; (2) JIAC needed training on de-escalation techniques; and (3) WPD exacerbated JIAC's problems by bringing juveniles in need of mental health treatment to JIAC rather than a medical facility.  (Doc. 1, at ¶¶ 84-86).  These allegations, even if true, do not establish that a constitutional violation ever occurred, so they cannot possibly be indicative of a pattern of constitutional violations.  *See Waller*, 932 F.3d at 1285-87.  The Complaint provides no necessary detail about the training County employees received or how the lack of additional training constitutes deliberate indifference to known or obvious constitutional violations that would result.  *See id.; see also Schneider*, 717 F.3d at 771.

In short, Plaintiff fails to plead sufficient facts establishing a pattern of constitutional violations that would have given the County notice that its training would cause violations of constitutional rights similar to those purportedly suffered by Lofton.  Without any notice, the County could not have acted with deliberate indifference in training its employees, as a matter of law.  *See Waller*, 932 F.3d at 1285-87; *Schneider*, 717 F.3d at 771.

### ii.    Lofton's injuries were not the obvious result of deficient training.

Plaintiff's allegations also do not fit within the narrow range of circumstances in which a municipality may be liable absent evidence of a pre-existing pattern.  The Tenth Circuit has repeatedly observed that extreme cases of lawlessness are so obviously wrong that municipalities cannot be held liable for failing to train officers without some prior instances of similar misconduct to put them on notice that training is necessary.  *Estate of Holmes v. Somers*, No. 18-

1221-JWB, 2021 WL 236080, at *7 (D. Kan. Jan. 25, 2021).  For example, in *Waller*, a compliant criminal defendant was abused by a deputy sheriff during a court proceeding.  932 F.3d at 1280-81.  The defendant politely told the court that he thought the investigation should have come before his arrest, after which the deputy sheriff unjustifiably threw him face first into a glass wall and metal post.  *Id.*  The Tenth Circuit stated that even an untrained law enforcement officer should have been well aware that any use of force in this situation—where a restrained detainee was simply addressing a judge at a hearing in a polite, calm voice—was inappropriate. *Id.* at 1288.  The case did not involve technical knowledge or ambiguous "gray areas" in the law that would make it "highly predictable" that a deputy sheriff would need "additional specified training" to know how to handle the situation correctly, such as a situation involving an officer making the wrong call regarding the level of force to employ against an individual who posed a threat.  *Id.*

Similarly, in *Schneider*, the Tenth Circuit rejected the plaintiff's municipal liability claim, concluding, in part, that "specific or extensive training hardly seems necessary for [officers] to know that sexually assaulting [individuals] is inappropriate behavior."  717 F.3d at 774.  The Tenth Circuit issued a similar ruling in *Barney v. Pulsipher*, 143 F.3d 1299, 1308 (10th Cir. 1998) (training is not necessary to put deputy sheriffs on notice that they may not violently assault a restrained detainee who is not acting in a threatening manner).

More recently, in *Swearingen v. Pleasanton Unified Sch. Dist.*, the court concluded that deputy sheriffs do not need training to know they cannot sexually assault high school students. No. 20-2630-DDC-TJJ, 2021 WL 5758544, at *7 (D. Kan. Dec. 3, 2021).  Consequently, the court dismissed the student's failure to train claim under § 1983 against the county that

employed the sheriff's deputy despite specific facts being pled that gave the sheriff's office prior notice of the sexual assault.  *Id.* at \*1-2, 6-7.

In *Estate of Holmes*, the U.S. District Court for the District of Kansas considered whether a plaintiff alleged sufficient facts supporting the plaintiff's excessive force claim against a municipality stemming from the shooting death of a suspect following an automobile chase.  No. 18-1221-JWB, 2021 WL 236080, at \*1-2.  The plaintiff alleged that the deceased suspect exited his vehicle compliantly and unarmed but officers on the scene punched and beat him, shot him with a bean bag and a taser, attacked him with a police dog, and shot him in the back with a gun. *Id.* at \*7.  Court concluded that "specific or extensive training or supervision hardly seems necessary to ensure officers are aware that they should not viciously attack, beat, and essentially murder a compliant, unarmed detainee."  *Id.* at \*8.

Here, as seen in the cases previously mentioned, Plaintiff's allegations reveal that the County JIAC employees did not need additional training to understand that the force they used on Lofton was excessive.  According to the Complaint, Lofton never posed a threat to anyone, "not least of which the five able-bodied, adult officers who cycled-in and out of the room during Cedric's slow death."  (Doc. 1, at ¶¶ 9, 70).  Nevertheless, Plaintiff claims the JIAC employees "unnecessarily, aggressively, and without justification" pushed Lofton toward a wall, and then repeatedly hit and shackled him on the ground, where he was pinned in a prone position for 39 minutes until he stopped breathing.  (*Id.* at ¶¶ 57-68).  They did so even though "[t]he Tenth Circuit has long recognized that it is clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force."  (*Id.* at ¶ 76) (internal quotations omitted).  As in *Waller*, and the cases cited therein, specific or extensive training hardly seems

necessary to ensure employees are aware that they should not use lethal force to kill a harmless, compliant, and unarmed 135-pound teenager like Lofton.  *See* 932 F.3d at 1285-88.

Plaintiff confirms the futility of any additional training throughout the Complaint, such as in paragraph 77, where he states, "[e]ven without such training, the excessiveness of the officers' force would have been obvious to any reasonable officer given the surrounding circumstances." (Doc. 1, at ¶ 77).  *See also Waller*, 932 F.3d at 1288) (training unnecessary when even an untrained law enforcement officer should have been well aware that any use of force in this situation was inappropriate).  Similarly, Plaintiff repeatedly asserts that "every reasonable officer would have known that using deadly force on Cedric Lofton constitutes excessive force" and that "every reasonable officer would have known that failing to render emergency aid to someone who poses no threat of harm and on whom an officer used lethal force violates US constitution." (*Id.* at ¶¶ 93-94, 104-105, 115-116, 126-127, 137-138).  Moreover, Plaintiff states elsewhere in the Complaint that "every reasonable officer would have known that failing to intervene to render timely emergency aid to someone who poses no threat of harm and on whom a fellow officer had used lethal force violates the U.S. Constitution."  (*Id.* at ¶¶ 147, 156, 165, 174, 183). Put simply, additional training was not necessary to prevent the "obvious" excessive force that caused Lofton's injuries.  Thus, Plaintiff must identify prior instances of misconduct committed by County employees in order to prevail on his failure to train claim.  Because the Complaint lacks reference to any prior instances of misconduct, the claim fails.

Likewise, Plaintiff's claim based on a similar policy of failing to train on how to de-escalate and otherwise identify and manage detainees who are suffering from a mental health issue, as Lofton is alleged to have been here, also fails because the JIAC employees did not need training to know that Lofton suffered from a mental health issue and required hospital attention.

They were already aware of these circumstances.  (Doc. 1, at ¶¶ 7, 53-54).  Thus, additional or different training simply was not necessary.  *See Waller*, 932 F.3d at 1288 (explaining that training is only necessary to make difficult choices regarding use of force less difficult, not to prevent employees from making a conscious decision to disregard known and obvious circumstances).

Not only was training on how to identify a detainee like Lofton as someone suffering from a mental illness unnecessary, but the training would not have changed the JIAC employees' treatment of Lofton because Lofton's mental illness did not present a circumstance that justified the physical force used on him.  This court considered similar circumstances in *Estate of Holmes*, referenced previously, in which an unarmed and disabled detainee was allegedly beaten and killed by the police after surrendering to them following a police chase.  *See* No. 18-1221-JWB, 2021 WL 236080, at *1-2, 7-8.  The plaintiff attempted to assert an excessive force claim based on a policy of failing to train on how to de-escalate and otherwise respond when faced with a disabled detainee.  *Id.* at *5-8.  The court precluded this claim from proceeding against a municipal defendant, in part because the detainee was not posing a threat when officers confronted him with force.  As a result, the court concluded that "any alleged disabilities did not affect his behavior and there was no situation to de-escalate."  *Id.*

Similarly, here, Lofton was not posing a threat at any time.  (*See* Doc. 1, at ¶ 70). Though he was suffering from a mental illness, the illness did not create a situation that required the force ultimately used by the JIAC employees.  *See Estate of Holmes*, No. 18-1221-JWB, 2021 WL 236080, at *8.

## VI.     Conclusion

As explained above, the claims against Sedgwick County, Kansas must be dismissed. Not only is Sedgwick County not an entity that may be sued under Kansas law, but Plaintiff fails to plead facts establishing liability against the County.  The Complaint does not establish that the County had a written policy that authorized the lethal force used on Lofton, nor does it identify prior similar incidents of a detainee's constitutional rights being violated.  Furthermore, the Complaint fails to establish that Lofton's injuries were the result of deliberately indifferent training of the County JIAC employees.

Wherefore, Defendant Sedgwick County, Kansas respectfully requests that the Court grant its motion to dismiss and grant such other relief as it may show it is entitled and the Court deems to be reasonable, appropriate, and just.

Respectfully submitted,

**Case Linden P.C.**

s/Cory R. Buck
Kevin D. Case, KS 14570
Cory R. Buck, KS 25969
2600 Grand Boulevard, Suite 300
Kansas City, MO  64108
Tel:  (816) 979-1500
Fax:  (816) 979-1501
kevin.case@caselinden.com
cory.buck@caselinden.com
Attorneys for Defendant Sedgwick County, Kansas

## Certificate of Service

I hereby certify that on August 24, 2022, a true and correct copy of the above and foregoing was served by electronic filing with the Clerk of the Court in the CM/ECF system, which will automatically send email notification of such filing to the following counsel of record:

Benjamin Stelter-Embry
Protzman Law Firm, LLC
4001 W. 114th St., Ste. 110
Leawood, KS  66211
Attorney for Plaintiff

Andrew M. Stroth *(admitted pro hac vice)*
Action Injury Law Group, LLC
191 N. Wacker Drive, Suite 2300
Chicago, IL  60606
Attorney for Plaintiff

John S. Maresse *(admitted pro hac vice)*
Steven A. Hart *(admitted pro hac vice)*
Hart McLaughlin & Eldridge, LLC
22 W. Washington Street, Suite 1600
Chicago, IL  60602
Attorneys for Plaintiff

Allen G. Glendenning
Jeffrey M. Kuhlman
Watkins Calcara, Chtd.
1321 Main Street, Suite 300
PO Drawer 1110
Great Bend, KS  67530
Attorneys for Defendants Jason Stepien, Brenton Newby, Karen Conklin, Billy Buckner, and Benny Mendoza

s/Cory R. Buck
Cory R. Buck