## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MARQUAN TEETZ, as Next Friend and
Personal Representative of the ESTATE OF
CEDRIC LOFTON, deceased,

  *Plaintiff,*

 vs.                                                        Case No. 22-cv-1134-EFM

SEDGWICK COUNTY, KANSAS, *et al.*,

  *Defendant.*

## MEMORANDUM AND ORDER

Plaintiff Marquan Teetz, as next friend and personal representative of the Estate of Cedric Lofton, deceased, brings this action under 42 U.S.C. § 1983 seeking redress for alleged constitutional violations that resulted in Lofton's untimely death. The Defendants are Sedgwick County, Kansas, the City of Wichita, Kansas, and a number of individual officers of both the County and City. Both the County and City now move to dismiss certain claims against them under Fed. R. Civ. P. 12(b)(6). Specifically, the County moves to dismiss Counts 11 and 12, which seek to impose *Monell* liability for excessive force and failure to train, respectively. The City moves to dismiss Count 14, a claim for failure to train. Because the Complaint (and the Amended Complaint) do not plausibly allege the necessary elements for Plaintiff to proceed on these claims, the Court grants both Motions.

## I.      Factual and Procedural Background[1]

Cedric Lofton was a 17-year-old foster child.  In the early morning hours of September 24, 2021, Lofton returned to his foster home after leaving without notice a day earlier.  Lofton's foster father was concerned about Lofton's mental health.  He first aired his concerns by calling the Kansas Department of Children and Families, which in turn directed him to call the police.

Several WPD officers arrived and encountered Lofton outside his foster home.  Plaintiff alleges Lofton presented no danger to the officers and showed no signs of violence.  Instead, Lofton was experiencing some kind of a mental health crisis.  Plaintiff reports that Lofton told the officers that he could see people (who were not there) who were trying to kill him.  The officers attempted to persuade Lofton to come with them willingly.  When this failed, Lofton was restrained and handcuffed.  Ultimately, the officers used a "WRAP" system—in effect a full body straitjacket, according to Plaintiff—to restrain Lofton.  Plaintiff alleges this was done in violation of WPD policy.

While restrained, Lofton was carried by several officers to a police car.  He was transported immediately to Sedgwick County's Juvenile Intake and Assessment Center ("JIAC").  This facility is part of the Juvenile Services Division of the Sedgwick County Department of Corrections and is meant to "connect referred youth and their families with appropriate services in order to limit their involvement with the juvenile justice system."

During intake at JIAC, Plaintiff alleges that a WPD officer falsified answers in order to avoid transferring Lofton to a hospital.  Specifically, the officer initially reported to JIAC that

---

[1] The following facts are taken from Plaintiff's First Amended Complaint, and are assumed true for the purposes of ruling on the Motions to Dismiss of the County and City.

Lofton was exhibiting signs—namely, a mental health crisis—that required immediate medical attention, but upon learning that such a response during intake would require WPD to transport Lofton to the hospital, the officer changed his answer. Plaintiff further alleges that the JIAC officers knew this response was false.

Once admitted to JIAC, Lofton was taken out of the WRAP restraint system and allowed to walk freely around the intake room. Lofton tried to approach the intake booths but was rebuffed by JIAC officer Jason Stepien. When Lofton again tried to approach, Plaintiff alleges that Stepien pushed Cedric toward a far wall. Stepien and Brenton Newby, another JIAC officer, then grabbed Lofton and held him. Lofton attempted to defend himself, and matters escalated when Stepien and Newby allegedly struck Lofton and attempted to tackle him to the ground. Plaintiff alleges that Lofton was then dragged into a holding cell.

In the cell, Lofton was allegedly pinned to a bench and had his legs shackled. Stepien and Newby then moved Lofton to the floor of the cell and continued to hold him in the prone position. According to Plaintiff, other JIAC officers, including Karen Conklin, Billy Buckner, and Benny Mendoza, came into the holding cell at various times, taking turns pinning Lofton to the ground. After several minutes passed, Lofton was handcuffed but officers continued to pin him to the ground thereafter.

Plaintiff alleges that this restraint of Lofton continued for 39 minutes uninterrupted, at which point Lofton had stopped breathing. When the officers stopped pinning Lofton to the floor, they rolled him over and attempted to resuscitate him. These efforts failed. Emergency services arrived minutes later and also failed in their attempts to resuscitate Lofton. Lofton was transported to Wesley Medical Center. He was pronounced dead two days later, on September 26, 2021. The Sedgwick County Chief Medical Examiner, after performing an autopsy on Lofton, determined

that Lofton died due to "complications of cardiopulmonary arrest sustained after physical struggle while restrained in the prone position" and ruled it as a homicide.

The JIAC use of force policy states that "JIAC staff shall use force only when all other less restrictive methods of behavior control have been attempted and failed, to protect the youth from injury, to prevent injury to others or to prevent escape."  It further provides that the "type and amount of force or restraint used shall only be to the extent reasonable and necessary to control a situation" and that force should only be used as a "temporary control measure" in limited circumstances, and never for discipline or punishment.  JIAC policy also states that all staff have a duty to intervene when they observe other staff using force beyond what is approved or necessary in a particular situation.

Plaintiff alleges that the JIAC officers who restrained Lofton violated this use of force policy.  In the alternative, he states that "to the extent JIAC's written policies authorize these Defendants' use of force on Cedric Lofton, JIAC's use of force policy is unconstitutional and resulted in Cedric Lofton's death."

According to Plaintiff, Sedgwick County Manager Tom Stolz expressed to the JIAC employees, who were put on administrative leave while the matter was being investigated, "that their leave is a formality and that we will vigorously defend them in this matter."  At other times, Plaintiff alleges County officials have cast aspersions on Lofton, suggesting his use of drugs was involved with his death.  The medical examiner determined that Lofton had no drugs in his system at the time of his death.

In 2016, the Kansas Department of Corrections issued a report on JIAC after a formal inspection.  A summary of the findings of that report, as laid out by Plaintiff, follows:

a. The report noted that JIAC was receiving too many juveniles with mental health issues and acknowledged that JIAC was not the proper place for such children both because JIAC lacked the capacity to handle them and because JIAC's community mental health partners, including COMCARE and St. Francis, were not responsive. As a result, the report specifically stated that JIAC needed "[s]upport in providing timelier response for [mental health] cases."

b. JIAC acknowledged that it needed training to address common issues of juveniles in its custody, including mental health issues, and specifically identified training on "staff management of risk," "de-escalation techniques," and "responding to trauma" as major needs.

c. The report explicitly admonished WPD for leaving mental health cases at JIAC as a form of punishment and refusing to provide transportation of youths to hospitals for medical evaluation. Specifically, WPD was noted to have "a tendency to sign paperwork and leave the juvenile quickly" and when "there is a need for transportation [to a medical facility, WPD [regularly] advise[d] it is the Sedgwick County Sheriff's responsibility" to handle such transport. The report also noted the tendency of WPD to improperly "us[e] detention [at JIAC] to punish youth."

Plaintiff alleges that the County and City have not made the changes recommended by this report in the over five years since its issuance.

Plaintiff filed suit against the County and City, as well as a number of individual officers from each, on June 13, 2022. The County filed a Motion to Dismiss under Rule 12(b)(6) on August 24, 2022, seeking dismissal of Counts 11 and 12. The City likewise filed a Motion to Dismiss seeking dismissal of Count 14. Plaintiff thereafter sought and was granted leave to file an Amended Complaint. The Amended Complaint (1) names the proper party in interest as the Board of Commissioners of Sedgwick County (2) names the individual Wichita police officers who were recently identified for the first time in the respective Rule 26(a)(1)(A) disclosures, (3) adds state law claims against City and County now that the 120-day notice period under K.S.A. § 12-105b has expired, and (4) adds § 1983 and state law claims against the identified WPD officers. Though normally the filing of an Amended Complaint would moot the pending Motions to Dismiss, the Court does not find that it does so here. None of the amendments change the facts alleged as

relevant to the Counts sought to be dismissed.  Therefore, the Court will consider the Motions fully briefed and will rule on them now.

## II.    Legal Standard

Under Rule 12(b)(6), a defendant may move for dismissal of any claim for which the plaintiff has failed to state a claim upon which relief can be granted.[2]  Upon such motion, the court must decide "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.' "[3]  A claim is facially plausible if the plaintiff pleads facts sufficient for the court to reasonably infer that the defendant is liable for the alleged misconduct.[4]  The plausibility standard reflects the requirement in Rule 8 that pleadings provide defendants with fair notice of the nature of claims as well the grounds on which each claim rests.[5]  Under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint but need not afford such a presumption to legal conclusions.[6]  Viewing the complaint in this manner, the court must decide whether the plaintiff's allegations give rise to more than speculative possibilities.[7]

---

[2] Fed. R. Civ. P. 12(b)(6).

[3] *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[4] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

[5] *See Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008) (citations omitted); *see also* Fed. R. Civ. P. 8(a)(2).

[6] *Iqbal*, 556 U.S. at 678.

[7] *See id.* ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.") (citation omitted).

### III.      Analysis

**A.      Claims Against Sedgwick County**

*1.      Count 11 – Unconstitutional Written Use of Force Policy*

Count 11 of the Complaint alleges that "Sedgwick County, through its JIAC, in violation of Plaintiff's constitutional rights, implemented, enforced, encouraged, and sanctioned a policy, practice, and/or custom of excessive force on juveniles to the extent its written use of force policy authorized JIAC officers' use of force on Cedric Lofton."  Earlier in the Complaint, Plaintiff similarly states that "to the extent JIAC's written policies authorize these Defendants' use of force on Cedric Lofton, JIAC's use of force policy is unconstitutional and resulted in Cedric Lofton's death."  Plaintiff clarifies that his qualifying language—that the County violated Lofton's constitutional rights through its policy only "to the extent" that policy authorized the use of force—is meant to call back to his allegations that County officials signaled approval of the use of force after Lofton's death.

This is essentially a ratification theory of recovery—that is, a contention that the County may be held liable for the unconstitutional conduct of its officers because it approved of or ratified that conduct.  The Tenth Circuit has stated that "if a subordinate's position is subject to review by the municipality's authorized policymakers and the authorized policymakers approve a subordinate's decision and the basis for it, their ratification will be chargeable to the municipality."[8]  At the pleading stage, a plaintiff wishing to proceed under a ratification theory must allege that the authorized policymakers for the municipality knew of, approved, and adopted

---

[8] *Moss v. Kopp*, 559 F.3d 1155, 1169 (10th Cir. 2009).

the subordinate's unconstitutional actions,[9] and that "such ratification caused the alleged constitutional harm."[10]

Plaintiff has not plausibly alleged that any ratification caused the constitutional harm—*i.e.,* Lofton's death in JIAC custody.  According to him, the County's ratification is clear by Sedgwick County Manager Tom Stolz's statement to corrections division leaders that the County would "vigorously defend" the JIAC employees involved in the death of Lofton.  Plaintiff also suggests that County officials cast Lofton in a negative light after the incident—such as suggesting that he was under the influence of narcotics at the time, which was proven false by Lofton's toxicology report—and otherwise implied that the situation was appropriated handled by JIAC staff.

Municipalities, however, may not be held liable on a ratification theory simply because they take steps to defend its officers in litigation, such as providing counsel.[11]  Nor does Plaintiff allege how such defense would have caused the alleged constitutional violation at issue, as it necessarily would have occurred after the events giving rise to the litigation.[12]  The same is true for the alleged statements by county officials casting Lofton in a negative light.  Plaintiff makes no plausible allegations that these statements purportedly made after-the-fact caused Lofton's death in JIAC custody.  As a result, this claim against Sedgwick County must be dismissed.

---

[9] *Butcher v. City of McAlester*, 956 F.2d 973, 978 (10th Cir. 1992) ("Ratification requires that Green knew of and approved Sanders' actions and adopted Sanders' unconstitutional motive.").

[10] *Coffee v. City of Okla. City*, 2009 WL 10669175, at *4 (W.D. Okla. 2009); *see also Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978) ("Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort.").

[11] *See Camfield v. City of Okla. City*, 248 F.3d 1214, 1230 (10th Cir. 2001).

[12] *See Davis v. City of Tulsa*, 380 F. Supp. 3d 1163, 1174 (N.D. Okla. 2019) ("There is a temporal problem inherent in the plaintiffs' ratification theory. The City's post-shooting review could not have been the direct cause of (or 'moving force' behind) the shooting that occurred before the review. In short, there is obviously no causal link between Mr. Starks's death and the City's alleged ratification of the shooting after his death. Mr. Starks died before the review and the City's alleged ratification thereof.").

Plaintiff, in his brief, also seems to argue that his excessive force claim against the County is based on an alleged unwritten policy of the County that resulted in widespread mistreatment of individuals in the JIAC facility.  Plaintiff is correct that a claim may exist against a municipality based on an unwritten policy or custom.[13]  But Plaintiff's Complaint does not allege such a claim here.  His claim for excessive force against the County clearly alleges the County violated Lofton's constitutional rights "to the extent its *written* use of force policy authorized JIAC officers' use of force on Cedric Lofton."[14]  To make a claim based on an alleged unwritten custom, Plaintiff must amend his Complaint to state such claim, either with Defendants' consent or with leave of the Court, as required by Fed. R. Civ. P. 15(a)(2).

2.      *Count 12 – Deliberate Indifference in Failure to Train*

Plaintiff alleges in Count 12 that the County was deliberately indifferent in failing to train its employees at the JIAC facility and that such failure to train caused Lofton's death.  The Supreme Court has recognized that there exist "limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983."[15]  A municipality's failure to train its officers "may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."[16]  "A municipality's

---

[13] *See Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008) ("A custom has come to mean an act that, although not formally approved by an appropriate decision maker, has such widespread practice as to have the force of law.  In order to establish a custom, the actions of the municipal employees must be continuing, persistent and widespread.") (citations and internal quotations omitted).

[14] Emphasis added.

[15] *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989).

[16] *Id.* at 388.

culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."[17]

The Tenth Circuit has identified several specific requirements for a failure to train claim against a municipality under § 1983 when municipal officers are alleged to have used excessive force:

> [A] plaintiff must first prove the training was in fact inadequate, and then satisfy the following requirements: (1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the [municipality] toward persons with whom the police officers come into contact, and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.[18]

The County's argument in favor of dismissal is twofold, both prongs of which attack Plaintiff's allegations on the third element—deliberate indifference. The County first argues that Plaintiff has not plausibly alleged a pattern of similar instances by JIAC employees, which is " 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."[19] Given this, the County next argues that Plaintiff's case is not one of those "rare" cases that can proceed without proof of a pattern of violations based on the "patently obvious" unconstitutional consequences of failing to train.[20]

---

[17] *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

[18] *Carr v. Castle*, 337 F.3d 1221, 1228 (10th Cir. 2003).

[19] *Connick*, 562 U.S. at 70 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 409 (1997)).

[20] *Id.* at 64 ("The Court [in *Canton*] sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations.").

Defendant is correct that "proving deliberate indifference ordinarily requires showing a pattern of similar instances."[21]   This is because "continued adherence to an approach that policymakers know or should know has failed to prevent tortious conduct by employees may establish conscious disregard for the consequences of their action."[22]

Plaintiff fails to plausibly allege a pattern of similar violations that pre-date Lofton's untimely death.   To do so, he solely relies on a 2016 report from the Kansas Department of Corrections ("KDOC") as to the conditions in the JIAC.   This report, he alleges, found that (1) JIAC was ill-equipped to handle children with mental health issues, (2) JIAC admitted it needed additional training on de-escalation techniques related to juveniles in its custody and responding to trauma, and (3) noted that the WPD exacerbated these problems by improperly leaving mental health cases at JIAC as a form of punishment and requiring the Sheriff's Office to arrange transport to medical facilities, if necessary.   Plaintiff alleges that JIAC failed to address any of these problems in the over five years since the publication of the report.

Nothing in this report, as Plaintiff has presented it, remotely resembles an allegation that the JIAC had suffered similar incidents in the past.   Certainly, the report identifies deficiencies in several aspects of the facility's operation but does not mention or rely upon any particular incident in making its findings, let alone a pattern of several similar incidents.

The cases relied upon by Plaintiff are thus inapposite.   In *Perea v. City of Albuquerque*,[23] for instance, the report relied upon by the plaintiff found that "officers frequently misused

---

[21] *George, on behalf of Bradshaw v. Beaver Cnty., by & through Beaver Cnty. Bd. of Comm'rs*, 32 F.4th 1246, 1254 (10th Cir. 2022).

[22] *Id.* (brackets removed) (quoting *Connick,* 563 U.S. at 62).

[23] 2014 WL 12621250, at *1 (D.N.M. 2014), *on reconsideration*, 2014 WL 12621251 (D.N.M. 2014), and *aff'd sub nom. Perea v. Baca*, 817 F.3d 1198 (10th Cir. 2016).

electronic control weapons . . . resorting to use of the weapon on people who are passively resisting, observably nonthreatening but unable to comply with orders due to their mental state, or posed only a minimal threat to the officers."[24]  In other words, the report clearly identified a pattern of previous similar incidents by officers.  Likewise, in *Revilla v. Glanz*,[25] the audit reports relied upon by the plaintiff found that specific doctors posed substantial risks to inmate health and safety because these doctors refused to see inmates with life threatening conditions.[26]  By contrast, the KDOC report relied upon by Plaintiff contains no specific allegations as to similar violations by the JIAC.  Rather, it only acknowledged that the JIAC needed assistance from outside agencies in caring for juveniles with mental health issues and that the JIAC itself recognized the need for additional training to address common issues with juveniles in its custody, such as de-escalation techniques and responding to trauma.  This is insufficient to allege a pattern of pre-existing similar violations.

Plaintiff's failure to allege a pattern of violations is near fatal to his claim.  Evidence—or at this stage, allegations—of "a pre-existing pattern of violations is *only unnecessary* in a narrow range of circumstances, however rare, in which the unconstitutional consequences of a failure to train are highly predictable and patently obvious."[27]  In such cases, "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights,

---

[24] *Id.* at *7.

[25] 8 F. Supp. 3d 1336 (N.D. Okla. 2014).

[26] *Id.* at 1341.

[27] *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1285 (10th Cir. 2019) (internal quotation marks omitted and emphasis added) (quoting *Connick*, 563 U.S. at 63-64).

that the policymakers of the city can be reasonably said to have been deliberately indifferent to the need."[28]

Plaintiff fails to plausibly allege that this is the rare case where evidence of a pattern of similar, pre-existing violations is unnecessary to demonstrate deliberate indifference in failure to train. While the KDOC report supports Plaintiff's contention that "the need for more or different training is so obvious"—as JIAC itself acknowledged more training was necessary as to mental health issues and de-escalation—the Court is not convinced that the lack of training was so likely to result in the violation of constitutional rights such that the County was deliberately indifferent to the need.

Plaintiff alleges the conduct of the JIAC officers here was completely beyond the pale. He alleges that Lofton posed no threat, the officers easily restrained Lofton after his initial resistance, that they successfully restrained his legs with shackles and handcuffed him, and still no fewer than five officers were involved with pinning Lofton to the floor for close to 40 minutes, at the end of which time he had long since stopped breathing. Such conduct, as alleged, is so outside the bounds of appropriate law enforcement behavior that it cannot be said to involve a "gray area" in the law that would make it "highly predictable" that an officer would need additional training to know how to correctly handle the situation.[29] Simply put, even an untrained officer should know that such conduct exceeds the permissible bounds of the use of force.[30]

---

[28] *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 773 (10th Cir. 2013).

[29] *Waller*, 932 F.3d at 1288.

[30] *See id.* ("Even an untrained law enforcement officer should have been well aware that any use of force in this situation—where a restrained detainee was simply addressing a judge at a hearing in a polite, calm voice—was inappropriate.").

Because even an untrained officer should know that the conduct alleged to have occurred in this case was improper, the Court cannot say that the consequences of any alleged lack of training here were highly predictable and patently obvious.  This, therefore, is not the "rare" case where a pattern of pre-existing violations in unnecessary for Plaintiff to proceed with his deliberate indifference in failure to train claim.  Plaintiff does not plausibly allege a pattern of pre-existing violations. Accordingly, Count 12 must be dismissed.

**B.      Failure to Train Claim Against the City of Wichita**

The City has three arguments as to why Plaintiff's failure to train claim against it should be dismissed under Rule 12(b)(6).  First, the City contends that the Complaint fails to allege an underlying constitutional violation by any of its officers.  Second, the City states that the Complaint does not properly allege that the City acted with deliberate indifference.  Finally, it argues that the Complaint does not identify a City policy that caused any alleged unconstitutional conduct. Because the Court finds dismissal is appropriate based on the lack of plausible allegations as to the City's deliberate indifference, it will not address causation.

*1.      Underlying Constitutional Violation*

A municipality cannot be held liable under § 1983 where there was no underlying constitutional violation by one of its officers.[31]  The parties agree that the relevant standards in determining whether a WPD officer violated Lofton's constitutional rights are those for deliberate indifference to the serious medical needs of pre-trial detainees under the Fourteenth Amendment. Such a claim relies on the two-part Eight Amendment inquiry into whether an official has been

---

[31] *Rowell v. Bd. of Cnty. Commissioners of Muskogee Cnty.*, 978 F.3d 1165, 1175 (10th Cir. 2020).

deliberately indifferent to a pre-trial detainee's serious medical needs.[32]  This test involves both an objective and subjective component.

i.    Objective Inquiry

The objective inquiry asks whether "the harm suffered rises to a level sufficiently serious to be cognizable under the Cruel and Unusual Punishment Clause of the Eighth Amendment."[33] The Tenth Circuit has made clear that a plaintiff may meet his burden on the objective inquiry in two ways.  First, a harm is "sufficiently serious" if "the condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."[34]  Second, even if the plaintiff's symptoms standing alone are not sufficiently serious, he may rely on the "intermediate harm" analysis to show that the a sufficiently serious "resulting harm," such as death, was caused by the failure to treat his intermediate symptoms.[35]  At the pleading stage, of course, Plaintiff need only plausibly allege an objectively serious harm to proceed.

Plaintiff has done so here.  Serious mental health needs can qualify as objectively serious conditions under the Eighth and Fourteenth Amendments.[36]  Plaintiff does not allege that Lofton was diagnosed with any mental health conditions by a medical professional, but rather that, at the time he was confronted by WPD officers, he was in the "obvious throes of a mental health crisis."

---

[32] *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1028 (10th Cir. 2020).

[33] *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (citations and internal quotation marks omitted).

[34] *Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1044 (10th Cir. 2022) (quoting *Al-Turki v. Robinson*, 762 F.3d 1188, 1192–93 (10th Cir. 2014)).

[35] *Id.* at 1045 (citations omitted).

[36] *See Sawyers v. Norton*, 962 F.3d 1270, 1284 (10th Cir. 2020); *Gray v. Geo Grp., Inc.*, 727 F. App'x 940, 944 (10th Cir. 2018) ("Gray's allegation that he was diagnosed and treated for the cited mental health disorders is sufficient to establish the objective component of his deliberate indifference claim regarding his mental health needs.").

Plaintiff alleges that Lofton spoke to the officers about seeing people who were not there and that he feared these people were trying to kill him.  Accepting Plaintiff's allegations as true, Lofton's severe mental health crisis qualified as one that would be obvious to a lay person as requiring medical attention.

The City's argument that Plaintiff has not alleged that his mental health crisis caused his death is without merit.  This argument seems to go to the second means at a plaintiff's disposal of showing an objectively serious harm—that is, the "intermediate harm" analysis.  This analysis comes into play when the plaintiff's symptoms standing alone are not sufficiently serious, and allows the plaintiff to show that a sufficiently serious resulting harm—here, death—was caused by the disregard of his symptoms.  Plaintiff here does not need to rely on the intermediate harm analysis, as he has alleged a sufficiently serious mental health need such that it would be obvious to a layperson that Lofton was in need of medical attention. Thus, Plaintiff has plausibly alleged that Lofton had an objectively serious medical need.

      ii.      Subjective Inquiry

The subjective component of the Eighth Amendment analysis requires the Court to consider "evidence of the prison official's culpable state of mind," specifically whether this evidence establishes the official knew of and disregarded "an excessive risk" to the plaintiff's health or safety.[37]  Actual knowledge is required; "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[38]  A defendant's knowledge can be inferred from circumstantial evidence.[39]

---

[37] *Prince*, 28 F.4th at 1045 (citing *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005)).

[38] *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

[39] *DeSpain v. Uphoff*, 264 F.3d 965, 975 (10th Cir. 2001).

"For example, the existence of an obvious risk to health or safety may indicate awareness of the risk."[40]

Plaintiff has plausibly alleged a culpable state of mind on the part of the WPD officers who arrested him and transported him to JIAC.  Accepting Plaintiff's allegations as true and drawing all reasonable inferences in his favor, the WPD officers observed Lofton seeing people who were not there and heard him express his belief that these people wanted to kill him.  As noted above, this was an obvious indication that Lofton was experiencing a mental health crisis.  The officers responded by the restraining Lofton in a WRAP restraint, from which fact it can be inferred that the officers knew Lofton's mental episode presented a very real risk to himself and others.

The City responds that Plaintiff fails to plausibly allege that the WPD officers knew or should have known that there was an excessive risk that Lofton would be injured or die as a result of excessive force by the JIAC employees.  There is support for the City's assertion that the subjective prong of a claim of deliberate indifference to serious medical needs requires the plaintiff to show the defendant "disregarded the *specific risk* of harm actually claimed."[41]  Because the specific risk claimed by Plaintiff is Lofton's death due to JIAC employees' use of excessive force, the City contends that Plaintiff must plausibly allege the WPD officers consciously disregard this specific risk.

---

[40] *Rife v. Okla Dep't of Pub. Safety*, 854 F.3d 637, 647 (10th Cir. 2017); *see also Farmer*, 511 U.S. at 842 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.").

[41] *Bruner-McMahon v. Hinshaw*, 846 F. Supp. 2d 1177, 1200 (D. Kan. 2012) (emphasis added), *aff'd sub nom. Bruner-McMahon v. Jameson*, 566 F. App'x 628 (10th Cir. 2014); *see also see Estate of Hocker v. Walsh*, 22 F.3d 995, 1000 (10th Cir. 1994) (plaintiffs required to show deliberate indifference to specific risk of suicide, not merely general risk of intoxication).

This argument, however, is ultimately unavailing.  Plaintiff has plausibly alleged that the WPD officers disregarded the specific risk that Lofton might be subjected to excessive force in the JIAC.  Plaintiff alleges that the WPD officers knew that Lofton was experiencing a mental health crisis, which the officers understood to make him dangerous as can be inferred by the use of the WRAP restraint system on him.  Instead of seeking mental health related treatment for Lofton, however, the WPD officers chose to simply drop Lofton off at JIAC.  In filling out the JIAC intake form, Plaintiff alleges the WPD officers falsified answers in order to avoid transferring Lofton to obtain medical treatment for his mental health crisis.

Taken as a whole, the Complaint has plausibly alleged that the WPD officers knew of and disregarded an excessive risk to Lofton's health or safety by leaving him at the JIAC facility. Therefore, Plaintiff has plausibly alleged an underlying constitutional violation by officers of the City—namely, deliberate indifference to Lofton's serious need for medical care.

2.      *Deliberate Indifference by the City of Wichita*

Though Plaintiff has plausibly alleged deliberate indifference to Lofton's serious medical needs on the part of the individual WPD officers, attributing this to the City is not a simple matter of vicarious liability.  "[V]icarious liability will not open a municipality to liability simply when one of its officers has committed a constitutional violation."[42]   Rather, "it is only when the execution of the government's policy or custom inflicts the injury that the municipality may be held liable under § 1983."[43]   As stated above, "the inadequacy of police training may serve as a

---

[42] *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1318 (10th Cir. 2002).

[43] *Id.* (cleaned up) (quoting *City of Canton*, 489 U.S. at 385).

basis for § 1983 liability . . . where the failure to train amounts to a deliberate indifference to the rights of persons with whom the police come into contact."[44]

Again, as above, proving deliberate indifference in the failure to train context "ordinarily requires showing a pattern of similar instances."[45]  Evidence of "a pre-existing patter of violations is only unnecessary in a narrow range of circumstances, however rare, in which the unconstitutional consequences of a failure to train are highly predictable and patently obvious."[46]

Plaintiff relies on the same arguments it made against the County to avoid dismissal of this claim.  In attempting to prove a pattern of violations by the WPD, he again relies on the 2016 KDOC report.  By Plaintiff's own admission, that report only made two findings as to the WPD. First, it found that the WPD had a "tendency to sign paperwork and leave the juvenile quickly" and to require the Sheriff's Office to arrange transport to a medical facility when necessary. Second, the report noted that the WPD sometimes improperly used detention at JIAC to punish youth.  Neither of these, however, plausibly allege a pre-existing pattern of similar violations by the WPD sufficient to support Plaintiff's failure to train claim.

Plaintiff's failure to train claim relies in large part on the WPD officers' failure to obtain mental health treatment for Lofton—specifically, by allegedly falsifying intake responses to ensure that Lofton was admitted to JIAC rather than taken to a medical facility for mental health treatment. Nothing in the 2016 report, or anywhere else in Plaintiff's Complaint, alleges a pattern of such behavior by the WPD.  The deficiencies identified in the report—that the WPD had a tendency to

---

[44] *Harris*, 489 U.S. at 385.

[45] *George*, 32 F.4th at 1254.

[46] *Waller*, 932 F.3d at 1285 (internal quotation marks omitted and emphasis added) (quoting *Connick*, 563 U.S. at 63–64).

leave quickly, would require the Sheriff's Office to arrange medical transport, and would leave juveniles at JIAC as a form of punishment—are far different in kind than falsifying intake answers, and as such there are no allegations that the City had notice of this kind of misconduct.

Nor is this the rare case which may proceed without plausible allegations of a pre-existing pattern of similar violations.  Similar to the alleged misconduct of the JIAC officers, the WPD's alleged falsifying of intake answers to avoid obtaining medical treatment for Lofton is not an "obvious" or "highly predictable" consequence of a dearth in training.  Even untrained officers should be aware that lying on an official form to avoid being required to obtain medical treatment for a person in custody is inappropriate.[47]  Therefore, Plaintiff's failure to train claim against the City is not one that may proceed without allegations of a pre-existing pattern of similar violations by WPD officers.  Because the Court finds that the 2016 KDOC report fails to exhibit such a pattern, Plaintiff's failure to train claim against the City must be dismissed.

**IT IS THEREFORE ORDERED** that Defendant Sedgwick County's Motion to Dismiss (Doc. 20) is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendant City of Wichita's Motion to Dismiss (Doc. 29) is **GRANTED**.

Counts 11, 12, and 14 are dismissed.

---

[47] *See Waller*, 932 F.3d at 1288 ("Even an untrained law enforcement officer should have been well aware that any use of force in this situation—where a restrained detainee was simply addressing a judge at a hearing in a polite, calm voice—was inappropriate.  This case does not involve technical knowledge or ambiguous 'gray areas' in the law that would make it 'highly predictable' that a deputy sheriff in Deputy Lovingier's position would need 'additional specified training' to know how to handle the situation correctly.") (quoting *Connick*, 563 U.S. at 71).

**IT IS SO ORDERED.**

Dated this 2nd day of December, 2022.


ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE