## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MARQUAN TEETZ as Next Friend and
Personal Representative of the ESTATE OF
CEDRIC LOFTON, deceased,

        *Plaintiff,*

vs.

                                       Case No. 22-1134-EFM

THE BOARD OF COUNTY
COMMISSIONERS OF SEDGWICK
COUNTY, KANSAS, et al.,

        *Defendant.*

## MEMORANDUM AND ORDER

Plaintiff Marquan Teetz, as next friend and personal representative of the Estate of Cedric Lofton, deceased, brings this action under 42 U.S.C. § 1983 seeking redress for alleged constitutional violations that resulted in Lofton's untimely death. Defendants are Sedgwick County, Kansas, the City of Wichita, Kansas, and several individual law enforcement officers who worked for the County and City.

Before this Court, the County and the City bring Motions to Dismiss arising out of Plaintiff's Second Amended Complaint ("SAC"). The County and City seek to dismiss Counts 11 and 22 respectively, in which Plaintiff alleges that both implemented, enforced, and/or promoted unconstitutional municipal policies. The County and City also seek to dismiss Counts 12 and 21, in which Plaintiff alleges that both were deliberately indifferent to Lofton's health and safety. Lastly, the County and City seek to dismiss Counts 44 and 45 respectively, in which Plaintiff

alleges that both negligently trained their employees. Because Plaintiff does not plausibly allege the necessary elements to proceed on any of these claims, the Court grants both Motions.

## I. Factual Background and Procedural History[1]

Cedric Lofton was a 17-year-old foster child. On the morning of September 24, 2021, Lofton returned to his foster home after leaving without notice a day earlier. Lofton's foster father was concerned about Lofton's mental health. He aired his concerns by calling the Kansas Department of Children and Families, who directed him to call the police.

Several WPD officers arrived and encountered Lofton outside his foster home. Lofton presented no danger to the officers and showed no signs of violence. Instead, Lofton was experiencing a mental health crisis. Lofton told the officers that he could see people (who were not there) who were trying to kill him. When Sergeant Supancic arrived on the scene, he voiced his intent to take Lofton to St. Joseph Hospital for a mental health evaluation. But after the officers informed Lofton that they were going to place him in the police vehicle to take him to the hospital, Lofton resisted and jumped away from the officers. A short struggle ensued, resulting in the officers restraining and handcuffing Lofton on his front lawn. Ultimately, the officers used a "WRAP" system—effectively a full body straitjacket—to restrain Lofton.

While restrained, Lofton was carried by several officers to a police car. Then, he was transported to Sedgwick County's Juvenile Intake and Assessment Center ("JIAC"). This facility is part of the Juvenile Services Division of the Sedgwick County Department of Corrections ("SCDC") and was created to "connect referred youth and their families with appropriate services in order to limit their involvement with the juvenile justice system."

---

[1] The facts in this section are taken from Plaintiff's Second Amended Complaint unless otherwise cited.

JIAC did not have the capacity to help Lofton during his mental health crisis because it had a skeleton crew without any mental health or medical staff. During Lofton's intake at JIAC, a WPD officer falsified answers to avoid transferring Lofton to a hospital. Specifically, the officer initially reported to JIAC that Lofton was exhibiting signs of a mental health crisis that required immediate medical attention. But upon learning that such a response during intake would require WPD to transport Lofton to the hospital, the officer changed his answer. Plaintiff alleges that the JIAC officers knew this response was false.

Once admitted to JIAC, Lofton was taken out of the WRAP restraint system and allowed to walk freely around the intake room. Lofton tried to approach the intake booths but was rebuffed by a JIAC officer. When Lofton again tried to approach, the officer pushed Lofton toward a far wall. This officer along with two others then grabbed Lofton and held him. Lofton attempted to defend himself but matters escalated when two officers struck and tackled Lofton to the ground. Officers then dragged Lofton into a holding cell.

In the cell, Lofton was pinned to a bench with his legs shackled. A few minutes later, Lofton was moved to the cell floor and pinned on his stomach in the prone position. No fewer than five JIAC and Juvenile Detention Facility officers cycled in and out of the cell, taking turns pinning Lofton to the ground.

Lofton remained pinned for 39 minutes uninterrupted, at which point he stopped breathing. Eventually, the officers rolled Lofton over and attempted to resuscitate him. These efforts failed. Emergency services arrived minutes later but also failed in their attempts to resuscitate Lofton. Lofton was transported to Wesley Medical Center. He was pronounced dead two days later, on September 26, 2021. The Sedgwick County Chief Medical Examiner, after performing an autopsy

on Lofton, determined that Lofton died due to "complications of cardiopulmonary arrest sustained after physical struggle while restrained in the prone position" and ruled his death a homicide.

The JIAC use of force policy states that "JIAC staff shall use force only when all other less restrictive methods of behavior control have been attempted and failed, to protect the youth from injury, to prevent injury to others or to prevent escape." It further provides that the "type and amount of force or restraint used shall only be to the extent reasonable and necessary to control a situation," that force should only be used as a "temporary control measure" in limited circumstances, and that force should "never be used under any circumstances for the purposes of punishment or discipline." JIAC policy also states that all staff have a duty to intervene when they observe other staff using force beyond what is approved or necessary in a particular situation.

In 2016, the Kansas Department of Corrections published a report detailing its findings related to JIAC after conducting a formal inspection. A summary of the report follows:

a. The report noted that JIAC was receiving too many juveniles with mental health issues and acknowledged that JIAC was not the proper place for such children both because JIAC lacked the capacity to handle them and because JIAC's community mental health partners, including COMCARE and St. Francis, were not responsive. As a result, the report specifically stated that JIAC needed "[s]upport in providing timelier response for [mental health] cases."

b. JIAC acknowledged that it needed training to address common issues of juveniles in its custody, including mental health issues, and specifically identified training on "staff management of risk," "de-escalation techniques," and "responding to trauma" as major needs.

c. The report explicitly admonished WPD for leaving mental health cases at JIAC as a form of punishment and refusing to provide transportation of youths to hospitals for medical evaluation. Specifically, WPD was noted to have "a tendency to sign paperwork and leave the juvenile quickly" and when "there is a need for transportation [to a medical facility, WPD [regularly] advise[d] it is the Sedgwick County Sheriff's responsibility" to handle such transport. The report also noted the tendency of WPD to improperly "us[e] detention [at JIAC] to punish youth."

Plaintiff alleges neither the County nor the City have made the changes recommended by this report since its issuance.

Plaintiff filed suit against the County and City, as well as several individual law enforcement officers, on June 13, 2022. The County filed a Motion to Dismiss under Rule 12(b)(6) on August 24, 2022. The City likewise filed a Motion to Dismiss under Rule 12(b)(6) on September 12, 2022. Before the Court could rule on the Motions, Plaintiff sought and was granted leave to file an Amended Complaint.[2] On December 2, 2022, this Court granted both Defendants' Motions to Dismiss, but dismissed all Counts without prejudice. Thereafter, Plaintiff sought and was granted leave to amend his complaint for a second time. On May 8, 2023, the County and the City both filed Motions to Dismiss under Rule 12(b)(6). These Motions are now ripe for ruling.

## II.    Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move for dismissal of any claim for which the plaintiff has failed to state a claim upon which relief can be granted.[3] Upon such motion, the court must decide "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"[4] A claim is facially plausible if the plaintiff pleads facts sufficient for the court to reasonably infer that the defendant is liable for the alleged misconduct.[5] The plausibility standard reflects the requirement in Rule 8 that pleadings provide defendants with fair notice of the nature of claims as well the grounds on which each claim rests.[6] Under Rule

---

[2] Though normally the filing of an Amended Complaint would moot the pending Motions to Dismiss, none of the amendments changed the alleged facts as relevant to the Counts sought to be dismissed.

[3] Fed. R. Civ. P. 12(b)(6).

[4] *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[5] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

[6] *See Robbins v. Okla. ex rel. Dep't Hum. Servs.*, 519 F.3d 1242, 1248 (10th Cir. 2008) (citations omitted); *see also* Fed. R. Civ. P. 8(a)(2).

12(b)(6), the court must accept as true all factual allegations in the complaint, but need not afford

such a presumption to legal conclusions.[7] Viewing the complaint in this manner, the court must

decide whether the plaintiff's allegations give rise to more than speculative possibilities.[8] If the

allegations in the complaint are "so general that they encompass a wide swath of conduct, much

of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to

plausible.'"[9]

## III.    Analysis

Generally, the government cannot be sued under 42 U.S.C. § 1983 for injuries caused by

its employees. However, a municipality can be liable under § 1983 for violations of civil rights if

the plaintiff can show (1) a violation of his constitutional rights, (2) an official municipal policy

or custom, and (3) direct causation between the policy and the constitutional violation.[10]

Here, the parties agree that JIAC officers and WPD officers violated Lofton's constitutional

rights. Therefore, the Court will assume without deciding that the injury element is met for each

Count. Rather, the parties' dispute centers around whether Plaintiff has plausibly alleged the

existence of a municipal policy, and whether such policy directly caused Lofton's constitutional

deprivation.

To meet the "municipal policy or custom" element, Plaintiff must plead that such a policy

or custom exists in one of five forms:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a
> widespread practice that, although not authorized by written law or express
> municipal policy, is so permanent and well settled as to constitute a custom or usage
> with the force of law; (3) the decisions of employees with final policymaking

---

[7] *Iqbal*, 556 U.S. at 678–79.

[8] *See id.* ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." (citation omitted)).

[9] *Robbins*, 519 F.3d at 1247 (quoting *Twombly*, 550 U.S. at 570).

[10] *Chilcoat v. San Juan Cnty.*, 41 F.4th 1196, 1215 (10th Cir. 2022).

authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.[11]

To establish the causation element, the challenged policy or practice must be "closely related to the violation of the plaintiff's federally protected right."[12] This requirement is satisfied if Plaintiff shows that "the municipal action was the moving force behind the injury of which the plaintiff complains."[13] Plaintiff must therefore "demonstrate a direct causal link between the municipal action and the deprivation of federal rights."[14]

**A.     Counts 11 and 22**

*1.     Count 11 – The County's Unconstitutional Written Use of Force Policy*

> a.     Plaintiff has plausibly alleged the existence of an official County policy but has failed to allege that such policy is unconstitutional.

In Count 11, Plaintiff alleges the existence of the first type of policy—a formal regulation of policy statement. Specifically, Plaintiff claims that that the County maintains a "written policy" which authorized the JIAC officers to use excessive force on Lofton. Plaintiff's argument is twofold: (1) the County's policy is unconstitutional, and (2) the policy's implementation, enforcement, and/or encouragement resulted in Lofton's death.

After reviewing the entire complaint, the only written policy Plaintiff mentions attributable to the County is Policy Number 8.810 of the SCDC Policy and Procedures Manual. Plaintiff incorporates several provisions of this policy into the SAC. Some of those relevant provisions read:

---

[11] *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019) (quotations omitted).

[12] *Schneider v. City of Grand Junction Police Dep't.*, 717 F.3d 760, 770 (10th Cir. 2013) (quotations omitted).

[13] *Bd. of the Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 405 (1997).

[14] *Id.* at 404.

> JIAC staff shall use force only when all other less restrictive methods of behavior control have been attempted and failed . . . . The type and amount of force or restraint used shall only be to the extent reasonable and necessary to control a situation.
> . . . .
> Force and/or restraints SHALL NEVER be used under any circumstances for the purposes of punishment or discipline.
> . . . .
> [When] observing another staff using force that is clearly beyond what is approved or needed in the situation, . . . [s]taff shall [v]erbally intervene; and/or [p]hysically intervene; and, immediately report all observations through the chain of command.
> . . . .
> Any time a youth is injured in an accident involving use of force, he/she shall receive immediate medical attention.

Given this information, the Court finds that Plaintiff has plausibly alleged that the County has an official use of force policy.

        b.     Plaintiff has failed to plausibly allege that the County's official policy caused Lofton's constitutional deprivation.

Although Plaintiff need not challenge the policy's constitutionality to persist on a § 1983 claim, the policy's constitutional status impacts the stringency of the causation element, nonetheless. Courts must apply the causation element "with especial rigor when the municipal policy or practice is itself not unconstitutional."[15]

Here, Plaintiff has only stated "the Sedgwick County Department of Corrections' use of force policy is unconstitutional." But Plaintiff has not alleged any additional facts that would explain what about Policy Number 8.810 is wholly or partially unconstitutional, facially or as applied. Thus, the Court finds that Plaintiff's allegation is conclusory. As such, Plaintiff has failed to adequately plead that the County's written use of force policy is unconstitutional.

But, even without such a heightened pleadings standard, the Court finds it implausible that Lofton was injured and/or died as a direct and proximate result of the procedures set forth in Policy

---

[15] *Schneider*, 717 F.3d at 770 (quotations omitted).

Number 8.810. To the contrary, it seems that the force JIAC officers used on Lofton was in blatant disregard of the County's written policies. Had the officers followed Policy Number 8.810 by employing less restrictive methods of behavior control, not applying force or restraints for the proposes of punishment or discipline, verbally or physically intervening, or immediately reporting all observations through the proper chain of command, Lofton would likely still be alive.

The Court does not believe that Plaintiff's SAC has adequately pled that Policy Number 8.810 "expressly failed to address well-known dangers associated with prone restraint position." Rather, he makes this allegation for the first time in his Response to the County's Motion to Dismiss. The Court cannot consider new allegations made outside the Complaint.[16] And the Court cannot rewrite Plaintiff's Complaint for him.[17]

But even if Plaintiff had made such an allegation in the SAC, he has not cited any cases supporting an argument that omissions in written policies should be treated the same as affirmatively stated policies. Additionally, Plaintiff fails to explain the causal link between the Policy's silence on the dangers of the prone position and the officers' decision to use it. In fact, Plaintiff alleges that regardless of the County's policies or training, the excessiveness of the officers' force would have been obvious to any reasonable officer given the surrounding circumstances. Thus, without connecting the County's policy—or lack thereof—to Lofton's death, the Court dismisses Count 11 against the County with prejudice.

---

[16] *BV Jordanelle, LLC v. Old Republic Nat'l Title Ins.*, 830 F.3d 1195, 1204–05 (10th Cir. 2016).

[17] *Parker v. Champion*, 148 F.3d 1219, 1222 (10th Cir. 1998) (holding that the court "will not rewrite a [complaint] to include claims that were never presented").

2.      *Count 22 – The City's Policy of Deliberate Indifference Toward Detainees' Medical Needs*

In Count 22, Plaintiff claims that the City was deliberately indifferent to Lofton's health and safety. However, it is unclear which of the five types of policies Plaintiff relies on to support this claim. All Plaintiff says is that the City has a policy of requiring officers to arrest and jail juveniles in mental health crisis if the juveniles resist arrest, and this policy is taught during officers' training.

"An allegation is conclusory where it states an inference without stating underlying facts or is devoid of any factual enhancement."[18] Attempting to prove the existence of a policy by merely stating that officers followed such a policy is definitionally conclusive. Additionally, simply stating that the officers were "trained" to follow the "arrest and jail policy" without providing any additional factual enhancement is yet another insufficient inference.

Other than Paragraph 19 of the SAC, each newly added allegation points to conduct or actions by individual officers—not any conduct, training, or inaction by the City. Thus, Plaintiff may very well have adequately pled officer liability. But that issue is not presently before the Court, and consequently, the Court cannot justifiably hold the City liable for the consequences of the officers' conduct. Doing so would essentially impose *respondeat superior*, which § 1983 clearly prohibits.[19] Rather, the legal test requires Plaintiff to plead the existence of an "official policy" so that the Court may distinguish the acts of the municipality from the acts of its employees.[20]

---

[18] *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021).

[19] *Schneider*, 717 F.3d at 767.

[20] *Id.* at 770.

As it stands, Count 22 is devoid of underlying deposition testimony, email receipts, publicly available online manuals, or any other facts that would corroborate his allegation. Thus, without any factual allegations that the officers' conduct followed a City policy, the Court is unable to draw the reasonable inference that Defendant is liable for the misconduct alleged. As such, the Court dismisses Count 22 against the City with prejudice.

## B.      Counts 12 and 21

In Counts 12 and 21, Plaintiff alleges the existence of the fifth type of policy—deliberate indifference toward injuries that may result from the municipalities' failure to adequately train its employees. To succeed on a failure to train claim, Plaintiff must show that "the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences."[21] A municipality's culpability for rights deprivation is "at its most tenuous where a claim turns on a failure to train."[22] This is because a policy of inadequate training is "far more nebulous, and a good deal further removed from the constitutional violation" that can concretely be identified in the other four types of policies.[23] Because inadequate training claims are the weakest of the five policies, a stringent standard of fault is applied to deliberate indifference.[24]

When a plaintiff challenges the adequacy of a municipal training program, the deficiencies must be "so gross or so pervasive that they can 'justifiably be said to represent city policy.'"[25]

---

[21] *Id.* (quoting *Brown*, 520 U.S. at 407).

[22] *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

[23] *Okla. City v. Tuttle*, 471 U.S. 808, 822 (1985).

[24] *Brown*, 520 U.S. at 410.

[25] *Lynch v. Bd. of Cnty. Comm'rs*, 786 F. App'x 774, 785 (10th Cir. 2019) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

Therefore, a plaintiff "must identify a *specific* deficiency in the entity's training program closely related to his ultimate injury."[26]

There are two ways a plaintiff can successfully plead deliberate indifference. First, the plaintiff may allege a pattern of constitutional violations committed by the untrained employees.[27] Second, alleging "a pre-existing pattern of violations is *only unnecessary*" when the unconstitutional consequences of failing to train are "highly predictable" and "patently obvious."[28] Plaintiffs rarely succeed when relying on the latter method because single-incident failure-to-train claims prevail only in a "narrow range of circumstances."[29]

> 1.    *Count 12 – The County's Deliberate Indifference Toward its Officers' Use of Excessive Force*

In Count 12, Plaintiff alleges that the County showed deliberate indifference toward the inadequate excessive force training its JIAC officers received. Specifically, Plaintiff alleges that officers failed to obtain mental health treatment for Lofton, failed to deescalate the situation, and pinned Lofton in the prone position for 39 uninterrupted minutes. Considering these facts, the Court will address whether Plaintiff has plausibly alleged the County's deliberate indifference either by pattern or single incident.

> a.    Plaintiff fails to plausibly allege that JIAC officers engaged in a pattern of constitutional violations.

Plaintiff fails to plausibly allege a pattern of violations that pre-date Lofton's death. Like in his First Amended Compliant, Plaintiff bases his argument on the 2016 JIAC Report and the County's failure to make any of its suggested changes. From this Plaintiff broadly states that JIAC

---

[26] *Huff v. Reeves*, 996 F.3d 1082, 1093 (10th Cir. 2021) (quoting *Keith v. Koerner*, 843 F.3d 833, 838–39 (10th Cir. 2016) (brackets, citation, and internal quotation marks omitted)) (emphasis added).

[27] *George v. Beaver Cnty.*, 32 F.4th 1246, 1250 (10th Cir. 2022).

[28] *Id.* at 1253 (emphasis added).

[29] *Id.*

has a history of widespread prior abuse, alleging that proper training—on use of force, de-escalation techniques, and identification and management of mental health admittees—could have averted this tragedy.

However, the Supreme Court has long rejected the argument that "injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct."[30] Without such a standard, "a claim could be made about almost any encounter resulting in injury" regardless of the training program's adequacy.[31] The Supreme Court acknowledged that even "adequately trained officers occasionally make mistakes," and "the fact that they do says little about the training program or the legal basis for holding the [municipality] liable."[32]

Here, nothing in the 2016 JIAC Report, as Plaintiff has presented it, remotely resembles an allegation that the JIAC had suffered similar incidents in the past. Additionally, Plaintiff provides no other examples of prior issues regarding officers' use of force, de-escalation techniques, or identification and management of mental health admittees. Certainly, the 2016 JIAC Report identifies deficiencies in several aspects of the facility's operation, but it does not mention or rely upon any particular incident in making its findings, let alone a pattern of several similar incidents. Even if Plaintiff had alleged a pattern of deficient training, he has not established a pattern of constitutional violations resulting from that deficient training. As a result, Plaintiff fails to plausibly allege the County's deliberate indifference through a pattern of constitutional violations.

---

[30] *Harris*, 489 U.S. at 391.

[31] *Id.*

[32] *Id.*

b.     Plaintiff fails to plausibly allege that the JIAC officers' misconduct was a highly predictable and patently obvious consequence of deficient training.

Without alleging a pattern, Plaintiff's only way to succeed on this deliberate indifference claim rests on his ability to demonstrate that Lofton's death was a highly predictable and patently obvious consequence of the County's failure to train its JIAC officers on the prone position. The Tenth Circuit has named these types of cases "single-incident failure-to-train claims."[33] This case, however, does not fall into the "narrow range of circumstances" necessary to establish a single-incident failure-to-train claim.

It is not enough for a plaintiff to allege that an officer's wrong decision injured a citizen during a predictable situation.[34] Rather, municipal liability requires a high likelihood that the County's failure to train will result in the officer making the wrong decision.[35] But when the situation's proper response "is obvious to all without training," then the failure to train "is not so likely to produce a wrong decision" that deliberate indifference would be implicated.[36]

This Court has rejected a per se rule to categorize the prone method of restraint as deadly force "even though it has the potential to cause death in certain circumstances."[37] In fact, this Court has found "no evidence that the probability of death is so high as to be considered 'likely' when such restraint is used."[38] In other words, the prone restraint itself is not deadly force but can become deadly force when intentionally or recklessly misused.

---

[33] *Valdez v. Macdonald*, 66 F.4th 796, 815–16 (10th Cir. 2023).

[34] *Id.* at 826–27.

[35] *Id.*

[36] *Sturdivant v. Blue Valley Unified Sch. Dist.*, 469 F. Supp. 3d 1121, 1134 (D. Kan. 2019) (citing *Walker v. City of New York*, 974 F.2d 293, 299–300 (2d Cir. 1992)) (internal quotations omitted).

[37] *Guseman by Guzeman v. Martinez*, 1 F. Supp. 2d 1240, 1259 (D. Kan. 1998).

[38] *Id.*

The Tenth Circuit outlined such misuse over 15 years ago when it said, "it is 'clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force.'"[39] The court held that after the plaintiff has been fully restrained for several minutes and no longer poses any danger, officers may not continue to apply pressure on the plaintiff's upper torso while he lies on his stomach.[40] This is because, regardless of any specialized knowledge, "a reasonable officer would know these actions present a substantial and totally unnecessary risk of death to the person."[41]

In his Complaint—and subsequent Amended Complaints—Plaintiff alleges that the JIAC officers' conduct was "completely beyond the pale." Considering those allegations, Plaintiff must explain what additional prone position training would have helped the officers know that they should cease its use on Lofton. This is especially true considering Lofton posed no threat; was easily restrained, shackled, and handcuffed; had no fewer than five officers pinning him to the floor; and had long since stopped breathing by the time 39 uninterrupted minutes had passed.

Yet, Plaintiff has not alleged what additional specialized training or knowledge officers needed to be better equipped for situations like this case. Thus, the Court finds that Plaintiff has not pled a "specific deficiency in the County's training program." Instead, Plaintiff has pled that the JIAC officers' decisions were so totally unnecessary that any reasonable officer would have known it constituted excessive force. This means that Lofton's death was not a likely outcome of the prone restraint's usage. Rather, the egregiously excessive manner in which officers used the

---

[39] *Weigel v. Broad*, 544 F.3d 1143, 1155 (10th Cir. 2008) (quoting *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004)).

[40] *Id.* at 1154.

[41] *Id.*

prone restraint posed a substantial and totally unnecessary risk of death—despite the proper response being obvious to all without training. Since the County is not expected to provide "specific or extensive training" that officers "may not violently assault a restrained detainee who is not acting in a threatening manner,"[42] the Court cannot find that the officers' wrong decision resulted from the County's failure to train.

Thus, even if "more or better training" would have prevented Lofton's death, "this fact alone does not demonstrate deliberate indifference."[43] As such, Plaintiff fails to plausibly allege that there was a highly predictable and patently obvious risk of Lofton's death without additional County-wide training on the dangers of abusing the prone position in the way the JIAC officers did. Without a finding of the County's deliberate indifference, the causation issue is moot. Therefore, the Court dismisses Count 12 against the County with prejudice.

2.    *Count 21 – The City's Deliberate Indifference Toward Adequate Police Training*

In Count 21, Plaintiff claims that the City was deliberately indifferent to WPD police officers' lack of proper training on how to deal with "juveniles and those in the throes of a mental health crisis." Specifically, Plaintiff asserts that the officers in this case failed to obtain mental health treatment for Lofton, falsified information about his mental state and behavior, and failed to take him to a hospital for a mental health evaluation. As such, the Court will address whether Plaintiff has plausibly alleged the City's deliberate indifference either by pattern or single incident.

a.    Plaintiff fails to plausibly allege that WPD officers engaged in a pattern of constitutional violations.

Plaintiff claims that WPD has a history of widespread prior abuse and/or a pattern or prior similar incidents which put the City on notice of the need to adequately train its officers. To support

---

[42] *Waller*, 932 F.3d at 1288.

[43] *Guseman*, 1 F. Supp. 2d at 1261.

his assertion, Plaintiff cites the 2016 JIAC Report as evidence that the City knew or should have known that its officers were violating individuals' constitutional rights. But the 2016 JIAC Report only made two findings relevant to Plaintiff's claim. First, WPD had a "tendency to sign paperwork and leave the juvenile quickly," requiring the Sheriff's Office to arrange medical transport when necessary. Second, WPD had a "tendency" to "improperly use detention at JIAC to punish youth."

The Report's use of the word "tendency" does not mean that Plaintiff adequately alleged a pattern. In fact, the Report's findings fail to support the kind of pattern which Plaintiff alleged. Plaintiff's failure to train claim relies in large part on the WPD officers' failure to obtain mental health treatment for Lofton—specifically, by falsifying intake responses to ensure that Lofton was admitted to JIAC rather than taken to a medical facility for mental health treatment. But nothing in the Report—or the rest of Plaintiff's SAC—suggests that officers regularly falsified juveniles' medical records. Nor is the Court convinced that leaving quickly and assigning transportation responsibilities amounts to frequently withholding or failing to provide medical evaluations and/or mental health treatment. Therefore, without additional facts underlying Plaintiff's claim, the Court must conclude that the officers' misconduct was an isolated incident rather than a pattern.

    b.  Plaintiff fails to plausibly allege that the WPD officers' misconduct was a highly predictable and patently obvious consequence of deficient training.

Without alleging a pattern of constitutional violations, Plaintiff's only way to success on this failure to train claim rests on his ability to demonstrate that the WPD officers' misconduct was a highly predictable and patently obvious consequence of deficient training.

However, falsifying medical intake responses is not the rare "single-incident failure-to-train" case. For example, in a case where the Tenth Circuit refused to apply municipality liability, the court explained that "[s]pecific or extensive training hardly seems necessary for a jailer to

know that sexually assaulting inmates is inappropriate behavior."[44] The same principle is true in this case. The Court cannot conclude that it was "highly predictable" and "patently obvious" that WPD officers would falsify Lofton's medical records. Just as all officers should intuitively know that it is illegal and morally reprehensible to rape an inmate, all officers—even untrained ones—should know the same is true of falsifying detainees' intake responses to avoid procuring treatment for their medical needs. Holding the City responsible for the officers' unpredictable and unprecedented misconduct would essentially impose liability on the sole basis of *respondeat superior*—a clear violation of § 1983.[45]

Therefore, by failing to identify a specific deficiency in the City's training program closely related to Lofton's constitutional injury, Plaintiff has not plausibly alleged that the City exhibited deliberate indifference. As such, the Court dismisses Count 21 against the City with prejudice.

## C.    Counts 44 and 45 – The County and City's Negligent Training

In addition to his federal claims, Plaintiff asserts state law negligent training claims against both the County and the City. A district court may "decline to exercise supplemental jurisdiction" over state law claims if the court "has dismissed all claims over which it has original jurisdiction."[46] The Supreme Court has advised that, absent another ground for federal subject matter jurisdiction, "when the federal-law claims have dropped out of the lawsuit in its early stages and only state law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice."[47]

---

[44] *Schneider*, 717 F.3d at 774 (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1308 (1998)).

[45] *Id.* at 770.

[46] 28 U.S.C. § 1367(c)(3).

[47] *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (citations omitted).

Likewise, the Tenth Circuit instructs courts to "generally decline to exercise supplemental jurisdiction when no federal claims remain because '[n]otions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary.'"[48] Because this Court has dismissed all of Plaintiff's federal claims against the County and the City, it declines to exercise supplemental jurisdiction over Plaintiff's remaining negligent training claims. Thus, the Court dismisses Counts 44 and 45 without prejudice.

**IT IS THEREFORE ORDERED** that Defendant Sedgwick County, Kansas, Board of Commissioners' Motion to Dismiss Counts 11, 12, and 44 (Doc. 149) is **GRANTED.**   Defendant Sedgwick County, Kansas Board of Commissioners is dismissed from the case.

**IT IS FURTHER ORDERED** that Defendant City of Wichita, Kansas's Motion to Dismiss Counts 21, 22, and 45 (Doc. 151) is **GRANTED.**  Defendant City of Wichita, Kansas is dismissed from the case.

**IT IS SO ORDERED.**

Dated this 14th day of November, 2023.



ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE

---

[48] *Hubbard v. Okla. ex rel. Dep't Hum. Servs.*, 759 F. App'x 693, 714 (10th Cir. 2018) (quoting *Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995)).