# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MARQUAN TEETZ, as Next Friend and
Personal Representative of the ESTATE
OF CEDRIC LOFTON, deceased,

        *Plaintiff*,

v.

        Case No. 22-1134-EFM

JASON STEPIEN, et al.,

        *Defendants*.

## MEMORANDUM AND ORDER

Before the Court is a Motion for Summary Judgment (Doc. 196) brought by Defendants Jason Stepien, Brenton Newby, Karen Conklin, William Buckner, and Benito Mendoza (collectively, "Defendants").[1] Defendants ask this Court to grant them summary judgment on all of Plaintiff's claims. Plaintiff's federal claims, brought under 42 U.S.C. § 1983, include excessive force, deliberate indifference to a medical need, and failure to intervene. Plaintiff's state claims, brought under Kansas law, include negligence, battery, intentional infliction of emotional distress, and negligent infliction of emotional distress. Lastly, Defendants Stepien, Conklin, and Buckner ask this Court to grant them summary judgment on Plaintiff's § 1983 supervisory liability claims. For the reasons stated below, the Court grants Defendants' motion in part and denies it in part.

---

[1] These five defendants are the only ones remaining in this case. several other defendants named in the Complaint have since been dismissed throughout the course of this litigation.

## I.   Factual and Procedural Background[2]

Cedric Lofton was a 17-year-old foster child. On September 23, 2021, Lofton's foster father, Tanea Randolph, drove him to Comcare—a certified behavioral health clinic—in Wichita, Kansas for a mental health evaluation. Lofton ran away once they reached the clinic, and Randolph called the Wichita Police Department ("WPD") to report Lofton as a runaway.

Lofton returned to Randolph's residence in the early morning hours of September 24, 2021. Randolph called the foster care agency, the Kansas Department of Children and Families, who advised him to call WPD and to not let Lofton back into the home. Randolph followed these instructions.

WPD officers arrived on the scene and spoke with Lofton to try to convince him to go to St. Joseph's Hospital, but Lofton refused to go voluntarily. The officers observed Lofton hallucinating and acting out of touch with reality. During the interaction, Lofton made several comments about people trying to kill him, and he did not cooperate with the officers' instructions.

After 40 minutes of negotiating with Lofton, Sergeant Supancic of the WPD directed officers to take Lofton for involuntary transport to St. Joseph's Hospital. Lofton resisted the WPD officers' attempt to take him, and a struggle ensued between Lofton and WPD officers. Eventually, the WPD officers placed Lofton in a WRAP restraint device. However, officers did not transport Lofton to the hospital. Sergeant Supancic determined that Lofton had committed several counts of battery on law enforcement during the struggle. So, he directed the officers to take Lofton to the Juvenile Intake and Assessment Center ("JIAC") instead.

JIAC facilitates the booking process for juveniles between the ages 10 and 17 when they are arrested by law enforcement within Sedgwick County, Kansas. When juveniles arrive at the

---

[2] The facts are those uncontroverted by the parties unless otherwise indicated.

facility, an assessment is performed, and they are either booked into the Juvenile Detention Facility ("JDF"), released to a parent or guardian, or released to a children's home.

Corrections Officer Jason Stepien was working as a Juvenile Intake Specialist at JIAC during the morning of September 24. Around 2:30 a.m., Stepien received a call from the County's Master Control booth informing him that WPD officers were bringing in a combative youth—referring to Lofton.

Defendants claim that Stepien was not provided any other information about Lofton. He was not told that the WPD officers initially tried to take Lofton for a mental health evaluation or that Lofton would be arriving in a WRAP restraint. Plaintiff claims that during a post-incident police interview, Stepien stated that WPD officers told him that they had been called out to Lofton's house to take him for a mental health evaluation and that Lofton was not "oriented to time and place."

Although it had no audio, security footage mostly captured the events that unfolded from 2:34 a.m. to 5:46 a.m. At 2:34 a.m., Lofton arrived at JIAC still in the WRAP restraint, accompanied by several WPD officers. WPD officers placed him in a holding room at JIAC before Stepien had a chance to speak with Lofton. One WPD officer told Stepien that Lofton was arrested for battering a law enforcement officer, being combative on scene, and because a family member reported that Lofton had used the drug "K2" in the past month—although, none of the officers knew whether Lofton had used any drugs that evening.

Stepien received a copy of Lofton's arrest report but did not read the narrative of the arrest. He only skimmed the report for demographic information. Then, Stepien went to the holding room to introduce himself to Lofton. Lofton asked to get out of the WRAP, and Stepien asked Lofton if he was going to be calm enough to let the WPD officers take him out. Lofton responded by saying,

"we'll see," and so Stepien told the WPD officers that he did not think Lofton was ready to be taken out of the WRAP. At 3:37 a.m., the WPD officers released Lofton from the WRAP but left him in the holding room.

At 4:07 a.m., Stepien asked Officer O'Hare of the WPD to answer the questions contained on JIAC's "Officer Release" form before he and the other officers left JIAC. The form lists the following six questions:

> Upon entry to the JIAC facility, does the juvenile have any of the following:
> [1] Physical injury that appears to need immediate medical care.
> [2] Signs of acute illness that appear to need immediate medical care.
> [3] Signs of intoxication with *significant* impairment in functioning.
> [4] Has taken medications, illicit drugs, and/or substances that pose a significant and immediate health risk.
> [5] Warning signs and symptoms for suicide that appear to need immediate medical care.
> [6] Has been tased during or subsequent to the arrest.[3]

The form indicated that answering "yes" to any question would require obtaining a medical release for the juvenile before JIAC could accept physical custody of him. When Stepien initially asked these questions, O'Hare verbally answered "yes" to the second and third questions. Stepien told O'Hare that WPD would need to get a medical release before JIAC could accept Lofton. O'Hare responded by informing Stepien that he was "kind of new" and wanted to talk to his fellow officers about the questions.

At 4:10 a.m., O'Hare conversed with the other officers, including his supervisor, in a separate room at JIAC. This conversation took place away from Stepien's station and outside of Stepien's presence. Officer O'Hare returned to Stepien and said "we are going to go with no" as the answer to all six questions. Consequently, JIAC accepted temporary physical custody of Lofton

---

[3] Emphasis in original.

at that time. Lofton remained in the legal custody of WPD, and only WPD could transport Lofton away from JIAC for medical treatment. By 4:17 a.m., all WPD officers had left JIAC.

At 4:20 a.m., Stepien released Lofton from the holding room. Lofton then approached JIAC's glass partition, reached under the screen, and started grabbing at a computer monitor. After Stepien told him to stop several times, Lofton stopped and walked away from the partition. Stepien told Lofton that he needed to sit down or else he would have to go back into the holding room. Lofton then approached the partition a second time. As he did so, Stepien entered the lobby.

Stepien asked Lofton to either sit down or go back to the holding room. Lofton only responded by asking Stepien questions like "what would happen if I attack you?" or "do you guys hit people here?" Lofton continued advancing towards Stepien, who tried to back away and maintain distance between himself and Lofton.

Brenton Newby was a Corrections Officer at JDF, which shares a building with JIAC. Around this time, Newby came over from the JDF side to the JIAC side and was standing behind one of the windows at the partition.

At 4:25 a.m., Stepien signaled to Newby to join him in the JIAC lobby. Newby entered the lobby, and he and Stepien continued to try to speak with Lofton and de-escalate Lofton's behavior. Lofton continued to approach them and reached out his arms as if to touch them. Stepien repeatedly asked Lofton to go back to the holding room, but Lofton remained non-compliant.

Around this time, Newby radioed his JDF Corrections Supervisor, Karen Conklin, who was working on the JDF side of the building and asked her to come to his location.

At 4:26 a.m., Stepien and Newby attempted to place Lofton in an over/under escort hold to take Lofton into the holding room. Lofton freed his right arm from the hold and punched Stepien

in the face, knocking Stepien's glasses off. At that point, a struggle ensued, and Lofton resisted Stepien and Newby's attempts to move him back to the holding room.

By 4:27 a.m., Conklin and another JDF Corrections Supervisor, William Buckner, arrived at the JIAC lobby to assist. When they arrived, Conklin and Buckner saw Lofton's arms around Newby's neck in a chokehold position. The officers were able to free Newby from Lofton's grasp and attempted to restrain Lofton in a seated position on the concrete bench in the holding room.

While Lofton was in the seated position, Stepien, Conklin, Newby, and Buckner tried to restrain Lofton's limbs to keep him from hitting, kicking, or scratching the officers. All the while, the officers continued their attempts to verbally de-escalate the situation. Lofton repeatedly said things like "I'm going to kill you" or "kill yourself," and referred to himself as Jesus and Satan.

The officers had a difficult time controlling Lofton in the seated position on the bench and determined that it would be safer to move him to the floor. Either before putting him on the floor or shortly after putting him on the floor, the officers applied shackles to Lofton's legs. Once Lofton was lying prone on the floor, Conklin, Newby, Buckner, and Stepien tried to restrain Lofton.

Stepien was kneeling next to and holding Lofton's ankles. Newby was located near Lofton's left arm, and Buckner was located near Lofton's right arm. The holds Newby and Buckner were trying to maintain on Lofton's arms were referred to as S.A.F.E holds. S.A.F.E holds are a technique used to grab the subject's wrist to immobilize him without hurting him. Conklin was kneeling next to Lofton's right hip. Defendants contend that Conklin placed one hand on each of Lofton's hips, but she did not place her weight on Lofton's back. Plaintiff contends that Conklin was laying on top of Lofton's back during the restraint.

From approximately 4:34 a.m. to 4:51 a.m., Stepien, Buckner, Conklin, and Newby remained in those relative positions trying to restrain and de-escalate Lofton. Defendant claims

that Lofton was fighting and resisting the entire time. Plaintiff contends that Lofton was subdued and largely immobilized.

Relatively early in their restraint of Lofton in the prone position, Newby and Buckner tried to bring Lofton's arms together in an attempt to handcuff him. They ultimately did not handcuff Lofton and threw the handcuffs aside.

Around 4:38 a.m., Conklin radioed for Corrections Officer Zach Hembrick. When Hembrick came to the holding room, Conklin informed him that he was responsible for the other juveniles at JDF because she and Newby were busy with Lofton. After receiving these instructions, he returned to JDF.

Eventually, Buckner told Stepien that they could not continue holding Lofton and suggested that he call WPD to come retrieve Lofton. Conklin radioed for another JDF officer, Benito Mendoza, to come relieve Stepien so that he could leave to call WPD.

At 4:50 a.m., Mendoza arrived at JIAC and took over Stepien's position at Lofton's feet. Stepien left the holding room at 4:51 a.m. and called dispatch to have WPD come back and take Lofton. Between 4:53 and 5:18 a.m., the corrections officers waited for WPD's response for transport.

Around 5:05 a.m., the officers handcuffed Lofton. Defendants contend that not long after the handcuffs were applied, Lofton stopped resisting. Plaintiff argues that Lofton never struggled, resisted, or fought after he was placed in the prone position, which was more than 30 minutes before he was handcuffed.

Shortly after they applied handcuffs, the officers released their holds on Lofton, but Lofton remained prone on the holding room floor. The corrections officers believed he was asleep and snoring. During the struggle, Lofton was bleeding from his nose. So, Buckner and Newby left the

holding room at 5:08 a.m. to go to the restroom and clean blood off their arms. Newby's shirt appeared sweaty when he left the room. Conklin, Mendoza, and Stepien stayed in the holding room to monitor Lofton. Lofton remained in his leg shackles and handcuffs while awaiting WPD's transport.

Conklin watched Lofton to make sure he was breathing. She tapped him twice and he appeared to snore in response. The third time Conklin tapped Lofton, he did not respond. Conklin rolled Lofton over onto his back and performed a sternal rub. Lofton did not respond. When Lofton did not respond to the sternal rub, Conklin began chest compressions on Lofton.

At 5:13 a.m., Stepien called 911 to report that Lofton had become non-responsive. Conklin continued to perform chest compressions while they awaited EMS. At 5:15 a.m., Buckner relieved Conklin. At 5:19 a.m., EMS arrived. EMS took over providing aid to Lofton and ultimately transported him to Wesley Medical Center Hospital.

Lofton was pronounced dead two days later on September 26, 2021. The autopsy performed by Dr. Timothy Gorrill reported that Lofton's death was a homicide resulting from "complications of cardiopulmonary arrest sustained after physical struggle while restrained in the prone position." Forensic pathologist, Dr. Jane Turner, reported that Lofton's most severe injuries were located at his shoulders and back, and the acute hemorrhaging present in those areas were indicative of blunt force trauma.

On June 13, 2022, Plaintiff filed his Complaint against Defendants, among other defendants who have since been dismissed from this action. On August 26, 2023, Defendants answered Plaintiff's Complaint. On February 2, 2024, Defendants filed this motion for summary judgment. Plaintiff timely responded, and Defendants timely replied. Thus, the matters are fully briefed and ripe for the Court's ruling.

## II.      Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[4] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[5] The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[6] The nonmovant must then bring forth specific facts showing a genuine issue for trial.[7] These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[8] The court views all evidence and reasonable inferences in the light most favorable to the non-moving party.[9]

## III.      Analysis

### A.      Federal Claims

#### 1.      Excessive Force (Counts 1–5)

In Counts 1–5, Plaintiff argues that each individual corrections officer violated Lofton's Fourth Amendment rights by restraining him in the prone position for a prolonged period, ultimately resulting in his death. However, Defendants contend that they are entitled to qualified immunity because Lofton's constant resistance and risk to officer safety justified their use of force.

---

[4] Fed. R. Civ. P. 56(a).

[5] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006) (citing *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1224 (10th Cir. 2001)).

[6] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (citation omitted).

[8] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998)).

[9] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (citation omitted).

The Fourth Amendment governs excessive force claims related to incidents that occur "prior to any probable cause hearing."[10] Officers violate an arrestee's clearly established Fourth Amendment right to be free from excessive force if the officers' arresting actions were objectively unreasonable in light of the facts and circumstances confronting them.[11] The Court assesses the reasonableness of an officer's conduct "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[12] This reasonableness standard—which is "clearly established" for the purposes of § 1983 actions[13]—implores the Court to consider the *Graham* factors: (1) the severity of the alleged crime, (2) the degree of potential threat that the suspect poses to an officer's safety and to others' safety, and (3) the suspect's efforts to resist or evade arrest.[14]

Because the reasonableness inquiry greatly overlaps with the qualified immunity analysis, "a qualified immunity defense is of less value when raised in defense of an excessive force claim."[15] This is because the qualified immunity inquiry asks the same question that the Fourth Amendment excessive force question asks: "whether a reasonable officer could have believed that the conduct in question did not violate clearly established law."[16]

But "[w]hether an officer acted reasonably in using force is 'heavily fact dependent.'"[17] Consequently, the Court cannot grant summary judgment in excessive force cases on the basis of

---

[10] *Walton v. Gomez (In re Estate of Booker)*, 745 F.3d 405, 419 (10th Cir. 2014) (further citations omitted).

[11] *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1313–14 (10th Cir. 2002) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)).

[12] *Graham*, 490 U.S. at 396.

[13] *Cook v. Olathe Med. Ctr., Inc.*, 773 F. Supp. 2d 990, 1000 (D. Kan. 2011) (citing *Graham*, 490 U.S. at 396–97; *Olsen*, 312 F.3d at 1314).

[14] *Rosales v. Bradshaw*, 72 F.4th 1145, 1151 (10th Cir. 2023) (citing *Graham*, 490 U.S. at 396).

[15] *Maresca v. Bernalillo Cnty.*, 804 F.3d 1301, 1313 (10th Cir. 2015) (brackets omitted) (citing *Olsen*, 312 F.3d at 1314).

[16] *Dixon v. Richer*, 922 F.2d 1456, 1463 (10th Cir. 1991).

[17] *Newell v. City of Salina*, 276 F. Supp. 2d 1148, 1152 (D. Kan. 2003) (quoting *Romero v. Bd. of Cnty. Comm'rs*, 60 F.3d 702, 705 n.5 (10th Cir. 1995)).

qualified immunity when, viewing the facts in the light most favorable to the non-moving party, "genuine issues of material fact preclude[] a judicial determination of whether the officer's conduct was objectively reasonable."[18] Rather, courts should only make summary judgment determinations when "the facts, considered collectively, present a[] []complete picture of the relevant circumstances."[19] Therefore, "[w]here a disputed issue of material fact remains, that ends the matter for summary judgment. The court may not move on to determine whether an officer's actions were objectively reasonable."[20] Accordingly, the Court will evaluate whether any genuine disputes exist regarding the *Graham* factors that would prevent the Court from assessing the objective reasonableness of Defendants' conduct.

### a. Severity of the Crime

First, the Court must assess the severity of Lofton's crime which led to law enforcement's intervention. Under K.S.A. § 21-5413(c)(2)(B) and (h)(3)(A), battery against a uniformed city law enforcement officer is a class A person misdemeanor. Generally, "the first *Graham* factor may weigh against the use of significant force if the crime at issue is a misdemeanor."[21]

Here, it is uncontroverted that before Lofton arrived at JIAC, Lofton resisted WPD officers' attempt to transport him to the hospital, and a struggle ensued between Lofton and WPD officers. Moreover, both parties agree that during the struggle, Sergeant Supancic determined that Lofton had committed several counts of battery on law enforcement officers. Because of this, Supancic directed the officers to take Lofton to JIAC. Although knowledge of Lofton's crime before coming

---

[18] *Olsen*, 312 F.3d at 1314 (brackets omitted) (quoting *Zuchel v. Spinharney*, 890 F.2d 273, 275 (10th Cir. 1989)).

[19] *Id.* (cleaned up) (quoting *Salmon v. Schwarz*, 948 F.2d 1131, 1137 (10th Cir. 1991)).

[20] *Id.* at 1315 (further quotations omitted).

[21] *Lee v. Tucker*, 904 F.3d 1145, 1149 (10th Cir. 2018).

to JIAC provided Defendants with useful background, it does not explain what caused their alleged use of excessive force. Therefore, the events leading up to Defendants' alleged excessive force is a far more relevant consideration.[22]

In the events leading up to the alleged excessive force, it is uncontroverted that Lofton ignored Stepien's warning to sit down or else he would have to go return to the holding room. Instead of sitting down, Lofton began advancing toward Stepien, who backed away from Lofton and extended his arms to maintain distance between the two of them. Stepien signaled for Newby, who entered the lobby and tried to speak with Lofton in an attempt to deescalate the situation. But Lofton continued to approach and tried to touch them. At that point, Stepien and Newby attempted to place Lofton in an over/under escort hold to take Lofton back to the holding room. The video footage clearly shows that Lofton resisted their restraint, broke free of Stepien's hold, and punched Stepien in the face. Lofton continued to struggle, knocking Stepien's glasses off his face at the entrance of the holding room.

Under K.S.A. § 21-5413(c)(3)(C) and (h)(3)(C), battery against a juvenile detention facility officer while such officer is engaged in the performance of his duty is a severity level 5, person felony. Lofton punching Stepien, a juvenile detention officer, would qualify as a felony under Kansas law. Moreover, Tenth Circuit precedent indicates that "the first *Graham* factor weighs against the plaintiff when the crime at issue is a felony."[23] Thus, because neither party disputes that Lofton committed this felony, the Court weighs this factor in Defendants' favor.

---

[22] *Estate of Ceballos v. Husk*, 919 F.3d 1204, 1215 (10th Cir. 2019) (explaining that the excessive force inquiry includes not only the officers' actions at the moment that the threat was presented, but also may include their actions in the moments leading up to the suspect's threat of force).

[23] *Vette v. Sanders*, 989 F.3d 1154, 1170 (10th Cir. 2021).

b.      Threat to Safety

Next, the Court must evaluate whether Lofton posed an immediate threat to Defendants' safety, such that their use of force would be justified. This factor "is undoubtedly the most important and fact intensive factor in determining the objective reasonableness of an officer's use of force."[24] Several factors help assess the immediacy and degree of the danger facing officers: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect."[25]

Here, Defendants knew that Lofton was unarmed. However, he repeatedly ignored Stepien's and Newby's commands, made unwanted advances toward them, verbally threatened them, fought against them trying to break free from their restraints, and ultimately battered them. Thus, at the outset of the interaction, it was not unreasonable for Stepien and Newby to put Lofton in the prone restraint to gain control of the situation and stop Lofton's threatening and violent behavior.

The more complex determination, however, is whether Lofton remained a safety threat throughout the 40-minute duration of the officers' restraint. The Tenth Circuit has held that the justification for an officer's use of force disappears when the arrestee is under the officers' control.[26] No exact test exists to determine whether an arrestee is effectively "controlled." However, the Tenth Circuit has held that an arrestee no longer poses a threat when he is

---

[24] *Id.* (further citations and quotations omitted).

[25] *Estate of Valverde v. Dodge*, 967 F.3d 1049, 1061 (10th Cir. 2020) (further citations and quotations omitted).

[26] *Vette*, 989 F.3d at 1170.

handcuffed, laying on his stomach, under substantial or significant pressure on his back, and subdued or incapacitated.[27] This definition is consistent with that of Plaintiff's expert, Jerome Davis.[28]

In this case, it is uncontroverted that Defendants placed Lofton in leg shackles, but they never placed Lofton in handcuffs. Moreover, both parties agree that Lofton was generally positioned face down on his stomach. But the parties vehemently dispute (1) whether the officers put substantial or significant pressure on Lofton's back and (2) whether Lofton was quickly subdued. The Court will address each dispute in turn.

Defendants present testimony that once Lofton was on the floor, Stepien, Newby, Buckner, and Conklin tried to restrain Lofton. Stepien was holding Lofton's feet, Newby was applying a S.A.F.E. hold on Lofton's left arm, Buckner was applying a S.A.F.E. hold on Lofton's right arm, and Conklin was holding Lofton's upper thighs or buttocks region. Defendants claim that none of them applied their body weight or significant pressure to Lofton's back or airway. Specifically, they claim that Newby's and Buckner's S.A.F.E. holds involved them laying to Lofton's side without putting their bodyweight directly on him. Further, Defendants argue that as Conklin kneeled on the floor, she placed her hands on Lofton's hips to prevent him from standing up but did not lay her weight across his back.

In contrast, Plaintiff presents evidence from medical examiner, Dr. Timothy Gorrill, and forensic pathologist, Dr. Jane Turner, that Lofton had extensive hemorrhaging in his shoulder and back tissues, shoulder damage, and upper back contusions. The doctors conclude that these injuries

---

[27] *See Estate of Valverde*, 967 F.3d at 1072; *Walton*, 745 F.3d at 424; *Weigel v. Broad*, 544 F.3d 1143, 1155 (10th Cir. 2008).

[28] Davis defined "control," based on commonly recognized corrections standards, as the point at which the detainee has ceased struggling or has stopped moving.

were indicative of significant weight or pressure being applied to those areas of Lofton's body. Specifically, the doctors opined that such pressure contributed to the development of Lofton's cardiac arrest, which ultimately caused his death.

Here, the evidence presented by Plaintiff disputes the evidence presented by Defendants. The doctors' opinions about the weight and impact placed on Lofton's back contradicts the officers' testimony that they did not put any pressure on Lofton's body. This dispute could influence the outcome of the lawsuit, and a rational jury could find in Plaintiff's favor on such evidence. Thus, viewing this evidence in the light most favorable to Plaintiff as the nonmoving party, there exists a genuine issue of material fact.

The second dispute, whether Defendants were able to quickly subdue Lofton, is closely intertwined with the third *Graham* factor. Thus, the Court will address it next.

    c.     Resisting the Officers' Restraint

The third *Graham* factor focuses on an arrestee's resistance to the officers' restraint. This is important because use of the prone restraint is excessive—and therefore unreasonable—after an arrestee is subdued or incapacitated.[29] Usually, courts consider the third *Graham* factor when a suspect is actively attempting to flee or resist the arrest or search. However, the exact language of the test may evolve depending on the factual scenario.[30] Specifically, when evaluating the third *Graham* factor, courts "consider any resistance during the suspect's encounter with officers."[31]

---

[29] *Walton*, 745 F.3d at 425 (finding that the use of the prone restraint on "a non-resisting subject" is excessive).

[30] *See Geddes v. Weber Cnty.*, 2022 WL 3371010, at *17 (10th Cir. Aug. 16, 2022) (Bacharach, J., dissenting) (adjusting the language in the *Graham* factors to "(1) the severity of the crime, (2) the presence of an immediate threat to the safety of jailers or others, and (3) the suspect's active resistance" because the alleged excessive force occurred while the plaintiff was detained at a correctional facility before a probable cause hearing).

[31] *Wilkins v. City of Tulsa*, 33 F.4th 1265, 1273 (2022).

In this case, WPD officers originally tried to convince Lofton to go to the hospital with them voluntarily. When he refused, they took him by force. During their struggle, Lofton battered the officers, so they took him to JIAC. Thus, although Lofton's subsequent interactions with Defendants are not considered resisting *arrest*, the Court may consider his resistance against moving to and staying in the holding room, nonetheless.

Defendants present deposition testimony from various JIAC/JDF officers explaining how the struggle ensued and continued between them and Lofton. For example, Buckner stated that as he tried to secure Lofton's arm, Lofton would repeatedly say that he was going to kill the officers. Buckner claimed that several times he would attempt to let go of his restraint to see if Lofton would calm down, but as soon as he would loosen his grip, Lofton would start struggling. He claims Lofton's attempts to move and try to get away were nonstop. Buckner stated that Lofton's constant movement prevented him from lying flat on his stomach the entire time. He felt that the officers did not have Lofton secured.

Similarly, Conklin explained that the officers' goal was to deescalate the situation to the point where they could leave the holding room and close the door. However, they were unable to do so because Lofton "was being way too combative." She claims that although they tried talking to him, Lofton attempted to kick, scratch, and fight with staff, and he told them that he was going to kill them. Conklin stated that Lofton was not flat on his stomach the entire time because his hips were turning as he was trying to flip over.

Likewise, Newby stated that the officers were unable to maintain their same positions because Lofton was not sitting still. Not only was he moving and trying to break free, but a few times, Lofton actually broke free of the holds. Newby claims that all the officers kept losing their holds because Lofton was not sitting still—rather, he was "expressing nonstop violent behavior."

Even when Lofton was on the ground, he was flailing his arms and legs and, at times, was able to pinch Newby's back and legs.

Mendoza came to relieve Stepien about 20 minutes after the restraint began. He explained that Conklin called him because Stepien "couldn't safely leave the room without possible injury" since Lofton "kept resisting" and "was kicking." Mendoza stated that the first thing he saw upon entering the room was Lofton fighting and struggling against the officers. He detailed that Lofton was trying to get up and the officers were "trying their best to keep him down." At the time, Mendoza assumed that Lofton was on drugs because he was acting erratic and crazy, and he was not listening or cooperating.

Lastly, Defendants point to the autopsy report in which Dr. Gorrill states that Lofton's cause of death was due to "complications of cardiopulmonary arrest sustained after *physical struggle* while restrained in the prone position."[32] They argue that because the pathological diagnosis specifically acknowledges that a physical struggle occurred, this supports Defendants' testimony that Lofton was not effectively subdued.

Plaintiff denies Defendants' accounts and instead relies upon the video footage to controvert their testimony. Plaintiff admits that a struggle initially occurred but claims that Lofton was subdued and largely immobilized within five minutes of the restraint beginning. Moreover, Plaintiff claims that the video shows no signs of Lofton fighting, resisting, struggling to get up, or being combative. Plaintiff also claims the video shows no measures taken by the officers to handcuff Lofton, roll him over, or place him in a seated position.

Plaintiff rebuts Defendant's characterization of Dr. Gorrill's findings by emphasizing the significance of the severe injuries and blunt force trauma the autopsy report noted. Plaintiff

---

[32] Emphasis added.

claims that these injuries, and ultimately Lofton's death, resulted from the intense pressure applied during the prone restraint—not from Lofton's physical response (i.e., his resistance) to the restraint.

The security camera that recorded the entire incident was located in the JIAC lobby. The camera was pointed at the holding room, but it had no audio. The holding room had a door, and parallel to the door, were two windows stacked on top of each other. The door was propped open during the entire encounter. There is no video footage from inside the holding room. Additionally, Lofton was completely out of view for most of the video because Lofton was positioned on the floor and the four officers surrounding him were sitting on their knees. The video did depict intermittent movement coming from the holding room, as various backs, legs, and heads of the officers could be seen shifting in and out of view from the holding room's door and windows. But due to the camera angle and lack of audio, it is unclear whether the officers' movement is due to a struggle against Lofton or whether the officers are merely readjusting or repositioning due to the holding room's relatively small size.

Realistically, the truth likely lies somewhere in the middle. It seems obvious to the Court from the video footage that Lofton was not completely subdued after the five-minute mark. Yet, it is also clear that there are large gaps of time—even acknowledged by Defendants—during which no observable movement occurs. Specifically, Defendants lists various time stamps during which they claim Lofton's resistance is visible on the footage. Notably, they do not note any resistance from timestamps 29:23 to 41:25, which constitutes a 12-minute period.

Those stagnant moments reasonably beg the question of whether Lofton was effectively subdued, at least to the point where the officers had sufficient control over Lofton to safely move him out of the prone position. And, more importantly, whether they had sufficient control over

Lofton during any of those stagnant moments is material to the question of whether continued use of the prone position constituted excessive force. These questions, however, cannot be answered by this Court. Rather, they constitute genuine disputes of material fact that preclude this Court from determining whether the officers' actions were objectively reasonable. As such, Defendants are not entitled to qualified immunity on Counts 1–5, and so the Court denies Defendant's motion for summary judgment on Plaintiff's excessive force claims.

2.      *Failure to Intervene (Counts 6–10)*

In Counts 6–10, Plaintiff argues that each individual corrections officer violated Lofton's Fourth Amendment rights by failing to intervene to prevent their fellow officers from using the excessive force which ultimately resulted in Lofton's death.

To establish failure to intervene, a plaintiff must demonstrate that "[1] a government officer violated his constitutional rights, [2] a different government actor (the defendant) observed or had reasons to know about that constitutional violation, and [3] the defendant had a realistic opportunity to intervene, but failed to do so."[33] If there is no underlying constitutional violation, there can be no liability for failure to intervene.[34]

However, as explained in Section A above, genuine disputes of material fact preclude this Court from determining whether an underlying constitutional violation of excessive force occurred. Without this information, the Court cannot decide whether the first element of Plaintiff's failure to intervene claim is met. Thus, the Court denies summary judgment on Counts 6–10.

---

[33] *Bledsoe v. Carreno*, 53 F.4th 589, 616 (10th Cir. 2022).

[34] *Jones v. Norton*, 809 F.3d 564, 576 (2015).

### 3. Deliberate Indifference to Serious Medical Needs (Count 23)

In Count 23, Plaintiff claims that Defendants violated Lofton's Fourteenth Amendment rights because they were deliberately indifferent to Lofton's obvious and serious mental health crisis. However, Defendants assert qualified immunity, contending that Plaintiff fails to meet his burden of demonstrating that their specific conduct violated clearly established law.

When a defendant raises qualified immunity on summary judgment, the burden shifts to the plaintiff to show that "(1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct."[35] Only if the "plaintiff meets this heavy burden" must "the defendant . . . prove that there are no genuine disputes of material fact and that he is entitled to judgment as a matter of law."[36] A court has discretion to address these prongs in either order, but a plaintiff must satisfy both to avoid qualified immunity.[37] Here, the Court begins and ends its analysis with the clearly established prong.

#### a. Clearly Established

Plaintiff claims that Defendants were deliberately indifferent to Lofton's mental health crisis in two distinct ways: (1) the officers failed to provide him with mental health treatment, and (2) the officers restrained him in the prone position while he was enduring a mental health crisis. Thus, Plaintiff purports that Lofton had a clearly established constitutional right to immediate mental health treatment, and he had a clearly established constitutional right to be free from the prone restraint while in mental crisis.

---

[35] *Duda v. Elder*, 7 F.4th 899, 909 (10th Cir. 2021).

[36] *Puller v. Baca*, 781 F.3d 1190, 1196 (10th Cir. 2015).

[37] *Milner v. Mares*, 754 F. App'x 777, 778 (10th Cir. 2019) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

A right is "clearly established" if Supreme Court or Tenth Circuit precedent (or the weight of authority from other circuits) would put reasonable officers in the defendants' position on notice that their actions violated a federal constitutional or statutory right.[38] "The plaintiff bears the burden of citing to [the Court] what he thinks constitutes clearly established law."[39] This does not require the existence of a case exactly on point,[40] but does require that the existing caselaw be sufficiently clear to place the constitutional issue "beyond debate."[41]

Additionally, "the precedent must have clearly established the right in light of the specific context of the case, not as a broad general proposition."[42] Thus, the generalized conclusion that deliberate indifference to an arrestee's medical needs is a clearly established constitutional violation is overbroad and insufficient to overcome qualified immunity.[43] "If such a general statement of the constitutional violation that must be clearly established were sufficient, qualified immunity would almost never be granted."[44]

Here, Plaintiff fails to present *any* cases showing that Defendants violated clearly established law in this fact-specific context. Plaintiff broadly claims that Defendants were deliberately indifferent, but when analyzing the specific conduct at issue, there is no caselaw

---

[38] *Dyer v. Carlson*, 2024 WL 3290231, at *2 (10th Cir. July 3, 2024).

[39] *Thomas v. Durastanti*, 607 F.3d 655, 669 (10th Cir. 2010); *see also Easter v. Cramer*, 785 F. App'x 602, 607 (10th Cir. 2019) ("The plaintiff bears the burden of directing the Court to authority that clearly establishes the right that was arguably violated."); *Gutierrez v. Cobos*, 841 F.3d 895, 902 (10th Cir. 2016) (finding plaintiffs failed to carry their heavy burden when they did not cite or discuss any pertinent caselaw).

[40] *Paugh v. Uintah Cnty.*, 47 F.4th 1139, 1167 (10th Cir. 2022) cert denied sub nom. Anderson v. Calder, 143 S. Ct. 2658, 216 L. Ed. 2d 1236 (2023) ("[T]his inquiry does not require a scavenger hunt for prior cases with precisely the same facts.")

[41] *White v. Pauly*, 580 U.S. 73, 79 (2017).

[42] *Frasier v. Evans*, 992 F.3d 1003, 1014 (10th Cir. 2021) (further citations and quotations omitted); *see also Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (emphasizing that the Supreme Court has repeatedly told lower courts not to define clearly established law at "a high level of generality").

[43] *Toler v. Troutt*, 631 F. App'x 545, 547 (10th Cir. 2015).

[44] *Id.*

provided to support a constitutional or statutory violation. For example, Plaintiff assumes without support that officers are constitutionally required to provide arrestees with mental health treatment upon their entry to a detention facility. Moreover, Plaintiff assumes without support that officers are constitutionally prohibited from employing the prone restraint on arrestees who are enduring a mental health crisis.

Although the Court reviews the evidence in the light most favorable to the nonmoving party, "the record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity."[45] Plaintiff fails to provide the Court with any authority to support either of his clearly established rights assertions in light of the facts of this case. Without a single supporting case, the Court must conclude that Plaintiff fails to meet his burden. Accordingly, Defendants are entitled to qualified immunity on Count 23, and thus, the Court grants their motion for summary judgment on Plaintiff's deliberate indifference claims.

## B.    State Claims

In addition to his federal claims, Plaintiff raises several state law claims—specifically, negligence, battery, and intentional infliction of emotional distress. The Court will address each in turn.

### 1.    Negligence (Count 36)

Plaintiff claims that Defendants acted negligently for two reasons. First, the officers violated their duty to properly respond to Lofton's mental health crisis. Second, the officers violated their duty to exercise reasonable care when restraining Lofton. Defendants assert discretionary function immunity to each of these claims.

---

[45] *Spencer v. Abbott*, 731 F. App'x 731, 740 (10th Cir. 2017) (quoting *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)).

Under K.S.A. 75-6104(a)(5), governmental employees are not liable for damages resulting from "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty . . . whether or not the discretion is abused and regardless of the level of discretion involved."

The policies presented as evidence in this case clearly gave JIAC officers discretion to handle the youths' medical needs and use various levels of physical force and restraints as they saw fit. As to the youths' medical needs, JIAC Policy 8.804(E) provides: "if *in the opinion of the intake staff*, the youth needs immediate medical attention or psychiatric assessment, the intake staff shall refuse admission until the youth has been taken to a hospital emergency room or psychiatric unit and evaluated by a physician or other medical or mental health professional."[46] Moreover, JIAC Policy 8.804(G) says that whether the juvenile is "oriented to self, time, or place" is an "example[] . . . provided *only as a further guideline* to staff in making the decision to require a youth to receive medical attention."[47]

Thus, this policy did not require JIAC staff to take Lofton to a hospital. So, even if Stepien had known that Lofton was not oriented to self, time, or place as Plaintiff contends, the decision remained within the correction officers' discretion, nonetheless. And Kansas law protects those government employees from liability regardless of whether their discretion is abused.

As to the use of force, JIAC policy also gives staff wide discretion. Specifically, JIAC Policy 8.810(III)(A)–(C) allows various levels of physical force. Permissible force includes physical handling involving body positioning and passive restraint, mechanical restraints involving handcuffs and shackles, and use of the holding room to contain a youth whose behaviors

---

[46] Emphasis added.

[47] Emphasis added.

are out of control. Policy 8.810(IV) also allows JIAC officers to call for assistance from JDF staff if "a youth's behavior escalates to such a level that the designated lead staff believes additional help is needed to control the situation and restore order and safety." These procedures give JIAC staff broad discretion when forcibly restraining juveniles is required. Thus, even if Defendants abused their discretion, Kansas law shields those government employees from liability, nonetheless. As such, the Court grants Defendants' motion for summary judgment on Count 36.

> 2.   *Intentional Torts*

Defendants assert that they are entitled to discretionary function immunity on all of the state law claims against them. However, "[o]nly negligent or wrongful acts or omissions of employees are excepted from liability by 75-6104, while acts or omissions involving more than the lack of ordinary care and diligence are not."[48] Thus, Defendants are not entitled to immunity under K.S.A. 76-6104(a)(5) for intentional torts.[49] Accordingly, the Court will consider Defendants' other defenses and arguments when ruling on Plaintiff's battery and intentional infliction of emotional distress claims.

> a.   Battery (Count 38)

Under Kansas law, civil battery is "the unprivileged touching or striking of one person by another, done with the intent of bringing about either a contact or an apprehension of contact that is harmful or offensive."[50] Defendants do not dispute any of the battery elements. Rather, they

---

[48] *Martin Marietta Materials, Inc. v. Kan. Dep't of Transp.*, 953 F. Supp. 2d 1176, 1199 (D. Kan. 2013) (further citations and quotations omitted).

[49] *See Watson v. City of Kan. City*, 80 F. Supp. 2d 1175, 1197 (D. Kan. 1999) (stating that § 75-6104 does not provide immunity in claims involving intentional torts); *Burgess v. West*, 817 F. Supp. 1520, 1526 (D. Kan. 1993) (same).

[50] *McElhaney v. Thomas*, 307 Kan. 45, 405 P.3d 1214, 1219 (Kan. 2017) (further citations, quotations, and brackets omitted).

claim that their use of force was privileged under Kansas's self-defense statute, K.S.A. § 21-5231(a).

Section 21-5231(a) grants civil immunity to any person who uses force under the reasonable belief that such force is necessary to defend himself.[51] The statute also grants civil immunity to any person who uses deadly force under the reasonable belief that such force is necessary to prevent imminent death or great bodily harm to himself.[52]

Defendants claim that they reasonably believed that their use of force against Lofton was necessary to control and restrain him so that he would not physically harm the officers any more than he already had. However, Plaintiff argues that Defendants' use of force exceeded that which was reasonable and necessary to ensure the officers' safety. Moreover, Plaintiff claims that considering the circumstances—including Lofton's stature, that he was unarmed, and that the officers outnumbered him—Defendants could not have reasonably believe that they faced death or great bodily harm.

As the Court concluded in Section A, Plaintiff has raised a genuine issue of material fact regarding whether Defendants' actions were unreasonable. Thus, the Court cannot resolve the issues of reasonableness and necessity that K.S.A. § 21-5231(a) requires.[53] Without resolving these issues, the Court cannot determine whether the statutory self-defense privilege protects Defendants or not. Accordingly, the Court denies Defendants' motion for summary judgment on Count 38.

---

[51] K.S.A. § 21-5231(a) (citing K.S.A. § 21-5222(a)).

[52] *Id.* (citing K.S.A. § 21-5222(b)).

[53] *See Duc Minh Tran v. City of Lawrence*, 653 F. Supp. 3d 894, 910 (D. Kan. 2023) (refusing to resolve the self-defense privilege because the plaintiff raised a genuine issue of material fact as to whether the defendant had unreasonably used excessive force).

b.      Intentional Infliction of Emotional Distress (Count 40)

To succeed on an intentional infliction of emotional distress claim, the plaintiff must prove that (1) defendant's conduct was intentional or in reckless disregard of plaintiff; (2) the conduct was extreme and outrageous; (3) there was a causal connection between defendant's conduct and plaintiff's mental distress; and (4) plaintiff's mental distress was extreme and severe.[54] "The wrongdoer need not intend to cause the victim emotional distress. Rather, the tort requires that the intentional conduct so far exceed societal norms that it may be fairly characterized as exceptionally vile or reprehensible or utterly intolerable."[55]

Here, the parties do not dispute the first and fourth elements. Both sides agree that Defendants' conduct—placing Lofton in the prone position for about 40 minutes—was intentional. Additionally, they agree that Lofton suffered extreme and severe mental distress. However, the parties disagree over whether the officers' conduct was extreme and outrageous, and whether Lofton's mental distress predated the officers' restraint or was caused by the officers' restraint. The Court will address the causation element first, and then the extreme and outrageous element.

i.      Causal Connection

Defendants claim that because Lofton was already suffering a mental crisis before he arrived at JIAC, it is impossible to tell what, if any, additional emotional distress was caused by Defendants. Specifically, they argue that the degree to which Lofton's preexisting mental distress may have been caused or impacted by Defendants is a complex medical question that would not be apparent to a layperson. Thus, to answer this question, Defendants contend that Plaintiff must designate an expert witness to opine that Lofton's distress worsened or changed in some way at

---

[54] *Harte v. Bd. of Comm'rs*, 864 F.3d 1154, 1197 (10th Cir. 2017) (applying Kansas law).

[55] *Estate of Randolph v. City of Wichita*, 57 Kan. App. 2d 686, 719, 459 P.3d 802 (2020).

JIAC. But because the deadline for expert designations has passed, and Plaintiff did not designate an expert to opine on this very issue, Defendants claim that Plaintiff has no viable way of proving the causation element.

In contrast, Plaintiff contends that any reasonable person could conclude that the prolonged restraint, ultimately inducing cardiac arrest, caused increasingly more mental anguish than the mental crisis Lofton was suffering prior to his arrival at JIAC. Plaintiff contends that throughout the encounter, Lofton expressed heightened fears that others were there to kill him. And although the phycological autopsy concluded that Lofton suffered from some acute psychotic condition—likely schizophrenia—Lofton was not so "out of his mind" to have no understanding that he was being pinned to the ground by four corrections officers. As such, that experience exacerbated his mental health crisis. Thus, because any lay person could understand Lofton's mental or emotional distress, Plaintiff argues that he need not disclose an expert to testify.

For this claim, the Court is unconvinced that an expert is required to opine on causation. The purpose of an expert witness is to assist the jury in understanding the evidence or to determine facts in issue.[56] These witnesses are distinguishable from lay witnesses due to their special skills, knowledge, education, and training. Frankly, the Court is uncertain that requiring an expert to testify on causation would help the jury reach a conclusion that it would otherwise be unable to reach. It does not take a medical professional to understand that enduring the physical force of four adult officers to the point where the mind goes unconscious and heart stops beating would induce significant mental and emotional distress throughout the 40-minute process—regardless of a preexisting mental crisis. Consequently, the Court finds that Plaintiff's non-expert evidence could

---

[56] *Selvidge v. United States*, 160 F.R.D. 153, 155 (D. Kan. 1995).

demonstrate a causal connection between Defendants' use of force and Lofton's emotional distress.

ii.       Extreme and Outrageous Conduct

Next, Defendants argue that Lofton's resistance justified their use of force, and so the conduct was not extreme or outrageous. In contrast, Plaintiff contends that Lofton was not resisting, so continuing to hold him in the prone position for 40 minutes constituted extreme and outrageous conduct.

For a court to submit the outrage question to a jury, "it must first determine that a jury could find that a defendant's conduct might be regarded as extreme and outrageous and that plaintiff suffered such extreme distress that no reasonable person should be expected to endure it."[57]

Ultimately, genuine disputes of material fact regarding Lofton's ongoing struggle and the reasonableness of Defendants' actions preclude summary judgment on this claim. The Court cannot conclude that the officers' conduct was extreme or outrageous without resolving the preliminary questions of whether the officers placed significant pressure on Lofton's back and whether Lofton continually resisted restraint. Thus, since "reasonable men may differ" on this element of the analysis, "the question is for the jury to determine."[58] Accordingly, the Court denies Defendants' motion for summary judgment on Count 40.

---

[57] *Raisdana v. Wichita*, 1993 WL 302233, at *13 (D. Kan. July 23, 1993).

[58] *Harte v. Bd. of Comm'rs*, 864 F.3d 1154, 1197 (2017) (further citations and quotations omitted).

C.      **Abandoned Claims (Count 24 & 42)**

Plaintiff abandons his claim for supervisory liability against Defendants Stepien, Conklin, and Buckner, and he abandons his negligent infliction of emotional distress claim against each individual defendant.

"A plaintiff abandons [his] claim when [he] fail[s] to substantively respond to defendant's arguments. Complete abandonment of a claim occurs when the plaintiff fails to respond in any manner to defendant's argument."[59] Plaintiffs who completely abandon their claims are subject to the courts entering summary judgment against them.[60]

Here, Plaintiff completely abandoned his supervisory liability claim and his negligent infliction of emotional distress claim because he did not respond in any manner to Defendant's arguments. As such, the Court grants Defendants' motion for summary judgment on Counts 24 and 42.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (Doc. 196) is **GRANTED in part** and **DENIED in part**. The Court grants summary judgment on Counts 23–24, 36, and 42 but denies summary judgment on Counts 1–10, 38, and 40.

**IT IS SO ORDERED.**

Dated this 3rd day of October, 2024.


_Eric F. Melgren_
ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE

---

[59] *Cortishae-Etier v. Ford Motor Co.*, 2023 WL 5625311, at *3 (D. Kan. Aug. 31, 2023).

[60] *See Hinsdale v. City of Liberal, Kan.*, 19 F. App'x 749, 768 (10th Cir. 2001) (affirming district court's summary judgment against plaintiff's claim because plaintiff had "abandoned [the] claim by failing to address it in his response to defendants' motion for summary judgment").