IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MARQUAN TEETZ, as Next Friend and
Personal Representative of the ESTATE OF
CEDRIC LOFTON, deceased,

*Plaintiff*,

v.

JASON STEPIEN, et. al.,

*Defendants.*

Case No. 22-1134-EFM

**MEMORANDUM AND ORDER**

Before the Court are eight *Daubert* motions. Defendants Jason Stepien, Brenton Newby, Karen Conklin, William Buckner, and Benito Mendoza (collectively "Defendants") move to strike or exclude the opinions of Plaintiff's experts, including Dr. Jane Turner (Doc. 249), Dr. Alon Steinberg (Doc. 250), Jerome Davis (Doc. 251), and Dr. Michael Lyman (Doc. 252). Plaintiff moves to strike Defendants' experts, including Dr. Robert Bux (Doc. 253), Dr. Bill Geis (Doc. 254), Dr. Mark Kroll (Doc. 255), and Dr. Richard Hough (Doc. 256).

On December 8, 2025, the Court held a *Daubert* hearing during which the Court heard testimony from two of Defendants' experts and arguments from counsel on all eight experts. The Court made several rulings from the bench on most of the motions but reserved its ruling on the motions concerning Dr. Lyman and Dr. Kroll. This Order rules on those two motions and memorializes the Court's rulings on the remaining *Daubert* motions as detailed below.

## I.     Factual and Procedural Background[1]

On September 24, 2021, Wichita Police Department ("WPD") officers placed 17-year-old Cedric Lofton, a foster child, in a WRAP restraint device after Lofton resisted WPD officers' attempts to take him to the hospital for a mental health evaluation. WPD officers transported Lofton to the Sedgwick County Juvenile Intake and Assessment Center ("JIAC"). At JIAC, Lofton was released from the WRAP restraint and continued to exhibit symptoms of a mental health crisis, leading to a subsequent physical confrontation between Lofton and Defendants. Defendants, JIAC and Sedgwick County Juvenile Detention Facility ("JDF") officers, placed Lofton in a prone restraint and maintained the prone restraint for 35–40 minutes. At some point, Defendant Stepien called 911, Lofton became unconscious, and EMS arrived. EMS triaged Lofton as code blue (no pulse, no breathing), attempted life-saving measures, and transported Lofton to Wesley Medical Center. Lofton was pronounced dead two days later on September 26, 2021. Dr. Timothy Gorrill, the Sedgwick County District Coroner, performed an autopsy of Lofton and concluded that Lofton died because of complications of cardiopulmonary arrest sustained after physical struggle while restrained in the prone position.

The underlying circumstances surrounding Lofton's death, and the cause thereof, are the subject of eight experts' reports presently before the Court. Two of these experts' reports, Jerome Davis and Dr. Michael Lyman, were previously before the Court on Defendants' *Daubert* motions at the summary judgment stage.[2] The parties fully briefed the present matters, and the Court held a *Daubert* hearing on all eight experts on December 8, 2025.

---

[1] The Court previously documented the uncontroverted facts in this case at the summary judgment stage. *See Teetz ex rel. Lofton v. Stepien*, 2024 WL 4381342, at *1–5 (D. Kan. Oct. 3, 2024), *aff'd*, 142 F.4th 705 (10th Cir. 2025). Thus, the Court proceeds summarily with the facts here, which are taken from the Pretrial Order.

[2] *Teetz ex rel. Lofton v. Stepien*, 2024 WL 4381229, at *1 (D. Kan. Oct. 3, 2024).

## II.     Legal Standard

Federal Rule of Evidence 702 governs the admissibility of opinion testimony from witnesses qualified as experts by their knowledge, skill, experience, training, or education. Under Rule 702, expert opinion testimony is admissible to assist the fact finder in matters of scientific, technical, or otherwise specialized knowledge provided that such testimony (1) is based upon sufficient facts or data, (2) is the product of reliable principles and methods, and (3) the witness applied the principles and methods reliably to the facts of the case.[3] As these requirements demonstrate, the Court is charged as a gatekeeper to admit only expert testimony that is relevant and reliable.[4] Consideration of proffered expert testimony is a flexible inquiry, specific to the facts of the case at bar.[5] The party offering the expert testimony bears the burden of showing that the expert's testimony is admissible.[6]

## III.    Analysis

At the *Daubert* hearing, the Court first addressed Plaintiff's motions because Defendants presented witness testimony from two of their experts. Here, the Court addresses the motions in the order they were filed, beginning with Defendants' *Daubert* motions.

---

[3] Fed. R. Evid. 702.

[4] *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

[5] *Id.* at 593; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999) (rejecting formulaic application of reliability factors discussed in *Daubert* because "[t]oo much depends upon the particular circumstances of the particular case at issue").

[6] *Myrick v. Husqvarna Prof'l Prods.*, 508 F. Supp. 3d 846, 854 (D. Kan. 2020).

A.     **Defendants'** *Daubert* **Motions**

    *1.*     *Dr. Jane Turner*

First, Defendants move to strike the opinions of Dr. Jane Turner. Dr. Turner is forensic pathologist who conducted a second autopsy of Lofton, reviewed relevant evidence, and read Dr. Alon Steinberg's publications—one of Plaintiff's other experts. Defendants challenge Dr. Turner's opinions that (1) "it is far more likely than not that the extensive hemorrhaging in [Lofton]'s back and shoulders was the result of such significant force applied by [Defendants];" (2) "[t]he absence of offensive wounds . . . confirms [Lofton] was not the aggressor;" and (3) "the cause of Cedric Lofton's death is prone restraint with cardiac arrest."[7] The Court addresses the admissibility of each challenged opinion in turn.

Defendants argue that Dr. Turner's first opinion regarding the cause of Lofton's injuries is unreliable. Specifically, Defendants argue that Dr. Turner failed to adequately account for another potential cause: the altercation where WPD officers placed Lofton in a WRAP restraint to transport him to JIAC. Dr. Turner reviewed the body camera footage of the WRAP altercation and deposition transcripts of the WPD officers involved.[8] While Dr. Turner's report does not discuss the previous WRAP altercation in detail, her opinion attributing the cause of injuries to Defendants is not absolute, rather it is that Defendants are *more likely than not* the cause. The Court permits Dr. Turner to opine as such, and any deficiency in her consideration of the WRAP altercation may be sufficiently addressed in cross-examination.[9]

---

[7] Doc. 249, Ex. M at 3.

[8] *Id.* at 2.

[9] *See Daubert*, 509 US. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Next, Defendants argue that Dr. Turner's second opinion that Lofton was not the aggressor is directly contradicted by undisputed facts, pointing to video evidence that shows Lofton punching Defendant Stepien in the face. Plaintiff argues Defendants "cherry-pick" Dr. Turner's opinion, and that the full context of Dr. Turner's opinion demonstrates that Lofton was not resisting while in the prone restraint since he lacked the offensive wounds that would normally accompany such resistance. To that end, Dr. Turner may opine that the lack of offensive wounds is inconsistent with someone who is resisting. But because "an expert opinion cannot be based on facts that are contradicted by undisputed evidence,"[10] Dr. Turner may not opine that Lofton "was not the aggressor."

Lastly, Defendants argue that Dr. Turner's cause of death opinion lacks any reliable methodology because it relies solely on Dr. Steinberg's opinions and publications. As Plaintiff points out, an expert "may rely on the opinions of another expert if they inform or contribute to his own independent conclusion."[11] But an expert "may not simply parrot or recite the opinions and knowledge of other expert and fact witnesses."[12] Thus, the Court permits Dr. Turner to offer her cause of death opinion to the extent it is based on her own review of this case.

Overall, the Court grants in part and denies in part Defendants' motion regarding Dr. Turner's opinions according to the parameters discussed above.

2.   *Dr. Alon Steinberg*

Second, Defendants move to strike or exclude the opinions of Dr. Alon Steinberg. Dr. Steinberg is a cardiologist who has testified in matters concerning prone restraint death. Dr.

---

[10] *Doe v. Lewis Roca Rothgerber Christie LLP*, 2025 WL 2815641, at *4 (D.N.M. Sept. 30, 2025).

[11] *Ash Grove Cement Co. v. Emps. Ins. of Wausau*, 246 F.R.D. 656, 661 (D. Kan. 2017).

[12] *Id.*

Steinberg wrote an initial report for this case after reviewing various documents. Dr. Steinberg also wrote a rebuttal report after reviewing three of Defendants' experts' reports. Defendants challenge Dr. Steinberg's opinions that (1) concern the cause of Lofton's injuries and rebut Dr. Bux, Defendants' expert, on the issue; (2) rebut Dr. Geis, Defendants' expert; and (3) the delay in administering CPR contributed to Lofton's death.

The parties' briefing and the Court's rulings on other experts at issue largely moots Defendants' challenges to Dr. Steinberg. Plaintiff will not offer Dr. Steinberg to testify as to the cause of Lofton's injuries or to rebut Dr. Bux on that matter. Instead, Plaintiff offers Dr. Turner to make that opinion under the parameters of the Court's ruling above. Additionally, as explained below, the Court bars Dr. Geis from testifying in this case and, therefore, any rebuttal by Dr. Steinberg is unnecessary. Further, Plaintiff does not offer Dr. Steinberg to testify that the delay of administering CPR contributed to Lofton's death, so the Court bars Dr. Steinberg's causation opinion on this matter. Defendants indicate that whether Dr. Steinberg may discuss the delay of administering CPR generally will be the subject of a future motion in limine, but that is a question for another day. Thus, the Court grants Defendants' motion and bars Dr. Steinberg from offering his opinions challenged by Defendants' motion.

      3.    *Jerome Davis*

Third, Defendants move to strike or exclude the opinions of Jerome Davis. This is Defendants' second attempt to do so. Mr. Davis has over 30 years of working in correctional environments in both adult and juvenile facilities with expertise in use of force and restraints. After reviewing video footage and other documented evidence, Mr. Davis offers eight opinions in this case. Defendants challenge each opinion in Mr. Davis's report. Plaintiff concedes that Opinions

1–3, 5, and 7–8[13] are barred by the Court's previous ruling prohibiting experts from testifying to legal conclusions or are otherwise irrelevant to the remaining Defendants in this case. Plaintiff, however, asserts that Opinions 4 and 6 are admissible. The Court addresses the admissibility of these opinions in turn.

In Opinion 4, Mr. Davis opines that Defendant Stepien "unnecessarily aggressed Lofton."[14] Defendant argues that this opinion is simply a repackaged legal conclusion barred by the Court's previous ruling. The Court agrees and bars Mr. Davis from offering this opinion at trial.

In Opinion 6, Mr. Davis opines that "[t]he dangers associated with prone restraint were well known within the juvenile justice community" prior to the events underlying this case.[15] Defendants first argue Mr. Davis is unqualified to opine on the juvenile justice community's knowledge of prone restraint dangers because he is not a medical doctor. Mr. Davis, however, does not opine on whether such knowledge is medically accurate. Next, Defendants argue that Mr. Davis does not sufficiently tie the juvenile justice community's general knowledge to Defendants' personal knowledge, rendering his opinion unhelpful to the jury. But Mr. Davis's opinion will help the jury determine what Defendants may or may not have known as members of the juvenile justice community and evaluate their credibility. Lastly, Defendants argue that Mr. Davis's testimony alludes to claims that are no longer a part of this case and will mislead the jury. But the claims

---

[13] When discussing Opinion 7 at the *Daubert* hearing, Plaintiff seemingly argued that he should be able to offer Mr. Davis's opinions on Defendants' training (or lack thereof) and indicated such argument may be the subject of a future motion in limine. Opinion 7, however, largely goes to Plaintiff's failure-to-train claim against Sedgwick County, which the Court previously dismissed. *See Teetz v. Bd. of Cnty. Comm'rs of Sedgwick Cnty., Kan.*, 2023 WL 7698030, at *6–10 (D. Kan. Nov. 15, 2023). Plaintiff concedes as much in his written response. *See* Doc. 263 at 6 ("Plaintiff's failure to train claim against [Sedgwick] County was dismissed by the Court on the pleadings, and, therefore, is not at issue in trial. Accordingly, Plaintiff will not be offering Mr. Davis for this opinion at trial."). Thus, the Court bars Mr. Davis from offering Opinion 7 at trial.

[14] Doc. 251, Ex. A at 9.

[15] *Id.* at 10.

remaining against Defendants necessarily require the jury to determine what a reasonable officer would have done in this case; Mr. Davis's opinions speak to this inquiry. Thus, the Court permits Mr. Davis to offer Opinion 6.

Overall, the Court grants in part and denies in part Defendants' motion regarding Mr. Davis's opinions according to the parameters discussed above.

    4.    *Dr. Michael Lyman*

Finally, Defendants move to strike or exclude the opinions of Dr. Michael Lyman. This is Defendants' second attempt to do so. Dr. Lyman holds a Ph.D. in Higher and Adult Education, is a former law enforcement agent, and has expertise in police procedures. He offers testimony about national standards on prone restraint use and that Defendants' use of the prone restraint violated JIAC policy. Defendants challenge Dr. Lyman's opinions for various reasons. The Court addresses each of Defendants' reasons in turn.

Defendants first challenge Dr. Lyman's qualification to testify to national standards in this case, arguing his expertise lies in policing, not juvenile corrections. But Dr. Lyman has significant expertise on police use of force generally and has been permitted to testify in numerous cases on corrections practices. Defendants do not identify any meaningful difference between standards on prone restraint use in a corrections setting versus prone restraint use in a general policing setting. Thus, Defendants' challenge to Dr. Lyman fails on this ground.

Defendants also challenge Dr. Lyman's opinion for lacking adequate foundation because his opinions are largely grounded on the International Association of Chiefs of Police non-binding, model policy and an advocacy piece. Defendants also point to Dr. Lyman's deposition testimony where he declares that the prone restraint is banned "everywhere," but could only name two specific jurisdictions. While the support Dr. Lyman's opinions rely on may be shaky, any

deficiencies can be sufficiently challenged on cross-examination. Accordingly, the Court permits Dr. Lyman to offer his opinions on national standards. The Court, however, bars Dr. Lyman from testifying to any impermissible legal conclusions or that Defendants violated JIAC policy and national standards.

Overall, the Court grants in part and denies in part Defendants' motion regarding Dr. Lyman's opinions according to the parameters discussed above.

**B.    Plaintiff's *Daubert* Motions**

*1.    Dr. Robert Bux*

Turning to Plaintiff's *Daubert* Motions, Plaintiff first moves to strike the opinions of Dr. Robert Bux. Dr. Bux is a board-certified pathologist and M.D. whose report discusses "excited delirium."[16] Excited delirium "is broadly defined as a state of agitation, excitability, paranoia, aggression, and apparent immunity to pain, often associated with stimulant use and certain psychiatric disorders."[17] Defendants seek to offer Dr. Bux's opinion that Lofton was in a state of excited delirium at JIAC based on Lofton's exhibitions of continual resistance, extreme strength, hyper-aggression, and profuse sweating. Plaintiff moves to exclude Dr. Bux's opinion for various reasons. The Court addresses each of Plaintiff's reasons in turn.

Plaintiff begins by arguing that excited delirium is a controversial medical opinion that is not accepted by the medical community, citing the American Medical Association, World Health Organization, and the American Psychiatric Association, amongst others, as not recognizing it. While these entities may not recognize excited delirium, it has been recognized and supported

---

[16] *See* Doc. 253, Ex. 1 at 7–10.

[17] *Mann v. Taser Int'l., Inc.*, 588 F.3d 1291, 1299 n.4 (11th Cir. 2009).

elsewhere within the scientific community for years.[18] Several courts have permitted testimony about excited delirium despite its controversial nature.[19] Thus, Plaintiff's arguments on the controversy surrounding excited delirium are better suited for cross-examination over exclusion.[20]

Similarly, Plaintiff's argument that Dr. Bux's opinion is unreliable because this case does not involve the use of illicit drugs is also better suited for cross-examination. Defendants concede that excited delirium cases often involve the use of illicit drugs and there was no evidence that Lofton used illicit drugs. But Defendants point out that excited delirium can also involve individuals suffering from severe mental health issues and crises. There are several witness observations of Lofton's erratic behavior, and Plaintiff himself asserts that Lofton was undoubtedly suffering a mental health crisis at JIAC. Excited delirium in such cases may be rare but are not without scientific support. Plaintiff may sufficiently challenge Dr. Bux's opinion as novel on cross-examination.

Lastly, Plaintiff lodges several critiques against Dr. Bux's methodology as applied to this case, all of which are better suited for cross-examination over exclusion. Plaintiff argues that Dr. Bux inconsistently testifies as to what characteristics must be present to diagnose excited delirium, but his testimony on what characteristics Lofton exhibited is largely consistent with medical

---

[18] Plaintiff concedes that excited delirium has past support but argues that there is a trend in the law departing from it. This trend, however, largely seems to be a departure from using terminology associated with excited delirium, in various contexts, not a departure from recognizing it as a valid diagnosis or syndrome. *See* Int'l Ass'n of Chiefs of Police; *Excited Delirium* 1 n.1 (2017); *see also* James R. Gill, *The Cancelling of Excited Delirium*, 45 Am. J. Forensic Med. & Pathology 98, 100 (2024).

[19] *Todero v. Blackwell*, 2021 WL 4472550, at *2 (S.D. Ind. Sept. 30, 2021) (collecting cases).

[20] Indeed, while Plaintiff discusses at length the controversy surrounding excited delirium in his written motion, Plaintiff does not explicitly move to strike Dr. Bux on this ground. *See* Doc. 253 at 12 ("[A]ccepting for present purposes that excited delirium is theoretically appropriate in *some* cases, Dr. Bux's methodology here is not reliable and not reliably applied to the facts of this case." (emphasis in original)).

literature supporting a diagnosis of excited delirium.[21] Plaintiff also argues Dr. Bux lacks foundational support for the characteristics he identified Lofton exhibited, but Dr. Bux permissibly relied on witness testimony and video footage at the scene to reach these conclusions.[22] Further, Plaintiff argues that Dr. Bux failed to properly rule out the prone restraint itself as a cause of death, but Dr. Bux explains why he concludes the prone restraint did not cause Lofton's death in his report.[23] Thus, the Court permits Dr. Bux to offer his cause of death opinion, and any deficiencies in methodology or foundation may be sufficiently addressed on cross-examination. Accordingly, the Court denies Plaintiff's motion as to Dr. Bux.

    2.    *Dr. Bill Geis*

Second, Plaintiff moves to strike the opinions of Dr. Bill Geis. Dr. Geis is a clinical psychologist and conducted a psychological autopsy of Lofton. A psychological autopsy is a post-mortem investigative procedure where an expert examines the decedent's medical records and interviews persons who interacted with the decedent before death to reconstruct the decedent's psychological state prior to death.[24] Dr. Geis reviewed Lofton's post-mortem medical records, depositions of Lofton's family members and the individual Defendants, and relevant video footage to reconstruct Lofton's psychological state prior to his death. In his report, Dr. Geis opines in Opinion 1 that Lofton "was suffering from an acute psychotic condition," showed signs of "the emergence of the mental illness schizophrenia," and that the most appropriate diagnosis of Lofton

---

[21] *See* Phillipe Gonin et al., *Excited Delirium: A Systematic Review*, 25 Acad. Emergency Med. 552, 561 (2018) ("The criteria most frequently cited are hyperaggressive behavior with superhuman strength and a combative attitude toward the police, hyperactivity, bizarre behaviors, unusual pain tolerance, and hyperthermia. However, *these criteria do not occur with equal frequency and none of them appear to be mandatory*." (emphasis added)).

[22] *See* Fed. R. Evid. 703 ("An expert may base on opinion on facts or data in the case that the expert has been made aware of or has personally observed").

[23] Doc. 253, Ex. 1 at 12–13.

[24] *See Bevan v. Valencia*, 2018 WL 3187356, at *5 (D.N.M. June 28, 2018) (citation omitted).

would be "Schizophreniform Disorder" based on the length of Lofton's symptoms.[25] In Opinion 2, Dr. Geis opines that Lofton's "state of exhaustion and adrenalin overload must be considered when assessing the cause of death."[26] Plaintiff largely challenges Dr. Geis's opinions as based on an unreliable methodology under Rule 702(c) and (d).

But Dr. Geis's opinions are primarily flawed under Rule 702(a) because neither will "assist the trier of fact to understand the evidence or determine a fact in issue."[27] As for Opinion 1, there is no dispute that Lofton was suffering from a mental health crisis at the JIAC facility. Defendants conceded at the *Daubert* hearing that labeling this crisis as "an acute psychotic condition," "schizophrenia," or "Schizophreniform Disorder" makes no material difference. Thus, Opinion 1 is simply not helpful. The same is true for Opinion 2. Telling the jury that Lofton's exhaustion and adrenalin overload must be considered when evaluating cause of death tells the jury nothing, particularly when other experts in this case considered these factors to evaluate Lofton's cause of death and the jury will generally be instructed to consider all the evidence presented in making its factual findings. Accordingly, the Court grants Plaintiff's motion and excludes Dr. Geis from testifying.

### 3.    *Dr. Mark Kroll*

Third, Plaintiff moves to strike the opinions of Dr. Mark Kroll. Dr. Kroll is a biomedical scientist who has authored dozens of peer-reviewed articles on chest compression, resuscitation, and restraint physiology, including the prone restraint. Dr. Kroll offers several opinions based on the evidence in this case. Primarily, he opines that Defendants' use of the prone restraint did not

---

[25] Doc. 254, Ex. 1 at 27.

[26] *Id.*

[27] Fed. R. Evid. 702(a).

contribute to Lofton's death. Plaintiff challenges Dr. Kroll's opinions for various reasons. The Court addresses each of Plaintiff's reasons in turn.

        a.        Plaintiff's Challenges to Dr. Kroll's Opinions as Contrary to Law and Based on Irrelevant Studies

Plaintiff first moves to strike Dr. Kroll entirely, arguing his opinions are contrary to law. Expert opinions contrary to law are generally inadmissible and should be excluded.[28] Plaintiff's argument that Dr. Kroll's opinions are contrary to law lie in the Tenth Circuit's appellate ruling affirming the Court's denial of qualified immunity to Defendants at the summary judgment stage.[29] Given the procedural posture of the case, the Tenth Circuit viewed the evidence in the light most favorable to Plaintiff as the non-moving party.[30] Plaintiff cites several statements from the Tenth Circuit's opinion:

> Indeed, the use of a prolonged prone restraint after a defendant is subdued constitutes deadly force which is justified only in limited circumstances under our precedent.[31]

> While we conclude that Mr. Teetz has met his burden to show a constitutional violation, it is also true that the use of the prone restraint under these circumstances constituted deadly force.[32]

> [A]lthough the limited use of a prone restraint to obtain control of a suspect can be proper police procedure, we have long recognized that prone restraints can constitute deadly force if prolonged.[33]

---

[28] *See Southard v. United Reg'l Health Care Sys., Inc.*, 2008 WL 4489692, at *2 (N.D. Tex. Aug. 5, 2008) ("[W]here . . . the expert's opinion is based on an erroneous legal premise, it is appropriate to exclude such testimony."); *see also Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 806 (N.D. Ill. 2005) ("Expert opinions that are contrary to law are inadmissible.").

[29] *Teetz*, 142 F.4th at 731.

[30] *Id.* at 719.

[31] *Id.* at 722.

[32] *Id.* at 725.

[33] *Id.* at 726.

> A reasonable officer would have been on notice that continued application of pressure after Mr. Lofton was subdued created a serious risk of asphyxiation and death, even if he was still verbalizing threats. Under those circumstances, it is clearly established that a continued prone restraint is unconstitutional.[34]

Here, Mr. Kroll's opinions are not so contrary to the Tenth Circuit to be inadmissible. Although the Tenth Circuit may have held that the prone restraint here constituted deadly force, it did not go so far to hold that Defendants' use of the prone restraint *caused* Lofton's death or his injuries. Nor could the Tenth Circuit do so, considering the procedural posture of the case. Thus, Dr. Kroll's opinion that the prone restraint did not contribute to Lofton's death does not contravene the Tenth Circuit. Additionally, the Tenth Circuit's conclusion that Defendants' prolonged use of the prone restraint was unreasonable and unconstitutional is contingent on the jury's determination of the length of Lofton's resistance, which is a material dispute in this case.[35] And whether Defendants placed substantial or significant pressure to Lofton's back is also a material dispute the jury must resolve.[36] Thus, Dr. Kroll's opinions regarding these material disputes do not contravene Tenth Circuit precedent.

However, the Court cautions Defendants in light of the Tenth Circuit's rulings. Dr. Kroll has opinions he can offer that are not incompatible with those rulings, but those opinions require skillful precision. He must be cautious that his testimony not vary from the Tenth Circuit's actual precedential statements regarding prone restraint, including its rulings in this very case. Should

---

[34] *Id.* at 731.

[35] *See id.* at 728–29 ("[T]he jury *could find* that Defendants imposed a prone restraint for as much as thirty minutes, during which stagnant moments for as long as twelve minutes indicate Mr. Lofton had ceased resisting. Under those facts, *if proved*, the use of deadly force was unreasonable and unconstitutional." (internal quotation marks and emphasis omitted) (emphases added)).

[36] *Id.* at 716, 718 (noting this Court's finding of a material factual dispute regarding the amount of weight Defendants placed on Lofton).

Dr. Kroll's opinions at trial stray beyond those parameters, Defendants risk the Court's at-trial reconsideration of this ruling.

Additionally, the Court will not permit Dr. Kroll to offer his opinion on the "media myth" of prone restraint dangers to the extent it relies on studies conducted on COVID-19 patients. These studies are irrelevant to the situation in this case, which involved a healthy 17-year-old, not a patient suffering from COVID-19 related pneumonia. Dr. Kroll's opinion lacks an analysis or an explanation on how these studies apply to Lofton. Thus, the Court bars Dr. Kroll from offering his opinion that prone restraint dangers are a "myth" as based on these irrelevant studies.

      b.  Plaintiff's Challenges to Dr. Kroll's Qualifications and Helpfulness

Plaintiff next argues that Dr. Kroll is unqualified to opine that the prone restraint did not contribute to or otherwise cause Lofton's death because he is not a medical doctor. Lacking a medical degree, however, does not automatically render Dr. Kroll unqualified so long as he has the requisite experience and knowledge to form his opinions. Dr. Kroll is a biomedical scientist, has authored dozens of peer-reviewed articles on chest compression and restraint physiology, and bases his opinion on decades of research on how external forces affect breathing and cardiac function. Other courts have found Dr. Kroll is sufficiently qualified to offer similar lack of causation opinions as within his expertise.[37] Dr. Kroll's opinion that the prone restraint did not contribute to Lofton's death is well within his expertise. Thus, the Court permits Dr. Kroll to offer this opinion.

---

[37] *See, e.g.*, *Estate of Carlock v. Wiliamson*, 2012 WL 75765, at *2–3 (C.D. Ill. Jan. 10, 2012) (permitting Dr. Kroll to opine on the physical effects on prone restraint despite lacking a medical degree); *Silva v. Chung*, 2019 WL 2195201, at *4–5 (D. Haw. May 21, 2019) (collecting cases); *but see Lackey v. City of Wilson*, 2024 WL 21594, at *2 (E.D. Okla. Jan. 2, 2024) (excluding Dr. Kroll from testifying because "Defendants have not carried their burden to show that Dr. Kroll's Opinions are admissible by a preponderance of the evidence.").

Plaintiff's remaining challenges to Dr. Kroll attack his qualifications to testify to certain opinions or his helpfulness to the jury in doing so. The Court addresses these challenges summarily below:

- The Court bars Dr. Kroll from discussing compression asphyxia and flail chest as irrelevant to the facts of this case.

- The Court permits Dr. Kroll to discuss how there was no genetic testing for channelopathy related mutations because it is relevant rebuttal material to Plaintiff's cause of death theory.

- The Court permits Dr. Kroll to offer opinions based on his factual assumptions regarding the amount of time Lofton was in the prone restraint—uncuffed and cuffed—so long as he clearly represents these opinions are based on his personal understanding of the facts.

- The Court bars Dr. Kroll from offering his opinions that "the prone restraint of Mr. Lofton was necessary for handcuffing" and that "[t]he JIAC/JDF officers had Mr. Lofton in the safest position he could be in given the circumstances" as police practices opinions are beyond his expertise.

- The Court permits Dr. Kroll to offer his opinion on Defendant Newby's use of the wall as within his expertise, so long as he clearly represents this opinion is based on his personal understanding of the facts.

- The Court permits Dr. Kroll to offer his opinion that "[t]he homicide manner of death opinion is largely arbitrary" as within his expertise based on his recent, peer-reviewed study on homicide manner of death rulings.

Overall, the Court grants in part and denies in part Plaintiff's motion regarding Dr. Kroll according to the parameters discussed above.

4. *Dr. Richard Hough*

Finally, Plaintiff moves to strike opinions of Dr. Richard Hough. Dr. Hough holds a Ph.D. in Education and has expertise in police and corrections practices. Dr. Hough offers 19 opinions in this case. Plaintiff's written motion attacks Dr. Hough's opinions in two ways: (1) Opinion 12 is unreliable and unhelpful; and (2) Dr. Hough, as a non-medical doctor, is unqualified to discuss or opine on medical issues. At the *Daubert* hearing, the Court asked Plaintiff to clarify which

opinions he believed Dr. Hough is unqualified to offer. Plaintiff identified Opinions 1–3 and 15. The Court addresses the admissibility of each challenged opinion in turn.

The parties conceded that Opinions 1–2 are irrelevant to this case at the *Daubert* hearing. Thus, the Court bars Dr. Hough from offering Opinions 1–2.

In Opinion 3, Dr. Hough opines that "the designation of homicide by a medical examiner is not synonymous with legal terminology that connotes criminal intent or negligence."[38] The Court concludes Dr. Hough is sufficiently qualified to opine as such based on his significant experience and expertise in law enforcement practices.

In Opinion 12, Dr. Hough opines that Defendants' restraint of Lofton was "reasonable" based on the circumstances.[39] Plaintiff attacks this opinion as unreliable and unhelpful, but the parties conceded Opinion 12 is an impermissible legal conclusion at the *Daubert* hearing. Thus, the Court bars Dr. Hough from offering Opinion 12.

Overall, the Court grants in part and denies in part Plaintiff's motion regarding Dr. Hough's opinions according to the parameters discussed above.

**IT IS THEREFORE ORDERED** that Defendants' Motion to Strike or Exclude Opinions of Dr. Jane Turner (Doc. 249) is **GRANTED in part and DENIED in part**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Strike or Exclude Opinions of Dr. Alon Steinberg (Doc. 250) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Strike or Exclude Opinions of Jerome Davis (Doc. 251) is **GRANTED in part and DENIED in part**.

---

[38] Doc. 256, Ex. 1 at 20.

[39] *Id.* at 22.

**IT IS FURTHER ORDERED** that Defendants' Motion to Strike or Exclude Opinions of Dr. Michael D. Lyman (Doc. 252) is **GRANTED in part and DENIED in part**.

**IT IS FURTHER ORDERED** that Plaintiff's *Daubert* Motion to Strike Defense Expert Robert M. Bux, M.D. (Doc. 253) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's *Daubert* Motion to Strike Defense Expert Bill D. Geis, Ph.D. (Doc. 254) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's *Daubert* Motion to Strike Defense Expert Mark Kroll, Ph.D. (Doc. 255) is **GRANTED in part and DENIED in part**.

**IT IS FURTHER ORDERED** that Plaintiff's *Daubert* Motion to Strike Defense Expert Richard Hough (Doc. 256) is **GRANTED in part and DENIED in part**.

**IT IS SO ORDERED.**

Dated this 15th day of December, 2025.

*/s/ Eric F. Melgren*
ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE